11 CV 9175

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) CIVIL ACTION NO. ) ) |
| Plaintiff, | ) ) |
| vs. | ) CLASS ACTION COMPLAINT ) |
| THE BANK OF NEW YORK MELLON CORPORATION, ROBERT P. KELLY, BRUCE W. VAN SAUN, THOMAS P. GIBBONS, MICHAEL K. HUGHEY, JOHN A. PARK, RUTH E. BRUCH, NICHOLAS M. DONOFRIO, STEVEN G. ELLIOTT, GERALD L. HASSELL, EDMUND F. KELLY, RICHARD J. KOGAN, MICHAEL J. KOWALSKI, JOHN A. LUKE, JR., ROBERT MEHRABIAN, MARK A. NORDENBERG, CATHERINE A. REIN, WILLIAM C. RICHARDSON, SAMUEL C. SCOTT III, JOHN P. SURMA, WESLEY W. VON SCHACK, BARCLAYS CAPITAL INC., BNY MELLON CAPITAL MARKETS, LLC, CITIGROUP GLOBAL MARKETS INC., GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MORGAN STANLEY & CO. INCORPORATED and UBS SECURITIES LLC, | ) ) ) ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Plaintiff, Louisiana Municipal Police Employees' Retirement System ("Plaintiff" or "LAMPERS"), alleges the following based upon Plaintiff's personal knowledge as to itself and the investigation of Plaintiff's counsel, which included, among other things, a review of The Bank of New York Mellon Corporation's ("BNY Mellon" or the "Company") public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BNY Mellon, *qui tam and*

1

Attorneys General actions against BNY Mellon, and securities analysts' reports and advisories about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of the common stock of BNY Mellon who purchased or otherwise acquired BNY Mellon common stock between February 28, 2008 and August 11, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  This action also asserts claims on behalf of purchasers of the Company's common stock pursuant or traceable to BNY Mellon's public offerings on or about May 11, 2009 and June 3, 2010, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      BNY Mellon, which was formed in July 2007 through a merger of The Bank of New York Company, Inc. ("BNY") and Mellon Financial Corporation ("Mellon"), is a financial services company that provides various products and services for institutions and individuals worldwide.  With approximately $25 trillion in assets under custody and administration, BNY Mellon is one of the largest custodial banks in the world and counts among its custodial clients some of the country's largest institutional investors, including financial institutions, states, cities, colleges, universities, foundations, non-profit religious organizations, and pension funds.  On behalf of these clients, BNY Mellon provides a variety of services to safeguard, maintain and manage their assets, including settlement of any purchases and sales of securities and currency, maintaining currency/cash bank accounts, effecting deposits and withdrawals and managing other cash transactions, and performing foreign currency exchange ("FX") transactions.  In

performing this role, BNY Mellon served in a fiduciary capacity and was obligated to act in the best interests of its custodial clients.

3.      Throughout the Class Period, and unbeknownst to its investors, BNY Mellon and certain of its executive officers issued a series of false and misleading statements, and omitted to disclose material information, regarding the Company's use of fraudulent practices to artificially inflate BNY Mellon's reported financial results, including by artificially increasing BNY Mellon's FX revenue, and misled investors regarding the sustainability and reasons behind the profitability of this critical line of business.   While BNY Mellon's FX trading services were offered to clients as purportedly "free of charge," in truth, BNY Mellon rigged the pricing of its FX transactions in order to reap illicit profits.

4.      Details about the Company's deceptive practices began to surface in January 2011 after two whistleblower (or *qui tam*) lawsuits against BNY Mellon were unsealed in Virginia and Florida.[1]   The *qui tam* actions alleged that BNY Mellon charged custodial clients executing "indirect" FX trades (also known as "standing instruction" trades) manipulated FX rates that were set after BNY Mellon converted U.S. dollars into foreign funds or vice versa.  Further, the charged FX rates bore no relationship to the prevailing market or Interbank rates at the time the trades were executed, and were selected after the fact by BNY Mellon solely to maximize the Company's fees.

5.      As detailed herein, the unsealed *qui tam* lawsuits were followed by a series of articles and investigative reports about the Company's illicit practices.

---

[1]      *See Commonwealth of Virginia, ex rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. CL-2009-15377 (Va. Cir. unsealed Jan. 21, 2011) (the "Virginia Action") and *State of Florida, ex rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. 2009-ca-4140 (Fla. Cir. unsealed Feb. 7, 2011) (the "Florida Action").

6.      On August 11, 2011, the Virginia Attorney General filed a Complaint in Intervention against BNY Mellon, and therein cited to numerous internal emails among BNY Mellon executives where they discussed the negative impact of providing clients "transparency" on FX fees and the impact that this would have on the Company's profitability.

7.      As a result of these disclosures, BNY Mellon's common stock has declined over 37 percent from the date the first *qui tam* action became public through the end of the Class Period.  The decline is directly attributable to the market absorbing previously undisclosed information about the Company's fraudulent FX practices.

8.      The Company is also the target of numerous other government actions.  For example, on October 4, 2011 (after the close of the Class Period), the New York Attorney General filed an action against BNY Mellon seeking $2 billion in damages for the Company's FX related conduct.[2]  On the same day that the New York Attorney General's Action was filed, the U.S. Department of Justice ("DOJ") filed a civil fraud action against BNY Mellon.[3]  BNY Mellon is also the subject of an investigation by the SEC and other regulatory authorities.

9.      The Company's trading revenues were significant and amounted to approximately $3.3 billion during the Class Period.  The DOJ estimates that approximately 69% of BNY Mellon's profits from FX trading may have resulted from the scheme set forth herein.

10.      Throughout the Class Period, defendants concealed and failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, BNY Mellon failed to disclose or indicate that the Company:  (1) manipulated FX

---

[2]      *The People of the State of New York v. The Bank of New York Mellon Corp.*, Index No. 09-114735 (N.Y. Super. filed Oct. 4, 2011) (the "New York AG Action").

[3]      *United States of America v. The Bank of New York Mellon Corp.*, No. 11-cv-06969-LAK (S.D.N.Y. filed Oct. 4, 2011).

trades to extract illicit profits from its custodial clients; (2) engaged in unlawful practices to artificially increase its FX fee revenue; (3) presented a misleading picture of the Company's business model and its actions taken to earn FX fee revenue; (4) failed to inform investors that withholding full transparency from its clients was critical to maintaining the profitability of its FX program; and (5) lacked adequate internal and financial controls. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock following disclosures of BNY Mellon's previously undisclosed FX trading scheme, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o), and Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13.    Venue is proper in this District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, BNY Mellon's principal executive offices are located within this District.

14.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

**PARTIES**

15.     Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS") is a defined benefit pension fund and retirement system created for the purpose of providing retirement allowances and other benefits for full-time municipal police officers and employees in the State of Louisiana, secretaries to chiefs of police, and employees of the system. As set forth in the accompanying certification, incorporated by reference herein, LAMPERS purchased BNY Mellon common stock at artificially inflated prices during the Class Period and has been damaged thereby.

16.     Defendant BNY Mellon is a Delaware corporation with its principal executive offices located at One Wall Street, New York, New York.

17.     Defendant Robert P. Kelly ("Kelly") was BNY Mellon's Chairman and Chief Executive Officer ("CEO") from 2007 until he resigned on August 31, 2011.

18.     Defendant Bruce W. Van Saun ("Van Saun") was BNY Mellon's Chief Financial Officer ("CFO") from 2007 until July 1, 2008.

19.     Defendant Thomas P. Gibbons ("Gibbons") became BNY Mellon's CFO on July 1, 2008, and continues to serve in this position.  Prior to the merger of BNY and Mellon, Gibbons was the CFO of BNY.

20.     Defendant Michael K. Hughey ("Hughey") was the Company's Controller from 2007 until May 1, 2008.  Prior to the merger of BNY and Mellon, Hughey served as the Controller of Mellon and Mellon Bank.

21.     Defendant John A. Park ("Park") became the Company's Controller on May 1, 2008, and continues to serve in this position.

22.    Defendants Kelly, Van Saun, Gibbons, Hughey and Park are collectively referred to as the "Officer Defendants."  The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BNY Mellon's reports filed with the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Officer Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Officer Defendants.

23.    Defendant Ruth E. Bruch ("Bruch") has been a member of BNY Mellon's Board of Directors since 2007.

24.    Defendant Nicholas M. Donofrio ("Donofrio") has been a member of BNY Mellon's Board of Directors since 2007.

25.    Defendant Steven G. Elliott ("Elliott") was a member of BNY Mellon's Board of Directors from 2007 until July 31, 2008.  Elliott was also a senior vice chairman of BNY Mellon from 1998 until December 30, 2010.

26.    Defendant Gerald L. Hassell ("Hassell") has been a member of BNY Mellon's Board of Directors since 2007.

27.     Defendant Edmund F. Kelly ("E. Kelly") has been a member of BNY Mellon's Board of Directors since 2007.

28.     Defendant Richard J. Kogan ("Kogan") has been a member of BNY Mellon's Board of Directors since 2007.

29.     Defendant Michael J. Kowalski ("Kowalski") has been a member of BNY Mellon's Board of Directors since 2007.

30.     Defendant John A. Luke, Jr. ("Luke") has been a member of BNY Mellon's Board of Directors since 2007.

31.     Defendant Robert Mehrabian ("Mehrabian") was a member of BNY Mellon's Board of Directors from 2007 until April 12, 2011.

32.     Defendant Mark A. Nordenberg ("Nordenberg") has been a member of BNY Mellon's Board of Directors since 2007.

33.     Defendant Catherine A. Rein ("Rein") has been a member of BNY Mellon's Board of Directors since 2007.

34.     Defendant William C. Richardson ("Richardson") has been a member of BNY Mellon's Board of Directors since 2007.

35.     Defendant Samuel C. Scott III ("Scott") has been a member of BNY Mellon's Board of Directors since 2007.

36.     Defendant John P. Surma ("Surma") has been a member of BNY Mellon's Board of Directors since 2007.

37.     Defendant Wesley W. von Schack ("van Schack") has been a member of BNY Mellon's Board of Directors since 2007.

38.   Defendants Bruch, Donofrio, Elliott, Hassell, E. Kelly, Kogan, Kowalski, Luke, Mehrabian, Nordenberg, Rein, Richardson, Scott, Surma and von Schack are collectively referred to as the "Director Defendants."

39.   The Officer Defendants and the Director Defendants are collectively referred to hereinafter as the "Individual Defendants."

40.   Defendant Barclays Capital Inc. ("Barclays") was an underwriter of BNY Mellon's May 11, 2009 common stock offering.

41.   Defendant BNY Mellon Capital Markets, LLC ("BNY Mellon Capital") was an underwriter of BNY Mellon's May 11, 2009 common stock offering.  BNY Mellon Capital is a subsidiary of BNY Mellon.

42.   Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of BNY Mellon's May 11, 2009 and June 3, 2010 common stock offerings.

43.   Defendant Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter of BNY Mellon's May 11, 2009 and June 3, 2010 common stock offerings.

44.   Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of BNY Mellon's May 11, 2009 and June 3, 2010 common stock offerings.

45.   Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") was an underwriter of BNY Mellon's May 11, 2009 and June 3, 2010 common stock offerings.

46.   Defendant UBS Securities LLC ("UBS") was an underwriter of BNY Mellon's May 11, 2009 common stock offering.

47.   Defendants Barclays, BNY Mellon Capital, Citigroup, Goldman Sachs, Merrill Lynch, Morgan Stanley and UBS are collectively referred to hereinafter as the "Underwriter Defendants."  The Underwriter Defendants underwrote BNY Mellon's May 11, 2009 and/or June

3, 2010 common stock offerings, which were conducted pursuant to materially false and misleading offering materials, and are charged with violations of the Securities Act in their capacity as underwriters for such offerings.

## SUBSTANTIVE ALLEGATIONS

### Background

48.    BNY Mellon was formed in July 2007 through a merger of BNY and Mellon. BNY Mellon is a financial services company that provides various products and services for institutions and individuals worldwide.  The Company's U.S. bank subsidiaries engage in trust and custody activities, investment management services, banking services, and various securities-related activities.  Among other services, BNY Mellon (through its subsidiary The Bank of New York Mellon) serves as a custodian for several of the world's largest institutional investors.  For fiscal 2010, BNY Mellon reported total revenues of $13.8 billion and $25 trillion in assets under custody – making BNY Mellon the "world's largest global custodian."

49.    Institutional investors and asset managers utilize BNY Mellon's custody services for multicurrency trading and settlements, accounting, portfolio servicing and reporting, corporate actions, and income collection.  Custodial clients typically invest in multiple securities of foreign issuers, and as such, must convert U.S. dollars ("USD") into foreign currencies to purchase these overseas securities.  Additionally, foreign dividends and currencies must be converted into USD before being repatriated to the United States.  BNY Mellon offers FX trading services to its custodial clients as a component of its custodial/trust services.

50.    BNY Mellon primarily reports revenue from "foreign exchange and other trading activities" in its "Asset Servicing" segment.  According to the Company's publicly filed documents, BNY Mellon's foreign exchange and other activities generated revenues of $786

million in 2007, "a record $1.5 billion" in 2008, approximately $1 billion in 2009, and $886 million in 2010 for the Company.

51.     Custodial clients' FX trading can be broken down into two basic categories: "Direct" or "Indirect." In Direct trading, clients trade FX currencies themselves or contract with a third party to execute their FX trades.  Direct trading involves a negotiation process between the FX client and the FX provider.

52.     The second way of executing FX transactions, and the one that is predominately used by custodial clients, is the "Indirect" method.  Indirect FX trading at BNY Mellon is also referred to by the Company as "non-negotiated" or "standing instructions" trades.  The Indirect method involves BNY Mellon, rather than the client, overseeing the trade process from start to finish. Under the Indirect FX trading program, BNY Mellon's promised its custodial clients that its FX trading services were provided "free of charge" and that FX transactions were executed according to "best execution standards"—a representation that BNY Mellon led its customers to believe meant that they would receive the best available rate at the time of execution.  For example, BNY Mellon told its custodial clients that its "standing instruction" Indirect FX services were "[o]perationally simple, free of charge and integrated with the client's activity on the various securities markets" and "designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business."

53.     In truth, and as alleged in the Virginia and Florida *qui tam* complaints and by the U.S. Attorney for the Southern District of New York and the New York Attorney General, when BNY Mellon received instructions from a custodial client to execute a foreign trade it would convert funds to complete the transaction.  After the trade was executed "[BNY Mellon] would note the low and high exchange rate of the day for the two currencies involved in the FX trade."

At the end of the trading day, BNY Mellon simply "ignored the price [it] paid for the FX [conversion]" and charged its clients for the "FX transaction as if the trade occurred at either the high or low of the day (depending on the nature of the transaction, buy or sell), in order to charge [its clients] the least favorable rate that occurred that trading day." Accordingly, when clients were "buying" a foreign currency, BNY Mellon would buy the currency at one rate but charge the clients a higher rate. For "sales" of FX currencies, BNY Mellon charged clients a lower conversion rate, and would return less to its clients. In either scenario, BNY Mellon simply pocketed the difference between the price it paid for the currency and the amount debited/credited to clients' accounts.

54.    According to the subsequently filed Virginia Complaint in Intervention, BNY Mellon "knowingly and systematically earned hundreds of millions of dollars by falsely presenting to those clients reported exchange rates for certain 'standing-instruction' FX transfers of foreign currencies conducted internally between BNYM's own FX trading desks and its transaction desks." Thus, by assigning false FX rates, BNY Mellon earned unwarranted income at its clients' expense.

55.    As further detailed in the Virginia Complaint in Intervention, the Company's "deceptive practices reflected a well thought-out scheme emanating from the highest reaches of BNYM's senior management" and that "high-ranking officers at the [Company] were aware of and participated in the deception."

56.    BNY Mellon's manipulation of FX rates has persisted throughout the Class Period.

**Materially False and Misleading**
**Statements Issued During the Class Period**

57.     The Class Period begins on February 28, 2008, when the Company filed a Form

10-K with the SEC to report its financial and operational results for the fiscal year ended

December 31, 2007 (the "2007 Form 10-K").  The 2007 Form 10-K was signed by defendants

Kelly, Van Saun and Hughey, and reported the Company's financial and operational results for

fiscal 2007.  The 2007 Form 10-K stated, *inter alia*:

> In 2007, we reported consolidated net income of $2.039 billion and diluted
> earnings per share of $2.18 compared with net income of $2.847 billion and
> diluted earnings per share of $3.94 in 2006.
>
> *     *     *
>
> Revenue from foreign exchange and other trading activities was $786 million in
> 2007, compared with $415 million in 2006. The increase reflects the merger with
> Mellon, record customer volumes, the favorable impact that resulted from
> increased currency volatility in the second half of 2007 and a higher valuation of
> the credit derivatives portfolio;
>
> *     *     *
>
> Foreign exchange and other trading activities revenue, which is primarily reported
> in the Asset Servicing segment, was $786 million in 2007, an increase of $371
> million, or 89%, compared with 2006. The increase was due to the merger with
> Mellon, record customer volumes due to increased activity of the existing client
> base, new clients, and the favorable impact that resulted from increased currency
> volatility in the second half of 2007. Other trading activities increased reflecting a
> higher valuation of the credit derivative portfolio caused by the widening of credit
> spreads.

58.     The 2007 Form 10-K also stated that "[f]ee and other revenue as a percent" of

BNY Mellon's total revenue was 80% for fiscal 2007.

59.     Additionally, BNY Mellon's 2007 Form 10-K stated:

> The results of the Asset Servicing segment are driven by a number of factors
> which include the level of transactional activity and the extent of services
> provided including custody, accounting, fund administration, daily valuations,
> performance measurement and risk analytics, securities lending and investment

manager back office outsourcing, as well as the market value of assets under administration and custody.

*        *        *

Dependence on fee-based business—We are dependent on fee-based business for a substantial majority of our revenue and our fee-based revenues could be adversely affected by a slowing in capital market activity, significant declines in market values or negative trends in savings rates or in individual investment preferences.

*        *        *

**_Our fee-based revenues could be adversely affected by a stable exchange-rate environment or decreased cross-border investing activity._**

The degree of volatility in foreign exchange rates can affect the amount of our foreign exchange trading revenue. Most of our foreign exchange revenue is derived from our securities servicing client base. Activity levels and spreads are generally higher when there is more volatility. Accordingly, we benefit from currency volatility and our foreign exchange revenue is likely to decrease during times of decreased currency volatility.

60.     With respect to BNY Mellon's adherence to ethics and its commitment to clients,

the 2007 Form 10-K stated:

> To address [operational] risks, we maintain comprehensive policies and procedures and an internal control framework designed to provide a sound operational environment. These controls have been designed to manage operational risk at appropriate levels given our financial strength, the business environment and markets in which we operate, the nature of our businesses, and considering factors such as competition and regulation. Our internal auditors monitor and test the overall effectiveness of the internal control and financial reporting systems on an ongoing basis.

> We have also established procedures that are designed to ensure that policies relating to conduct, ethics and business practices are followed on a uniform basis. Among the procedures designed to ensure effectiveness are our "Code of Conduct", "Know Your Customer", and compliance training programs.

*        *        *

> BNY Mellon's businesses benefit from the global growth in financial assets. Our success is based on continuing to provide superior client service, strong investment performance and the highest fiduciary standards. We seek to deploy capital effectively to our businesses to accelerate their long-term growth and deliver top-tier returns to our shareholders.

14

61.     Additionally, and with respect to the effectiveness of BNY Mellon's internal
controls, the 2007 Form 10-K stated:

> Management of the Corporation is responsible for establishing and maintaining
> adequate internal control over financial reporting for the Corporation, as such
> term is defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as
> amended.
>
> The Corporation's management, including its principal executive officer and
> principal financial officer, has assessed the effectiveness of the Corporation's
> internal control over financial reporting as of December 31, 2007. In making this
> assessment, management used the criteria set forth by the Committee of
> Sponsoring Organizations of the Treadway Commission in Internal Control—
> Integrated Framework. Based upon such assessment, management believes that,
> as of December 31, 2007, the Corporation's internal control over financial
> reporting is effective based upon those criteria.

62.     The Company's 2007 Form 10-K also contained Sarbanes-Oxley required
certifications, signed by defendants Kelley and Van Saun, which stated:

> I, [Robert P. Kelly / Bruce W. Van Saun] certify that:
>
> 1.     I have reviewed this annual report on Form 10-K of The Bank of New York
>        Mellon Corporation (the "registrant");
>
> 2.     Based on my knowledge, this report does not contain any untrue statement
>        of a material fact or omit to state a material fact necessary to make the
>        statements made, in light of the circumstances under which such statements
>        were made, not misleading with respect to the period covered by this report;
>
> 3.     Based on my knowledge, the financial statements, and other financial
>        information included in this report, fairly present in all material respects the
>        financial condition, results of operations and cash flows of the registrant as
>        of, and for, the periods presented in this report;
>
> 4.     The registrant's other certifying officer and I are responsible for establishing
>        and maintaining disclosure controls and procedures (as defined in Exchange
>        Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial
>        reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for
>        the registrant and have:
>
>        a)     Designed such disclosure controls and procedures, or caused such
>               disclosure controls and procedures to be designed under our
>               supervision, to ensure that material information relating to the
>               registrant, including its consolidated subsidiaries, is made known to us

by others within those entities, particularly during the period in which this report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*    *    *

Pursuant to 18 U.S.C. Section 1350, the undersigned officer [Robert P. Kelly / Bruce W. Van Saun] of The Bank of New York Mellon Corporation (the "Corporation"), hereby certifies, to his knowledge, that the Corporation's Annual Report on Form 10-K for the year ended Dec. 31, 2007 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

63.     On April 17, 2008, the Company issued a press release entitled "The Bank of New York Mellon Reports First Quarter Continuing EPS of $0.72 excluding Merger and Integration Expenses, An increase of 16% compared with first quarter of 2007; First Quarter Continuing EPS of $0.65 compared with $0.61 a year ago." Therein, the Company stated, in relevant part:

> The Bank of New York Mellon Corporation (NYSE: BK) today reported income from continuing operations of $749 million, or $0.65 per share, in the first quarter of 2008. This compares to income from continuing operations of $437 million, or $0.61 per share, in the first quarter of 2007 and $700 million, or $0.61 per share, in the fourth quarter of 2007.
>
> *          *          *
>
> **Foreign exchange and other trading activities** totaled $259 million. This compares with $182 million in the prior year period on a pro forma combined basis, and $305 million in the fourth quarter of 2007. The increase compared to the prior year primarily reflects the benefit of increased client volumes and currency volatility.

64.     On May 9, 2008, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on April 17, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*. Additionally, the Form 10-Q stated, in relevant part:

> Foreign exchange and other trading activities revenue, which is reported primarily in the Asset Servicing segment, increased by $132 million, or 104%, to $259 million compared with the first quarter of 2007, and decreased 15% (unannualized) compared with the fourth quarter of 2007. The increase compared to the first quarter of 2007 was due to the merger with Mellon and also reflected the benefit of significant increases in currency volatility as well as higher client volumes.

65.     On July 17, 2008, the Company issued a press release entitled "The Bank of New York Mellon Corporation Reports Second Quarter Continuing EPS of $0.34 Excluding Merger and Integration Expenses." Therein, the Company stated, in relevant part:

The Bank of New York Mellon Corporation (NYSE: BK) today reported income
from continuing operations of $302 million, or $0.26 per share, in the second
quarter of 2008. This compares to income from continuing operations of $448
million, or $0.62 per share, in the second quarter of 2007 and $749 million, or
$0.65 per share, in the first quarter of 2008.

*       *       *

**Foreign exchange and other trading activities** totaled $308 million. This
compares with $176 million in the prior year period on a pro forma combined
basis, and $259 million in the first quarter of 2008. The increase compared to the
prior year period primarily reflects the benefit of currency volatility and increased
client volumes.

66.     On August 8, 2008, BNY Mellon filed a Quarterly Report with the SEC on Form

10-Q.  The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's

financial results previously announced on July 17, 2008.   The Company's Form 10-Q also

contained Sarbanes-Oxley required certifications, substantially similar to the certifications

contained in ¶62, *supra*.    Additionally, the Form 10-Q stated, in relevant part:

Foreign exchange and other trading activities revenue, which is reported primarily
in the Asset Servicing segment, increased by $191 million, or 163%, to
$308 million compared with the second quarter of 2007, and increased 19%
(unannualized) compared with the first quarter of 2008. The increase compared to
the second quarter of 2007 was due to the merger with Mellon Financial and also
reflected the benefit of increased volatility as well as higher client volumes.

67.     On October 16, 2008, the Company issued a press release entitled "The Bank of

New York Mellon Corporation Reports Third Quarter Continuing EPS of $0.26."  Therein, the

Company stated, in relevant part:

The Bank of New York Mellon Corporation (NYSE: BK) today reported income
from continuing operations of $305 million, or $0.26 per share, in the third
quarter of 2008. This compares to income from continuing operations of $642
million, or $0.56 per share, in the third quarter of 2007 and $302 million, or $0.26
per share, in the second quarter of 2008.

*       *       *

**Foreign exchange and other trading activities** totaled a record $385 million, an
increase of 62% compared with $238 million in the prior year and an increase of

25% (unannualized) compared with $308 million in the second quarter of 2008. The increase compared to both periods reflects the benefit of higher market volatility and volumes associated with our client activity and the current market environment.

68.     On November 7, 2008, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on October 16, 2008.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*.    Additionally, the Form 10-Q stated, in relevant part:

> Foreign exchange and other trading activities revenue, which is reported primarily in the Asset Servicing segment, increased by $147 million, or 62%, to a record $385 million compared with the third quarter of 2007, and increased 25% (unannualized) compared with the second quarter of 2008. The increases compared to both periods reflect the benefit of increased volatility and higher client volumes, as well as the higher value of the credit default swap book (used to economically hedge certain loan exposures).

69.     On January 20, 2009, the Company issued a press release entitled "The Bank of New York Mellon Corporation Reports Fourth Quarter Continuing EPS of $0.05."  Therein, the Company stated, in relevant part:

> The Bank of New York Mellon Corporation today reported fourth quarter income from continuing operations, before an extraordinary item, and after preferred stock dividends, of $53 million, or $0.05 per common share.
>
> *             *             *
>
> **Foreign exchange and other trading activities** totaled a record $510 million, an increase of 67% compared with $305 million in the prior year and an increase of 32% (unannualized) compared with $385 million in the third quarter of 2008. The increase compared to both periods reflects the benefit from higher volatility in all major currencies.

70.     On February 27, 2009, BNY Mellon filed a Form 10-K with the SEC to report its financial and operational results for the fiscal year ended December 31, 2008 (the "2008 Form 10-K").  The 2008 Form 10-K was signed by defendants Kelly, Gibbons and Park, and reported

the Company's financial and operational results for fiscal 2008.  The 2008 Form 10-K also

stated, *inter alia*:

> We reported net income applicable to common stock of $1.4 billion and diluted
> earnings per share of $1.20, and income from continuing operations applicable to
> common stock of $1.4 billion and diluted earnings per share of $1.22.

*     *     *

> Total fee and other revenue increased $1.5 billion in 2008 compared with 2007
> driven by the merger with Mellon Financial, net new business, cross sells and
> organic growth, higher securities lending revenue, higher foreign exchange and
> other trading revenue and the impact of the fourth quarter 2007 acquisition of the
> remaining 50% interest in BNY Mellon Asset Servicing B.V.

*     *     *

> Foreign exchange and other trading activities revenue totaled a record $1.5 billion
> in 2008 compared with $786 million in 2007. The increase primarily reflects the
> benefit of increased market volatility and higher client volumes.

*     *     *

> Foreign exchange and other trading activities revenue, which is primarily reported
> in the Asset Servicing segment, was a record $1.5 billion in 2008, an increase of
> $676 million, or 86%, compared with 2007. The increase primarily resulted from
> higher volatility in all major currencies and a rise in client volumes, as well as the
> higher value of the credit default swap book (used to economically hedge certain
> loan exposures).

71.    The 2008 Form 10-K also stated that "[f]ee and other revenue as a percent" of

BNY Mellon's total revenue was 78% for fiscal 2008.

72.    Additionally, BNY Mellon's 2008 Form 10-K stated:

> The results of the Asset Servicing segment are driven by a number of factors
> which include the level of transactional activity, the extent of services provided
> including custody, accounting, fund administration, daily valuations, performance
> measurement and risk analytics, securities lending and investment manager
> backoffice outsourcing, and the market value of assets under administration and
> custody.

*     *     *

> ***Our fee-based revenues could be adversely affected by a stable exchange-rate
> environment or decreased cross-border investing activity.***

20

The degree of volatility in foreign exchange rates can affect the amount of our foreign exchange trading revenue. Most of our foreign exchange revenue is derived from our securities servicing client base. Activity levels and spreads are generally higher when there is more volatility. Accordingly, we benefit from currency volatility and our foreign exchange revenue is likely to decrease during times of decreased currency volatility.

73.     With respect to BNY Mellon's adherence to ethics and its commitment to clients, the 2008 Form 10-K stated:

We have also established procedures that are designed to ensure that policies relating to conduct, ethics and business practices are followed on a uniform basis. Among the procedures designed to ensure effectiveness are our "Code of Conduct", "Know Your Customer", and compliance training programs.

74.     Additionally, and with respect to the effectiveness of BNY Mellon's internal controls, the 2008 Form 10-K stated:

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting for the Corporation, as such term is defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended.

The Company's management, including its principal executive officer and principal financial officer, has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2008. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control— Integrated Framework. Based upon such assessment, management believes that, as of December 31, 2008, the Company's internal control over financial reporting is effective based upon those criteria.

75.     The Company's 2008 Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*.

76.     On April 21, 2009, the Company issued a press release entitled "The Bank of New York Mellon Corporation Reports First Quarter Continuing EPS of $0.28 Impacted by: $0.21 per share resulting from investment and goodwill write-downs, $0.04 per share from merger and integration expenses." Therein, the Company stated, in relevant part:

21

The Bank of New York Mellon Corporation today reported first quarter income from continuing operations applicable to common shareholders of $322 million, or $0.28 per common share.

*     *     *

**Foreign exchange and other trading activities** totaled $307 million, an increase of 19% compared with $259 million in the prior year and a decrease of 40% (unannualized) compared with $510 million in the fourth quarter of 2008. The increase compared with the first quarter of 2008 reflects the benefit from a higher volatility of key currencies, partially offset by lower client volumes.

77.     On May 8, 2009, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on April 21, 2009. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*. Additionally, the Form 10-Q stated, in relevant part:

> Foreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, increased 19% compared with the first quarter of 2008, and decreased 40% (unannualized) compared with the fourth quarter of 2008. The increase compared with the first quarter of 2008 reflects the benefit from higher volatility of key currencies, partially offset by lower client volumes. The decrease from the fourth quarter of 2008 reflects the impact of both lower volatility and client volumes.

78.     The statements contained in ¶¶57-77 were materially false and misleading when made because BNY Mellon failed to disclose or indicate that the Company: (1) manipulated Indirect FX trades to extract illicit profits from its custodial clients; (2) engaged in unlawful practices to artificially increase its Indirect FX fee revenue; (3) presented a misleading picture of the Company's business model and its actions taken to earn Indirect FX fee revenue; (4) failed to inform investors that withholding full transparency from its clients was critical to maintaining the profitability of its FX program; and (5) lacked adequate internal and financial controls.

79.     On or about May 11, 2009, BNY Mellon conducted a secondary public offering of common stock (the "May 2009 Offering"), raising proceeds of approximately $1.347 billion

22

(net of underwriting fees) by selling 48,300,000 shares of stock to the public at a price of $28.75 per share. The May 2009 Offering was conducted pursuant to a shelf registration statement filed with the SEC on Form S-3 on July 2, 2007 (the "Shelf Registration Statement"). Form S-3 permits an issuer to register numerous securities for later issuance in a single SEC filing. Once this "shelf" is established, the issuer may later "take down" securities from the shelf by issuing them to the public pursuant to a later-filed Prospectus, Prospectus Supplement, and/or Pricing Supplement that refers investors to the underlying Form S-3. The Shelf Registration Statement included a Prospectus and a Prospectus Supplement, dated May 11, 2009, that became part of the Shelf Registration Statement pursuant to which the May 2009 Offering was conducted. The Shelf Registration Statement and the relevant Prospectus and Prospectus Supplement are referred to collectively as the "May 2009 Offering Materials."

80.     The May 2009 Offering was underwritten by defendants Goldman Sachs, Morgan Stanley, Barclays, BNY Mellon Capital, Citigroup, Merrill Lynch and UBS.

81.     The May 2009 Offering Materials incorporated by reference: i)  BNY Mellon's 2008 Form 10-K, filed with the SEC on February 27, 2009 (discussed at ¶¶ 70-75); and ii) BNY Mellon's Quarterly Report for the 2009 first quarter, filed with the SEC on May 8, 2009 (discussed at ¶77).

82.     The documents incorporated by reference into the May 2009 Offering Materials were materially false and misleading when made because BNY Mellon failed to disclose that the Company:  (1) manipulated Indirect FX trades to extract illicit profits from its custodial clients; (2) engaged in unlawful practices to artificially increase its Indirect FX fee revenue; (3) presented a misleading picture of the Company's business model and its actions taken to earn Indirect FX fee revenue; (4) failed to inform investors that withholding full transparency from its

clients was critical to maintaining the profitability of its FX program; and (5) lacked adequate internal and financial controls.

83.    As a result, BNY Mellon's May 2009 Offering Materials contained untrue statements and omitted material facts at the time the Offering Materials were issued.

84.    On July 22, 2009, the Company issued a press release entitled "The Bank of New York Mellon Corporation Reports Second Quarter Continuing EPS of $0.23 Impacted by: $0.23 - TARP redemption premium/dividends and FDIC special assessment, $0.05 - Investment write-downs and M&I expenses offset by the benefit of tax set." Therein, the Company stated, in relevant part:

> The Bank of New York Mellon Corporation (NYSE: BK) today reported second quarter income from continuing operations applicable to common shareholders of $267 million, or $0.23 per common share, compared with $303 million, or $0.26 per common share, in the second quarter of 2008 and $363 million, or $0.31 per common share, in the first quarter of 2009.
>
> *           *           *
>
> **Foreign exchange and other trading activities** totaled $237 million, a decrease of 23% compared with $308 million in the prior year and a decrease of 23% (unannualized) compared with $307 million in the first quarter of 2009. The decrease compared with both periods reflects lower trading revenue primarily due to the lower valuation of credit derivatives used to hedge the loan portfolio. The year-over-year comparison also reflects lower foreign exchange revenue driven by lower volumes, partially offset by higher volatility, while sequentially, foreign exchange fees increased driven by higher volumes.

85.    On August 7, 2009, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on July 22, 2009.   The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*.    Additionally, the Form 10-Q stated, in relevant part:

> Foreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, decreased 23% compared with the second quarter

of 2008, and 23% (unannualized) compared with the first quarter of 2009. The decrease compared with both periods reflects lower trading revenue primarily due to the lower valuation of credit derivatives used to hedge the loan portfolio. The year-over-year comparison also reflects lower foreign exchange revenue driven by lower volumes, partially offset by higher volatility, while sequentially, higher foreign exchange revenue was driven by higher volumes.

86.     On October 20, 2009, the Company issued a press release entitled "BNY Mellon Reports Third Quarter Continuing EPS Loss of $2.04. Impacted by: $2.54 Investment Securities Portfolio Restructuring Charge, $0.03 M&I Expenses." Therein, the Company stated, in relevant part:

> The Bank of New York Mellon Corporation (NYSE: BK) today reported a third quarter loss from continuing operations applicable to common shareholders of $2.439 billion, or $2.04 per common share, compared with income of $303 million, or $0.26 per common share, in the third quarter of 2008 and $267 million, or $0.23 per common share, in the second quarter of 2009.
>
> *          *          *
>
> **Foreign exchange and other trading activities** totaled $246 million, a decrease of 36% compared with $385 million in the prior year and an increase of 4% compared with $237 million in the second quarter of 2009. The decrease year-over-year reflects lower foreign exchange revenue, driven by lower volumes and volatility, as well as a lower valuation of the credit derivatives used to hedge the loan portfolio. The sequential increase reflects higher fixed income derivatives revenue and an improved valuation of credit derivatives, partially offset by lower foreign exchange revenue resulting from lower volatility and seasonality.

87.     On November 6, 2009, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on October 20, 2009. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*. Additionally, the Form 10-Q stated, in relevant part:

> Foreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, decreased 36% compared with the third quarter of 2008, and increased 4% (unannualized) compared with the second quarter of 2009. The decrease year-over-year reflects lower foreign exchange revenue driven by lower volumes and volatility, as well as a lower valuation of the credit default

swaps used to economically hedge the loan portfolio. The sequential increase reflects higher fixed income derivatives revenue and a lower level of mark-to-market losses on credit default swaps, partially offset by lower foreign exchange revenue resulting from lower volatility and seasonality.

88.     On January 20, 2010, the Company issued a press release entitled "BNY Mellon Reports Fourth Quarter Continuing EPS of $0.59 or $712 Million; Net Benefit of $0.04 Due To: Discrete tax benefit and securities gains partially offset by a restructuring charge related to global efficiency initiatives and M&I expenses." Therein, the Company stated, in relevant part:

> The Bank of New York Mellon Corporation (NYSE: BK) today reported fourth quarter income from continuing operations applicable to common shareholders of $712 million, or $0.59 per common share, compared with $50 million, or $0.04 per common share, in the fourth quarter of 2008 and a loss of $2.439 billion, or $2.04 per common share, in the third quarter of 2009.
>
> \*          \*          \*
>
> **Foreign exchange and other trading activities** totaled $246 million, a decrease of 52% compared with a record $510 million in the prior year period and unchanged compared with the third quarter of 2009. The decrease year-over-year primarily reflects lower foreign exchange revenue, driven by lower volatility and spreads, as well as a lower valuation of the credit derivatives used to hedge the loan portfolio. The sequential results reflect higher foreign exchange revenue and lower mark to market adjustments on credit default swaps, offset by lower fixed income trading revenue.

89.     On February 26, 2010, BNY Mellon filed a Form 10-K with the SEC to report its financial and operational results for the fiscal year ended December 31, 2009 (the "2009 Form 10-K"). The 2009 Form 10-K was signed by defendants Kelly, Gibbons and Park, and stated, *inter alia*:

> Foreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, decreased $426 million, or 29%, from a record $1.5 billion in 2008. The decrease primarily resulted from lower foreign exchange revenue driven by lower volumes and a lower valuation of the credit default swaps used to economically hedge the loan portfolio. Foreign exchange volumes were down in 2009, decreasing approximately 21% from the elevated levels experienced during the credit crisis in 2008.

90.   The 2009 Form 10-K also stated that "[f]ee and other revenue as a percent" of

BNY Mellon's total revenue was 62% for fiscal 2009.

91.   Additionally, BNY Mellon's 2009 Form 10-K stated:

The results of the Asset Servicing segment are driven by a number of factors
which include the level of transactional activity, the extent of services provided,
including custody, accounting, fund administration, daily valuations, performance
measurement and risk analytics, securities lending, investment manager
backoffice outsourcing, and the market value of assets under administration and
custody.

*        *        *

Fees for many of our products and services are based on the volume of
transactions processed, the market value of assets managed and administered,
securities lending volume and spreads, and fees for other services rendered.
Corporate actions, cross-border investing, global mergers and acquisitions
activity, new debt and equity issuances, and secondary trading volumes all affect
the level of our revenues.

*        *        *

The degree of volatility in foreign exchange rates can affect the amount of our
foreign exchange trading revenue. Most of our foreign exchange revenue is
derived from our securities servicing client base. Activity levels and spreads are
generally higher when there is more volatility. Accordingly, we benefit from
currency volatility and our foreign exchange revenue is likely to decrease during
times of decreased currency volatility.

92.   With respect to BNY Mellon's adherence to ethics and its commitment to clients,

the 2009 Form 10-K stated:

Key components of our strategy include: providing superior client service versus
peers; strong investment performance (relative to investment benchmarks); above
median revenue growth (relative to peer companies for each of our businesses); an
increasing percentage of revenue and income derived from outside the U.S.;
successful integration of acquisitions; competitive margins; and positive operating
leverage.

*        *        *

The understanding, identification and management of risk are essential elements
for the successful management of BNY Mellon. Our primary risk exposures are
[Credit, Market and Operational.] ...

To address [operational] risks, we maintain comprehensive policies and procedures and an internal control framework designed to provide a sound operational environment. These controls have been designed to manage operational risk at appropriate levels given our financial strength, the business environment and markets in which we operate, the nature of our businesses, and considering factors such as competition and regulation. Our internal auditors and internal control group monitor and test the overall effectiveness of the internal control and financial reporting systems on an ongoing basis.

We have also established procedures that are designed to ensure that policies relating to conduct, ethics and business practices are followed on a uniform basis. Among the procedures designed to ensure effectiveness are our "Code of Conduct", "Know Your Customer", and compliance training programs.

93.     Additionally, and with respect to the effectiveness of BNY Mellon's internal controls, the 2009 Form 10-K stated:

Management of BNY Mellon is responsible for establishing and maintaining adequate internal control over financial reporting for BNY Mellon, as such term is defined in Rule 13a-15(f) under the Exchange Act.

BNY Mellon's management, including its principal executive officer and principal financial officer, has assessed the effectiveness of BNY Mellon's internal control over financial reporting as of December 31, 2009. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control—Integrated Framework. Based upon such assessment, management believes that, as of December 31, 2009, BNY Mellon's internal control over financial reporting is effective based upon those criteria.

94.     The Company's 2009 Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*.

95.     On April 20, 2010, the Company issued a press release entitled "BNY Mellon Reports First Quarter Continuing EPS of $0.49 or $601 Million." Therein, the Company stated, in relevant part:

The Bank of New York Mellon Corporation ("BNY Mellon") (NYSE:BK) today reported first quarter income from continuing operations applicable to common shareholders of $601 million, or $0.49 per common share, compared with $363 million, or $0.31 per common share, in the first quarter of 2009 and $712 million, or $0.59 per common share, in the fourth quarter of 2009.

*     *     *

**Foreign exchange and other trading activities** totaled $263 million, a decrease of 14% compared with $307 million in the prior year period and an increase of 7% compared with $246 million in the fourth quarter of 2009. The decrease year-over-year primarily reflects lower foreign exchange revenue, driven by lower volatility, partially offset by increased volumes. The sequential increase primarily reflects higher fixed income trading revenue and lower mark to market adjustments on credit default swaps partially offset by lower foreign exchange revenue driven by lower volatility.

96.     On May 7, 2010, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on April 20, 2010.   The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*.     Additionally, the Form 10-Q stated, in relevant part:

Foreign exchange and other trading activities revenue totaled $262 million in the first quarter of 2010 compared with $307 million in the first quarter of 2009. The decrease primarily reflects lower foreign exchange revenue, driven by lower volatility, partially offset by increased volumes.

*     *     *

Foreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, decreased 15% compared with the first quarter of 2009, and increased 7% (unannualized) compared with the fourth quarter of 2009. The decrease year-over-year primarily reflects lower foreign exchange revenue driven by lower volatility, partially offset by increased volumes. The sequential increase primarily reflects higher fixed income trading revenue and lower mark-to-market adjustments on credit default swaps, partially offset by lower foreign exchange revenue driven by lower volatility.

97.     The statements contained in ¶¶84-96 were materially false and misleading when made because BNY Mellon failed to disclose that the Company:  (1) manipulated Indirect FX trades to extract illicit profits from its custodial clients; (2) engaged in unlawful practices to artificially increase its Indirect FX fee revenue; (3) presented a misleading picture of the Company's business model and its actions taken to earn Indirect FX fee revenue; (4) failed to

29

inform investors that withholding full transparency from its clients was critical to maintaining the profitability of its FX program; and (5) lacked adequate internal and financial controls.

98.     On or about June 3, 2010, BNY Mellon conducted a secondary public offering of common stock (the "June 2010 Offering"), raising proceeds of approximately $679 million (net of underwriting fees) by selling 25,925,925 shares of stock to the public at a price of $27.00 per share.  Pursuant to the June 2010 Offering, BNY Mellon filed a Prospectus and a Prospectus Supplement, dated June 3, 2009, that became part of the Shelf Registration Statement pursuant to which the June 2010 Offering was conducted.  The Shelf Registration Statement and the relevant Prospectus and Prospectus Supplement are referred to collectively as the "June 2010 Offering Materials."

99.     The June 2010 Offering was underwritten by defendants Goldman Sachs, Citigroup, Merrill Lynch and Morgan Stanley.

100.    The June 2010 Offering Materials incorporated certain materials by reference:  i) BNY Mellon's 2009 Form 10-K, filed with the SEC on February 26, 2010 (and amended on May 14, 2010) (discussed at ¶¶89-94); and ii) BNY Mellon's Quarterly Report for the 2010 first quarter, filed with the SEC on May 7, 2010 (discussed at ¶96).

101.    The documents incorporated by reference into the June 2010 Offering Materials were materially false and misleading when made because BNY Mellon failed to disclose or indicate that the Company:  (1) manipulated Indirect FX trades to extract illicit profits from its custodial clients; (2) engaged in unlawful practices to artificially increase its Indirect FX fee revenue; (3) presented a misleading picture of the Company's business model and its actions taken to earn Indirect FX fee revenue; (4) failed to inform investors that withholding full

transparency from its clients was critical to maintaining the profitability of its FX program; and (5) lacked adequate internal and financial controls.

102.    As a result, BNY Mellon's June 2010 Offering Materials contained untrue statements and omitted material facts at the time the Offering Materials were issued.

103.    On July 20, 2010, the Company issued a press release entitled "BNY Mellon Reports Second Quarter Continuing EPS of $0.55 or $668 Million Vs. $0.23 or $267 Million in the Second Quarter of 2009." Therein, the Company stated, in relevant part:

> The Bank of New York Mellon Corporation ("BNY Mellon") (NYSE: BK) today reported second quarter income from continuing operations applicable to common shareholders of $668 million, or $0.55 per common share, compared with $267 million, or $0.23 per common share, in the second quarter of 2009 and $601 million, or $0.49 per common share, in the first quarter of 2010.
>
> "Our focus on winning new business and providing exceptional client service resulted in solid growth in securities servicing fees and continued long-term asset inflows for our asset and wealth management businesses. Our conservative risk profile is reflected in our excellent credit quality and strong capital generation," said Robert P. Kelly, chairman and chief executive officer of BNY Mellon.
>
> *       *       *
>
> **Foreign exchange and other trading activities** totaled $220 million compared with $237 million in the prior year period and $262 million in the first quarter of 2010. In the second quarter of 2010, foreign exchange revenue totaled $244 million, an increase of 39% sequentially, driven by increased volatility.

104.    On August 6, 2010, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on July 20, 2010.   The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*.    Additionally, the Form 10-Q stated, in relevant part:

> Foreign exchange and other trading activities revenue totaled $220 million in the second quarter of 2010 compared with $237 million in the second quarter of 2009. The decrease primarily reflects credit valuation adjustments ("CVA") on derivatives due to widening spreads and lower fixed income trading revenue,

partially offset by improvement in the credit derivative portfolio which was impacted by tighter credit spreads in the second quarter of 2009 and increased volatility in the foreign currency markets.

*      *      *

Foreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, was $220 million in the second quarter of 2010, a decrease of 7% compared with the second quarter of 2009, and a decrease of 16% (unannualized) compared with the first quarter of 2010. In the second quarter of 2010, foreign exchange revenue totaled $244 million, an increase of 39% sequentially, driven by increased volatility.

105.   On October 19, 2010, the Company issued a press release entitled "BNY Mellon Reports Third Quarter Continuing EPS of $0.51 Including $0.04 of M&I and Restructuring Expenses." Therein, the Company stated, in relevant part:

The Bank of New York Mellon Corporation ("BNY Mellon") (NYSE: BK) today reported third quarter income from continuing operations applicable to common shareholders of $625 million, or $0.51 per common share, compared with a loss of $2,439 million, or $2.04 per common share, in the third quarter of 2009 and income of $668 million, or $0.55 per common share, in the second quarter of 2010.

*      *      *

**Foreign exchange and other trading revenue** totaled $146 million compared with $246 million in the prior year period and $220 million in the second quarter of 2010. In the third quarter of 2010, foreign exchange revenue totaled $160 million, a decrease of 35% sequentially, driven by seasonality and lower volatility.

106.   On November 8, 2010, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on October 19, 2010. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*. Additionally, the Form 10-Q stated, in relevant part:

Foreign exchange and other trading revenue totaled $146 million in the third quarter of 2010 compared with $246 million in the third quarter of 2009. In the third quarter of 2010, foreign exchange revenue totaled $160 million, a decrease

of $31 million from the third quarter of 2009, driven by lower volatility. Other
trading revenue was a negative $14 million in the third quarter of 2010, compared
with revenue of $55 million in the third quarter of 2009. The decrease was largely
due to a decline in long-term interest rates.

\*       \*       \*

Foreign exchange and other trading revenue, which is primarily reported in the
Asset Servicing business, was $146 million in the third quarter of 2010, a
decrease of 41% compared with the third quarter of 2009, and 34%
(unannualized) compared with the second quarter of 2010. In the third quarter of
2010, foreign exchange revenue totaled $160 million, a decrease of 35%
sequentially, driven by seasonality and lower volatility. Other trading revenue was
a negative $14 million in the third quarter of 2010, largely due to a decline in
long-term interest rates.

107.    On January 19, 2011, the Company issued a press release entitled "BNY Mellon

Reports Fourth Quarter Continuing EPS of $0.55 Including $0.04 of M&I and Restructuring

Expenses." Therein, the Company stated, in relevant part:

The Bank of New York Mellon Corporation ("BNY Mellon") (NYSE: BK) today
reported fourth quarter income from continuing operations applicable to common
shareholders of $690 million, or $0.55 per common share, compared with $712
million, or $0.59 per common share, in the fourth quarter of 2009 and $625
million, or $0.51 per common share, in the third quarter of 2010.

\*       \*       \*

**Foreign exchange and other trading revenue** totaled $258 million compared
with $246 million in the prior year period and $146 million in the third quarter of
2010. In the fourth quarter of 2010, foreign exchange revenue totaled $206
million, an increase of 29% sequentially and 2% year-over-year. The sequential
increase was driven by increased volumes, new business and higher
volatility. Other trading revenue was $52 million in the fourth quarter of 2010, an
increase of $7 million compared with the fourth quarter of 2009 and $66 million
compared with the third quarter of 2010. The sequential increase was largely
driven by an improvement in fixed income and derivatives trading.

108.    On February 28, 2011, BNY Mellon filed a Form 10-K with the SEC to report its

financial and operational results for the fiscal year ended December 31, 2010 (the "2010 Form

10-K"). The 2010 Form 10-K was signed by defendants Kelly, Gibbons and Park, and stated,

*inter alia*:

We reported net income from continuing operations applicable to the common shareholders of BNY Mellon of $2.6 billion, or $2.11 per diluted common share in 2010.

*    *    *

Foreign exchange and other trading revenue totaled $886 million in 2010 compared with $1.0 billion in 2009. The decrease primarily resulted from both lower fixed income and derivatives trading revenue and lower foreign exchange revenue.

109.   The 2010 Form 10-K also stated that "[f]ee and other revenue as a percent" of

BNY Mellon's total revenue (excluding net securities gains) was 78% for fiscal 2010.

110.   Additionally, BNY Mellon's 2010 Form 10-K stated:

The results of the Asset Servicing business are driven by a number of factors which include: the level of transaction activity; the range of services provided, including custody, accounting, fund administration, daily valuations, performance measurement and risk analytics, securities lending, and investment manager backoffice outsourcing; and the market value of assets under administration and custody.

*    *    *

Our Asset Servicing business also generates foreign exchange trading revenues, which are influenced by the volume of client transactions and the spread realized on these transactions, market volatility in major currencies, the level of cross-border assets held in custody for clients, the level and nature of underlying cross-border investments and other transactions undertaken by corporate and institutional clients. As part of our foreign exchange business, we offer a standing instruction program that provides a cost-effective and efficient option, to our clients, for handling a high volume of small transactions or difficult to execute transactions in restricted and emerging markets currencies. Our foreign exchange platform provides custody clients and their investment managers an end-to-end solution that transfers to BNY Mellon much of the burden, risk and infrastructure cost associated with foreign exchange transactions. Custody clients and their investment managers have the option of executing their transactions pursuant to the standing instruction program, through any of the other foreign exchange trading options made available by BNY Mellon, or with another foreign exchange provider.

*    *    *

The degree of volatility in foreign exchange rates can affect the amount of our foreign exchange trading revenue. Most of our foreign exchange revenue is

34

derived from our securities servicing client base. Activity levels and spreads are generally higher when there is more volatility. Accordingly, we benefit from currency volatility and our foreign exchange revenue is likely to decrease during times of decreased currency volatility.

111.    With respect to BNY Mellon's adherence to ethics and its commitment to clients, the 2010 Form 10-K stated:

The understanding, identification and management of risk are essential elements for the successful management of BNY Mellon. Our primary risk exposures are: [operational, market and credit.] ...

To address [operational] risks, we maintain comprehensive policies and procedures and an internal control framework designed to provide a sound operational environment. These controls have been designed to manage operational risk at appropriate levels given our financial strength, the business environment and markets in which we operate, the nature of our businesses, and considering factors such as competition and regulation. Our internal auditors and internal control group monitor and test the overall effectiveness of the internal control and financial reporting systems on an ongoing basis.

We have also established procedures that are designed to ensure that policies relating to conduct, ethics and business practices are followed on a uniform basis. Among the procedures designed to ensure effectiveness are our "Code of Conduct," "Know Your Customer," and compliance training programs.

*         *         *

BNY Mellon's businesses benefit from the global growth in financial assets and from the globalization of the investment process. Over the long term, our financial goals are focused on deploying capital to accelerate the long-term growth of our businesses and achieving superior total returns to shareholders by generating first quartile earnings per share growth over time relative to a group of peer companies.

Key components of our strategy include: providing superior client service versus peers; strong investment performance relative to investment benchmarks; above-median revenue growth relative to peer companies; increasing the percentage of revenue and income derived from outside the U.S.; successful integration of acquisitions; competitive margins; and positive operating leverage. We have established Tier 1 capital as our principal capital measure and have established a targeted ratio of Tier 1 capital to risk-weighted assets of 10%. We expect to update our capital targets once Basel III guidelines are finalized.

112.   Additionally, and with respect to the effectiveness of BNY Mellon's internal controls, the 2010 Form 10-K stated:

> Management of BNY Mellon is responsible for establishing and maintaining adequate internal control over financial reporting for BNY Mellon, as such term is defined in Rule 13a-15(f) under the Exchange Act.
>
> BNY Mellon's management, including its principal executive officer and principal financial officer, has assessed the effectiveness of BNY Mellon's internal control over financial reporting as of December 31, 2010. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control—Integrated Framework. Based upon such assessment, management believes that, as of December 31, 2010, BNY Mellon's internal control over financial reporting is effective based upon those criteria.

113.   The Company's 2010 Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*.

114.   On April 19, 2011, the Company issued a press release entitled "BNY Mellon Reports First Quarter Earnings of $625 Million or $0.50 Per Share." Therein, the Company stated, in relevant part:

> The Bank of New York Mellon Corporation ("BNY Mellon") (NYSE: BK) today reported first quarter net income applicable to common shareholders of $625 million, or $0.50 per common share, compared with net income from continuing operations applicable to common shareholders of $601 million, or $0.49 per common share, in the first quarter of 2010 and $690 million, or $0.55 per common share, in the fourth quarter of 2010.
>
> *       *       *
>
> **Foreign exchange and other trading revenue** totaled $198 million compared with $262 million in the first quarter of 2010 and $258 million in the fourth quarter of 2010. In the first quarter of 2011, foreign exchange revenue totaled $173 million, a decrease of 1% year-over-year and 16% sequentially as increased volumes were more than offset by declines in volatility. Other trading revenue was $25 million in the first quarter of 2011, a decrease of $62 million compared with the first quarter of 2010 and $27 million compared with the fourth quarter of 2010. Both decreases were driven by lower fixed income and derivatives trading revenue.

115.   On May 9, 2011, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q.   The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on April 19, 2011.   The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in 62 , *supra*.   Additionally, the Form 10-Q stated, in relevant part:

> Foreign exchange and other trading revenue was $198 million in the first quarter of 2011, a decrease of 24% compared with the first quarter of 2010, and 23% (unannualized) compared with the fourth quarter of 2010. In the first quarter of 2011, foreign exchange revenue totaled $173 million, a decrease of 1% year-over-year and 16% (unannualized) sequentially, as increased volumes were more than offset by declines in volatility. Other trading revenue was $25 million in the first quarter of 2011, a decrease of $62 million compared with the first quarter of 2010 and $27 million compared with the fourth quarter of 2010. Both decreases were driven by lower fixed income and derivatives trading revenue. Foreign exchange and other trading revenue is primarily reported in the Investment Services business. Other trading revenue is also reported in the Other segment.

116.   On July 19, 2011, the Company issued a press release entitled "BNY Mellon Reports Second Quarter Earnings of $735 Million or $0.59 Per Share." Therein, the Company stated, in relevant part:

> The Bank of New York Mellon Corporation ("BNY Mellon") (NYSE:BK) today reported second quarter net income applicable to common shareholders of $735 million, or $0.59 per common share, compared with net income applicable to common shareholders of $658 million, or $0.54 per common share, in the second quarter of 2010 and net income applicable to common shareholders of $625 million, or $0.50 per common share, in the first quarter of 2011.

> *       *       *

> **Foreign exchange and other trading revenue** totaled $222 million compared with $220 million in the second quarter of 2010 and $198 million in the first quarter of 2011. In the second quarter of 2011, foreign exchange revenue totaled $184 million, a decrease of 25% year-over-year and an increase of 6% sequentially. The year-over-year decrease reflects lower volatility partially offset by higher volumes. The increase sequentially primarily reflects higher volatility. Other trading revenue was $38 million in the second quarter of 2011, an increase of $64 million compared with the second quarter of 2010 and $13 million compared with the first quarter of 2011.

117.   On August 8, 2011, BNY Mellon filed a Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Park, and reaffirmed the Company's financial results previously announced on July 19, 2011.   The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶62, *supra*.   Additionally, the Form 10-Q stated, in relevant part:

> Foreign exchange and other trading revenue was $222 million in the second quarter of 2011, compared with $220 million in the second quarter of 2010, and $198 million in the first quarter of 2011. In the second quarter of 2011, foreign exchange revenue totaled $184 million, a decrease of 25% year-over-year and an increase of 6% (unannualized) sequentially. The year-over-year decrease reflects lower volatility partially offset by higher volumes. The increase sequentially primarily reflects higher volatility. Other trading revenue was $38 million in the second quarter of 2011, an increase of $64 million compared with the second quarter of 2010 and $13 million compared with the first quarter of 2011. Both increases were driven by higher fixed income trading revenue.

118.   The statements contained in ¶¶103 – 117 were materially false and misleading when made because BNY Mellon failed to disclose or indicate that the Company:   (1) manipulated Indirect FX trades to extract illicit profits from its custodial clients; (2) engaged in unlawful practices to artificially increase its Indirect FX fee revenue; (3) presented a misleading picture of the Company's business model and its actions taken to earn Indirect FX fee revenue; (4) failed to inform investors that withholding full transparency from its clients was critical to maintaining the profitability of its FX program; and (5) lacked adequate internal and financial controls.   These false and misleading statements affirmatively concealed the Company's true profitability and the sustainability of BNY Mellon's reported revenues, and concealed known risks that the Company's illegal trading scheme exposed the Company to regulatory action, government and private lawsuits, adverse publicity, and the loss of current and future custodial client customers.   In addition, the Company's false and misleading statements created a false portrayal of the Company's business operations and drivers of BNY Mellon's reported financial

results and provided investors with a false sense of the sustainability and stability of the Company's FX trading business.

### The Truth Begins to Emerge

119.   Details about the Company's deceptive practices began to surface after a whistleblower (or *qui tam*) lawsuit against BNY Mellon was unsealed in Virginia on January 21, 2011.[4]  The Virginia Action was filed on behalf of certain pension funds located in Virginia that had retained BNY Mellon as a trustee to manage fund accounts.   As alleged in the Virginia Action:

> [BNY Mellon] *knowingly and intentionally charged the Commonwealth false exchange rates for purchases and sales of foreign currency rather than the exchange rates at which Defendant actually executed the transactions for the Funds.*
>
> \*          \*          \*
>
> In order to keep the truth from the Commonwealth, in the periodic accountings which Defendant was obligated to render to the Commonwealth, [BNY Mellon] *reported false FX prices that failed to reflect the actual cost of the transaction and concealed the Defendant's markup or markdown* that caused the Commonwealth to pay more than it should have or receive less than it should have.[5]

120.   On or about January 27, 2011, the Virginia Attorney General intervened in the Virginia Action.  As detailed by *The Washington Post* on January 28, 2011:

> According to the attorney general's office, the Bank of New York Mellon would watch currency markets and conduct trades on behalf of Virginia at the most advantageous price it could find during a trading day. *But when the bank reported the results of the trade to the state, it would report that the state had received the day's least advantageous price. It would then pocket the difference.*

---

[4]     *Commonwealth of Virginia, ex rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. CL-2009-15377 (Va. Cir.).

[5]     Hereinafter, all emphasis is added unless otherwise noted.

121.    On this news, shares of the Company's stock declined over 2.3 percent, to close on January 28, 2011 at $30.88 per share.

122.    Following the unsealing of the Virginia Action and the Virginia Attorney General's notice of intention to intervene in the case, on January 31, 2011, *The Wall Street Journal* published an article entitled "Global Finance: Virginia Files Suit Over Forex – State Says Bank of New York Gave It Unfavorable Prices in Currency Transactions." The article stated, in relevant part:  "According to the Virginia complaint, Bank of New York kept the difference between the rate charged and the actual rate between 2000 and 2009. ***Bank of New York 'kept these profits a secret from its custodial client, the Commonwealth.'***"

123.    On February 3, 2011, *The Wall Street Journal* published an article entitled "States Widen Currency-Trade Probes." The article discussed an expanding number of state probes into BNY Mellon and other custodial banks' FX practices. As stated in the article:

> State prosecutors are g*etting help from an organized group of whistle-blowers in a widening investigation into wheth*er banks overcharged public pension funds by tens of millions of dollars for foreign-exchange transactions
>
> The whistle-blowers … are helping with investigations into the issue by attorneys general in California and Virginia, according to court documents and people familiar with the matter.
>
> Other states, including Florida and Tennessee, also are conducting probes, according to a spokeswoman for the Florida attorney general and people familiar with the other states.
>
> *           *           *
>
> In Virginia, an entity called FX Analytics sued Bank of New York Mellon Corp., claiming that the financial giant overcharged a state pension fund in converting currencies for its securities trading. Last month, the Virginia attorney general intervened, or took over the case, which was filed in 2009. The suit, which was unsealed last week, seeks $150 million in damages, according to documents filed in a Fairfax County circuit court.
>
> *           *           *

The suits claim the banks didn't charge the pension funds the currency rates that the banks paid, *but consistently charged them the highest currency-conversion prices of the day, and pocketed the difference*. The suits say the banks similarly overcharged when the pension funds exited the trades.

*       *       *

According to a preliminary study reported by professors at Brandeis University and Williams College in September, custodial banks generally know the price they charge their clients and the bid-ask spread within a few hours of any transaction. *But the customers only learn later about the price they paid, and never the bid-ask, or the gap between what sellers are offering and buyers are willing to pay.*

124.    On this news, shares of the Company's stock declined almost 1.2 percent, to close on February 3, 2011 at $31.46 per share.

125.    The following day, on February 4, 2011, *The Wall Street Journal* published an article entitled "Bank Accused of Fake Trades – Suit Alleges BNY Mellon Overcharged Virginia Pension Funds by $20 Million." The article stated, in relevant part:

Bank of New York Mellon Corp. currency traders used a foreign-exchange system called "Charlie" to create fake trades and overcharge Virginia pension funds by at least $20 million, according to allegations in recently unsealed documents in a Virginia court.

*       *       *

Bank of New York Mellon generated 2009 revenue of $4.26 billion for its asset-servicing unit, *including $757 million from foreign-exchange and other trading activities, the latest full-year figures available*. The $4.26 billion figure was more than half of the bank's total 2009 revenue, though the 2009 total included an unusual one-time item. Asset servicing typically accounts for about a third of the bank's revenue.

For some banks, foreign-exchange trading revenue is on the rise. *Bank of New York's revenue from foreign-exchange trading for clients jumped about 60% in the fourth quarter of 2010 compared with the third quarter of last year, and they rose 19% from 2009's fourth quarter*, according to brokerage firm Guggenheim Securities.

The states are investigating claims that the banks didn't charge the pension funds the currency rates that the banks paid but consistently charged them the highest

41

currency-conversion prices of the day, and pocketed the difference. The suits say the banks similarly overcharged when the pension funds exited the trades.

126.    On this news, shares of the Company's stock declined approximately 1.5 percent, to close on February 4, 2011 at $31.00 per share.

127.    On February 7, 2011, the *qui tam* complaint filed in the Florida Action was unsealed after the Florida Attorney General filed a notice of intention to intervene.[6]  Similar to the Virginia Action, the Florida Action was filed on behalf of certain Florida state pension funds that had retained BNY Mellon as a trustee to manage fund accounts.  According to unsealed complaint:

> [BNY Mellon] knowingly and intentionally created and carried out a fraudulent scheme in which they charged FRSTF [Florida Retirement System Trust Fund] fictitious, feigned, imaginary and/or falsified FX rates ("Falsified FX Rates") that prevailed during the transaction-days in question, and were not the FX rates at which Defendants actually executed requested FX transactions for FRSTF.

128.    On February 15, 2011, *Reuters* published an article entitled "U.S. Custody banks face fx profit margin squeeze." The article reported that profit margins at custodial banks would likely "shrink[] as scrutiny [over FX practices] grows."  The article specifically cited to FX related lawsuits against BNY Mellon alleging that the Company "overcharged public retirement funds," and noting that "U.S. custody banks are grappling with more than just lawsuits targeting their foreign exchange practices. They also face a profit margin squeeze on lucrative currency trading as customers look for better deals."  The article also drew a direct link between the allegations in the lawsuits and their impact on BNY Mellon's profitability:  "Whatever the outcome, analysts and industry observers point to increased customer scrutiny on pricing that is driving down margins in an area previously considered a safe haven for the custodians – and one far more profitable than their bread-and-butter recordkeeping and account processing work."

---

[6]    *State of Florida, ex rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. 2009-ca-4140 (Fla. Cir.).

129.   On this news, shares of the Company's stock declined over 3 percent, to close on February 15, 2011 at $31.05 per share.

130.   On April 19, 2011, before the opening of the markets, BNY Mellon announced its first quarter 2011 results, which included $173 million in FX revenue—a 16% decrease from the prior quarter and a 1% decrease from the same period the prior year.  On a conference call addressing BNY Mellon's reported earnings that day, analysts questioned Defendants CEO Kelly and CFO Gibbons concerning the "attention" BNY Mellon's FX business had received, including news relating to existing lawsuits and customer inquiries, and the impact of that scrutiny on how the FX trading business was priced and executed.  In response to an analyst who asked whether the profit margins on FX trading would "come down towards the level of the rest of the firm" because of the increased scrutiny, Defendant CFO Gibbons stated that while "it's too early to tell," "there is some potential there for margin compression."

131.   Also, on April 19, 2011, *The Wall Street Journal* published an article entitled "Custody Banks Face Forex-Fee Fireworks."  The article stated, in relevant part:

> Excitement is a foreign emotion for custody-bank investors. Unlike their Wall Street cousins, these firms typically stay out of the spotlight and deliver steady earnings thanks to the tedious, back-office processing the banks handle for money managers.
>
> But unwanted scrutiny of foreign-exchange processing at Bank of New York Mellon Corp. and State Street Corp. over the past year has raised the risk of some unwanted fireworks.
>
> ***State and local pension funds have demanded reams of data to determine if they are getting the best pricing for their currency trades.*** State attorneys general in California, Virginia and Florida are pursuing legal claims to uncover whether funds in those states were charged properly.

132.   As a result of these disclosures, shares of the Company's stock declined approximately 3 percent, to close on April 19, 2011 at $28.35 per share.

133.    On May 23, 2011, *The Wall Street Journal* published the results of an independent analysis it undertook to confirm the veracity of the allegations made in the *qui tam* actions. Specifically, in an article entitled "Inside a Battle Over Forex – Bank Gave Pension Fund Least-Favorable Rates, Analysis Shows," the *Journal* reported that:

> *A Wall Street Journal analysis of more than 9,400 trades the bank processed over the past decade for a large Los Angeles pension fund could provide ammunition to its critics.*
>
> *BNY Mellon priced 58% of the currency trades within the 10% of each day's trading range that was least favorable to the fund*, the analysis shows. As a result, the trades cost the pension fund, the Los Angeles County Employees Retirement Association, $4.5 million more than if the average trade occurred at the middle of the trading range for each day, the analysis showed.
>
> *A BNY Mellon spokesman confirmed the accuracy of the data and said the bank's employees "tend" to price foreign-exchange trades at one end of each day's "interbank" trading range -- the rates at which major banks like BNY Mellon buy and sell foreign currencies.* But the bank said there was nothing improper about the practice. It said clients like the Los Angeles pension fund knew -- or should have known -- *that the bank doesn't act in their interests when pricing the trades.*
>
> The Los Angeles fund disagrees. It said in a letter to BNY Mellon in January that the bank was its fiduciary, so it should have looked out for the fund's interests and offered it "best execution," or the best possible price. It alleged BNY Mellon had used a "hidden mark-up" in currency trades and had a duty "not to make undisclosed profits" at the fund's expense. The bank says it complied with its written agreement with its client. The fund has since ceased using the bank for certain currency trades.

134.    On this news, shares of the Company's stock declined approximately 1.3 percent, to close on May 23, 2011 at $27.81 per share.

135.    On May 24, 2011, *The Wall Street Journal* published an article entitled "SEC Deepens Probe of Forex Trading – Regulators Are Examining How State Street and BNY Mellon Characterized Transactions to Clients." The article stated, in relevant part:

> Federal securities regulators are taking a deeper look at the role of big banks in executing currency trades for clients.

*The Securities and Exchange Commission is examining whether two major banks* [BNY Mellon and State Street] *made proper representations to pension-fund clients about how their currency trades would be handled and priced,* according to a person familiar with the matter.

At issue is whether "custody" banks – which handle securities and back-office tasks for institutional investors – are overcharging public pension funds for trading in the $4 trillion-a-day foreign-exchange market.

*The SEC probe, which is examining the currency-trading activities of Bank of New York Mellon Corp. and State Street Corp., marks a new level of scrutiny by authorities.* It comes on the heels of previously publicized probes by the Justice Department and three state attorneys general into whether the banks fairly charged clients for currencies.

*It hadn't been previously known that the SEC was examining BNY Mellon's activities. And the nature of the SEC investigation hadn't been made public.*

*       *       *

The SEC typically doesn't have direct jurisdiction over the foreign-exchange market. And the private agreements between custody banks and their clients appear to give banks wide discretion over how they charge funds for currency transactions.

*But the SEC can determine whether the banks' transactions with the pension funds breached securities laws. One issue the agency is examining is whether the banks misrepresented how they intended to carry out the foreign-exchange trades.*

136.    On this news, shares of the Company's stock declined approximately 1.3 percent, to close on May 24, 2011 at $27.49 per share.

137.    On August 11, 2011, the Commonwealth of Virginia filed a Complaint in Intervention in the Virginia Action alleging damages "estimated to be in excess of $40,000,000, based on the Virginia Funds' standing-instruction FX trades, the rates of which BNYM falsely reported to the Commonwealth."    The damages could be trebled (to $120 million) and the Company could also face civil penalties of at least $811 million.

138.    The Virginia Complaint in Intervention also cited to numerous internal emails among BNY Mellon executives where they discussed the negative impact on the Company's

profits if BNY Mellon's clients were provided with better transparency about the Company's indirect FX pricing.  For example, according to the Complaint in Intervention:

> *These deceptive practices reflected a well thought-out scheme emanating from the highest reaches of BNYM's senior management. Internal BNYM communications reveal that high-ranking officers at the Bank were aware of and participated in the deception.*
>
> One e-mail, dated February 8, 2008, from Jorge Rodriguez, BNYM's Executive Vice President of Global Sales and a Managing Director at the Bank's New York City offices, explained to a number of other high-ranking New York-based BNYM executives, including Richard Mahoney, Executive Vice President of Global Markets, *that the "pricing advantages" of BNYM's FX pricing scheme would "disappear" if the Bank's custodial clients achieved "full transparency."*
>
> Such "full transparency" would permit custodial banking clients to understand the difference between what BNYM reported and (i) what BNYM paid or received for the foreign currency, (ii) the FX rate at the time an instruction was given, or (iii) the FX rate at the time of BNYM's internal transfer of currency to or from its inventory to or from the Virginia Funds' accounts.
>
> Specifically, *Mr. Rodriguez noted that if BNYM were required to provide "full transparency" in its reports to its custodial clients, their increased "ability to carefully monitor each and every trade at the time of execution" would "reduce[] margins dramatically."*

139.    The Complaint in Intervention also noted that "BNYM's scheme guaranteed that its custodial clients, including the Virginia Funds, were unable to monitor any aspects of the Bank's practice of assigning false FX rates."

140.    Further according to the Complaint in Intervention, the "spread between the false FX rates BNYM reported to the Virginia Funds" and the actual price … generated for BNYM greater amounts of income than it was entitled to pursuant to its negotiated agreements with the Virginia Funds."  As a result, BNY Mellon "earned this excessive income entirely at the expense of the Virginia Funds."

141.    Also on August 11, 2011, the State of Florida intervened in the Florida Action. Similar to the Virginia action, the Florida Attorney General stated that:

*BNY Mellon added hidden spreads*, including mark-ups and mark-downs, to these foreign exchange trades rather than pricing the trades at the exchange rates at which it actually executed the transactions, *causing the FRSTF to pay far more than it should have for buys and receive much less than it should have for sells.* BNY Mellon also caused greatly increased (and unnecessary) trading costs for the FRSTF by not netting foreign exchange transactions when the FRSTF bought and sold the same currency on a given day. Due to BNY Mellon's misconduct, the State will ultimately have to provide millions of additional dollars to the FRSTF, monies that otherwise could have been made available for essential services to its citizens.

142.   On August 12, 2011, *The Wall Street Journal* published an article regarding the complaints in intervention filed by the Florida and Virginia Attorneys General, and further discussed the internal BNY Mellon emails that had been discovered in those cases.  The article, entitled "Two States Go After Big Bank on Forex," stated:

The Virginia lawsuit, filed in a Fairfax, Va., state court, cites internal bank emails allegedly *showing that senior bank officials knew about, and endorsed, a currency-trading method that hurt state pensioners.*

The complaint cites what it describes as a 2008 email from a senior BNY Mellon banker, Jorge Rodriguez, *warning his colleagues that if the bank was required to provide "full transparency" to its clients, the clients' "ability to carefully monitor each and every trade at the time of execution" would eat into profits by reducing the bank's "margins dramatically."*

143.   In response to these disclosures, shares of the Company's stock declined over 2.5 percent, to close on August 12, 2011 at $19.99 per share.

144.   In sum, from the time that the truth about the Company's practices slowly started to emerge on January 21, 2011, the Company's shares declined from a price of $31.95 per share to a closing price of $19.99 per share on August 12, 2011 – a decline of $11.96 per share, or over 37 percent, representing a market capitalization loss of over $14 billion.  The declines in BNY Mellon's stock price were the direct result of the materialization of the highly material and foreseeable risks to BNY Mellon's profitability and future business prospects—including the filing of numerous lawsuits and government actions, adverse publicity, and the loss of a highly

47

material portion of BNY Mellon's valuable FX trading revenue stream—that were concealed by the Company's false and misleading Class Period statements.

## POST CLASS PERIOD DEVELOPMENTS

145.   On August 31, 2011, BNY Mellon announced that defendant Kelly had "stepped down as chairman, chief executive officer and director by mutual agreement with the board of directors, due to differences in approach to managing the company."

146.   On October 4, 2011, the Manhattan U.S. Attorney, Preet Bharara, filed a civil fraud action against BNY Mellon in the U.S. District Court for the Southern District of New York.[7] According to the complaint, BNY Mellon "from at least 2000 to the present has engaged a scheme to defraud custodial clients who use BNYM's foreign exchange services."

147.   Also on October 4, 2011, the Attorney General for the State of New York filed a complaint against BNY Mellon in New York State Court seeking $2 billion in damages.[8]

148.   On October 26, 2011, Massachusetts's Secretary of the Commonwealth filed an administrative complaint (the "Massachusetts complaint") against BNY Mellon based upon the Company's "scheme to deceive its clients and its client's investment managers by misleading and omitting critical information with respect to [BNY Mellon's] foreign exchange Standing Instruction Service."[9]   According to the Massachusetts complaint: "BNY Mellon's representations about its Standing Instruction Service were nothing more than an illusion.  In reality, BNY Mellon's Standing Instruction Service was a hidden scheme that rigged the pricing of non-negotiated foreign exchange transactions, while maximizing profits for the bank."  As

---

[7]      *United States of America v. The Bank of New York Corporation*, No. 11-cv-6969 (S.D.N.Y.)

[8]      *The People of the State of New York, et al. v. The Bank of New York Corporation*, No.  09-114735 (N.Y. Sup. Ct.).

[9]      *In re The Bank of New York Mellon Corp.*, No. 2011-0044 (Mass. Sec. Div.).

further detailed in the Massachusetts complaint, BNY Mellon's scheme "garnered tens of millions [of dollars] in illegal profits from exorbitant undisclosed mark ups on foreign currency exchanges effected for BNY Mellon's Massachusetts public pension fund clients," and as a result, BNY Mellon, "through its fraudulent scheme, effectively stole tens of millions of dollars from Massachusetts state pensioners."

149.    Finally, on November 18, 2011, the judge presiding over the Virginia Action sustained claims alleged in the Virginia Attorney General's case against BNY Mellon.  In so ruling, *Bloomberg* reported that the Judge told the Attorney General: "You have a cause of action" and that there was "no question about that."  A spokesman for the Attorney General also stated that, with respect to the allegations that BNY Mellon had "engaged in a pattern of intentional conduct to defraud the commonwealth, its retirees and its taxpayers," the Court had "unequivocally held that the facts alleged were sufficient to allow the suit – which is for nearly one billion dollars in damages and civil penalties – to proceed toward trial."  *Bloomberg* further reported that the Judge stated that, "assuming Virginia's allegations are true, [BNY Mellon] submitted false records to the state because it was 'permitting fund managers to pocket funds, which they would not be allowed to do.'"

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

150.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased BNY Mellon common stock during the Class Period, and who were damaged thereby, and on behalf of all persons who purchased or otherwise acquired the Company's common stock pursuant or traceable to the Company's May 2009 and June 2010 public stock offerings (the "Class").  Excluded from the Class are defendants, directors and officers of BNY Mellon and their families and affiliates.

151.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  According to the Company's Form 10-K filed with the SEC on February 28, 2011, BNY Mellon had over 1.2 billion shares of stock outstanding.

152.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether the Securities Act and/or Securities Exchange Act were violated by defendants;

(b)   Whether defendants omitted and/or misrepresented material facts;

(c)   Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether the prices of BNY Mellon common stock was artificially inflated; and

(e)   The extent of damage sustained by Class members and the appropriate measure of damages.

153.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

154.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

155.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

156.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of BNY Mellon's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.   Specifically, Defendants' false and misleading statements misrepresented the Company's true profitability and future business prospects, and investors suffered losses as the price of BNY Mellon stock declined when those statements were corrected and risks concealed by the Company materialized, including on the dates that news reports concerning regulatory action regarding the Company's FX trading practices, government and private lawsuits, and their impact on BNY Mellon's FX trading practices were disclosed to the market as set forth above.   Accordingly, as a result of their purchases of BNY Mellon's common stock during the Class Period, LAMPERS and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## SCIENTER ALLEGATIONS

157.   During the Class Period, the BNY Mellon and the Officer Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.   In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of BNY Mellon's common stock during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

158.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's common stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased BNY Mellon common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

159.    At all relevant times, the market for BNY Mellon common stock was efficient for the following reasons, among others: (a) as a regulated issuer, BNY Mellon filed periodic public reports with the SEC; and (b) BNY Mellon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

160.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. The

specific statements pleaded herein were not "forward looking statements" when made. To the extent there were any forward-looking statements, there was no meaningful cautionary statement identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false or misleading forward-looking statements because, at the time the forward-looking statement was made, the speaker knew the statement was false or misleading and/or the statement was authorized and/or approved by an executive officer of BNY Mellon who knew that the statement was false.   Moreover, to the extent that BNY Mellon and the Officer Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that BNY Mellon and the Officer Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures false and misleading.   None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder**
**Against BNY Mellon and the Officer Defendants**

161.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

162.    During the Class Period, BNY Mellon and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase BNY Mellon common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

163.    BNY Mellon and the Officer Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for BNY Mellon common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

164.    BNY Mellon and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about BNY Mellon's unlawful FX trading scheme, financial well-being and prospects, as specified herein.

165.   As a direct and proximate result of BNY Mellon and the Officer Defendants' wrongful conduct, LAMPERS and other members of the Class suffered damages in connection with their purchases or acquisitions of BNY Mellon common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Officer Defendants

166.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

167.   The Officer Defendants acted as controlling persons of BNY Mellon within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff has alleged as false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

168.   In particular, each of the Officer Defendants had direct and supervisory involvement in the day-to-day operations of the Company, a primary violator under Section 10(b), and therefore had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

169.   By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## THIRD CLAIM

### Violation of Section 11 of The Securities Act
### Against BNY Mellon, Defendants Kelly, Gibbons, Park,
### the Director Defendants and the Underwriter Defendants

170.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.   This count is predicated upon defendants' liability for making false and materially misleading statements in the Offering Materials.

171.   This Claim does not sound in fraud.   Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.   For purposes of asserting this Claim under the Securities Act, LAMPERS does not allege that the defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

172.   This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's common stock pursuant to or traceable to the false Offering Materials issued in connection with the Company's May 2009 Offering and June 2010 Offering.

173.   With respect to the May 2009 Offering, this Claim is asserted against BNY Mellon, Officer Defendants Kelly, Gibbons and Park, the Director Defendants and Underwriter

Defendants Goldman Sachs, Morgan Stanley, Barclays, BNY Mellon Capital, Citigroup, Merrill Lynch and UBS.  With respect to the June 2010 Offering, this Claim is asserted against BNY Mellon, Officer Defendants Kelly, Gibbons and Park, the Director Defendants, and Underwriter Defendants Goldman Sachs, Citigroup, Merrill Lynch and Morgan Stanley.

174.    Liability under this Claim is predicated on the Defendants' respective participation in the May 2009 Offering and June 2010 Offering, which were conducted pursuant to the May 2009 and June 2010 Offering Materials.  The May 2009 and June 2010 Offering Materials contained untrue statements and omissions of material fact concerning, *inter alia*, the Company's FX trading scheme, financial results and future business prospects.

175.    This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Materials and within three years of the effective date of the Offering Materials.

176.    By reason of the foregoing, the Defendants named in this Claim are liable for violations of Section 11 of the Securities Act to members of the Class who purchased or otherwise acquired the common stock sold pursuant and/or traceable to the May 2009 and/or June 2010 Offering Materials.

**FOURTH CLAIM**

**Violation of Section 12(a)(2) of The Securities Act**
**Against BNY Mellon and the Underwriter Defendants**

177.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count

is predicated upon defendants' liability for making false and materially misleading statements in the Offering Materials.

178.   This Claim does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Claim. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12 claim.

179.   With respect to the May 2009 Offering, this Claim is asserted against BNY Mellon and Underwriter Defendants Goldman Sachs, Morgan Stanley, Barclays, BNY Mellon Capital Markets, Citigroup, Merrill Lynch and UBS.  With respect to the June 2010 Offering, this Claim is asserted against BNY Mellon and Underwriter Defendants Goldman Sachs, Citigroup, Merrill Lynch and Morgan Stanley.

180.   BNY Mellon and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the May 2009 and June 2010 Offering Materials.  The May 2009 and June 2010 Offering Materials, including Prospectuses, Prospectus Supplements and pricing supplements incorporated therein, contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth in the charts provided herein. These statements include, among others, representations concerning BNY Mellon's FX trading scheme, financial condition and business prospects.

181.   This action is brought within three years from the time that the common stock upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

182. By reason of the foregoing, BNY Mellon and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to members of the Class who purchased common stock sold pursuant or traceable to the May 2009 and/or June 2010 Offerings pursuant to the May 2009 and June 2010 Offering Materials.

## FIFTH CLAIM

### Violation of Section 15 of The Securities Act
### Against Defendants Kelly, Gibbons, Park and the Director Defendants

183. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class. This count is predicated upon BNY Mellon's strict liability for making false and materially misleading statements in the Offering Materials.

184. This Claim does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Claim. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that the defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

185. The Defendants Kelly, Gibbons, Park and the Director Defendants, by virtue of their positions and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of BNY Mellon within the meaning of Section 15 of the Securities Act. Defendants Kelly, Gibbons, Park and the Director Defendants had the power and influence and exercised the same to cause BNY Mellon to engage in the acts described herein. Each of Defendants Kelly, Gibbons, Park and the Director Defendants served as an executive officer and/or director of BNY Mellon prior to and/or at the time of the May 2009 and/or June 2010 Offerings.

186.    By virtue of the conduct alleged herein, Defendants Kelly, Gibbons, Park and the Director Defendants are liable for the aforesaid wrongful conduct and are liable, to the same extent that BNY Mellon is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased BNY Mellon common stock pursuant and/or traceable to the May 2009 and June 2010 Offerings pursuant to the applicable May 2009 and June 2010 Offering Materials.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 14, 2011

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**

By: _____

Gerald H. Silk
Avi Josefson
Michael Blatchley
1285 Avenue of the Americas
New York, NY 10019
jerry@blbglaw.com
avi@blbglaw.com
michaelb@blblgaw.com

*Attorneys for Plaintiff Louisiana Municipal*
*Police Employees' Retirement System*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, R. Randall Roche, on behalf of Louisiana Municipal Police Employees' Retirement System ("LAMPERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the General Counsel of LAMPERS. I have reviewed the complaint and authorize its filing.

2.  LAMPERS did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  LAMPERS is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  LAMPERS' transactions in The Bank of New York Mellon Corporation securities that are the subject of this action are set forth in the chart attached hereto.

5.  LAMPERS served as representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *Louisiana Municipal Police Employees Retirement System v. KPMG, LLP et al.*, Case No. 10-cv-1461 (N.D. Ohio)
    *Louisiana Municipal Police Employees Retirement System v. Green Mountain Coffee Roasters, Inc. et al.*, Case No. 11-cv-289 (D. Vt.)

6.  LAMPERS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

    *In re Royal Bank of Scotland Group PLC Securities Litigation*, Case No. 09-cv-300 (S.D.N.Y.)
    *City of Roseville Employees' Retirement System v. Textron, Inc. et al.*, Case No. 09-cv-367 (D.R.I.)
    *Kyung Cho et al. v. UCBH Holdings, Inc. et al.*, Case No. 09-cv-4208 (N.D. Cal.)
    *City of Brockton Retirement System v. Avon Products, Inc. et al.*, Case No. 11-cv-4665 (S.D.N.Y.)

7.  LAMPERS will not accept any payment for serving as a representative party on behalf of the Class beyond LA MPERS' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.


I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of November, 2011.

R. Randall Roche
General Counsel
*Louisiana Municipal Police Employees'
Retirement System*

**Louisiana Municipal Police Employees' Retirement System**
**Transactions in Bank of New York Mellon Corporation (BK)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 03/31/2008 | 100 | 41.8000 |
| Purchase | 05/14/2008 | 500 | 44.7323 |
| Purchase | 06/10/2008 | 500 | 41.9683 |
| Purchase | 08/20/2008 | 14,800 | 34.9489 |
| Purchase | 08/21/2008 | 1,000 | 34.8320 |
| Purchase | 11/14/2008 | 100 | 29.9060 |
| Purchase | 11/19/2008 | 100 | 27.1005 |
| Purchase | 01/30/2009 | 3,900 | 26.3510 |
| Purchase | 01/30/2009 | 300 | 26.3700 |
| Purchase | 01/30/2009 | 1,800 | 26.4542 |
| Purchase | 02/12/2009 | 100 | 25.7700 |
| Purchase | 03/23/2009 | 100 | 26.2900 |
| Purchase | 07/06/2009 | 3,800 | 27.8821 |
| Purchase | 08/25/2009 | 3,000 | 29.2587 |
| Purchase | 10/15/2009 | 700 | 28.0649 |
| Purchase | 10/15/2009 | 700 | 28.1300 |
| Purchase | 05/03/2010 | 2,200 | 31.1900 |
| Purchase | 12/16/2010 | 184 | 29.3867 |
| Purchase | 12/20/2010 | 216 | 29.5220 |
| Purchase | 05/19/2011 | 100 | 28.6032 |
| Sale | 07/08/2008 | (1,000) | 36.1019 |
| Sale | 08/26/2008 | (15,800) | 33.8300 |
| Sale | 10/20/2009 | (400) | 29.3000 |
| Sale | 11/10/2009 | (600) | 26.9668 |
| Sale | 11/18/2009 | (300) | 26.7934 |
| Sale | 11/18/2009 | (2,000) | 26.8800 |
| Sale | 12/08/2009 | (1,100) | 26.9641 |
| Sale | 12/18/2009 | (600) | 26.7825 |
| Sale | 01/06/2010 | (1,600) | 28.1912 |
| Sale | 01/14/2010 | (600) | 29.0660 |
| Sale | 01/25/2010 | (300) | 29.7140 |
| Sale | 02/12/2010 | (100) | 27.0550 |
| Sale | 02/19/2010 | (1,800) | 28.6782 |
| Sale | 03/17/2010 | (1,200) | 30.3751 |
| Sale | 03/22/2010 | (2,200) | 30.5000 |