UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>BANK OF NEW YORK MELLON CORP.<br>FOREX TRANSACTIONS LITIGATION<br><br>This Document Relates to: 11-CV-09175 | ) **CIVIL ACTION NO.**<br>) MASTER FILE<br>) 12 MD 2335 (LAK)<br>)<br>) CONSOLIDATED CLASS ACTION<br>) COMPLAINT<br>)<br>) **JURY TRIAL DEMANDED**<br>) |

RECEIVED
2012 MAY 11 P 8:03
U S DISTRICT COURT SDNY

# TABLE OF CONTENTS

**Page(s)**

SUMMARY OF THE ACTION ............................................................................. 1

JURISDICTION AND VENUE .......................................................................... 8

PARTIES .......................................................................................................... 8

    A.    Plaintiffs............................................................................................ 8

    B.    Defendant BNYM.......................................................................... 9

    C.    The Officer Defendants................................................................. 9

    D.    The Director Defendants............................................................... 10

    E.    The Underwriter Defendants......................................................... 12

BNYM'S FRAUDULENT FX TRADING SCHEME ..................................... 13

    A.    Background:  The Purported Benefits Of BNYM's "Indirect/SI" Program
          To BNYM's Custodial Clients............................................... 13

    B.    The Reality:  BNYM "Rapes" Its Custodial SI/Indirect Client Accounts Of
          Hundreds Of Millions Of Dollars Through Its FX Fraud ...................... 15

    C.    BNYM's Concerted Efforts To Conceal Its FX Fraud.......................... 21

    D.    The Importance of the FX Fraud To BNYM's Financial Results ........ 25

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ................... 27

    A.    Defendants' False And Misleading Statements Regarding BNYM's
          Revenue And Internal Controls ......................................... 27

    B.    Defendants' False And Misleading Statements Regarding BNYM's Client
          Services And The Transparency Of Its Business Model ...................... 37

    C.    Defendants' False And Misleading Website Statements ...................... 38

PARTIAL DISCLOSURES, FURTHER MISLEADING STATEMENTS, AND THE
GRADUAL EMERGENCE OF THE FULL SCOPE OF THE FRAUD ..................... 40

POST CLASS PERIOD DEVELOPMENTS ................................................. 52

ADDITIONAL SCIENTER ALLEGATIONS............................................... 53

CLASS ACTION ALLEGATIONS ............................................................... 55

LOSS CAUSATION ........................................................................................... 56

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
DOCTRINE ................................................................................................... 57

EXCHANGE ACT COUNTS ........................................................................... 58

SECURITIES ACT COUNTS .......................................................................... 60

JURY TRIAL DEMANDED ............................................................................. 67

Lead Plaintiff, the State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund and, together with the Oregon Public Employee Retirement Board on behalf of the Oregon Public Employee Retirement Fund ("Oregon"), and the Additional Plaintiffs (*see* ¶¶17-18) (collectively, "Plaintiffs") bring this securities class action on behalf of investors who purchased or otherwise acquired the stock of The Bank of New York Mellon Corporation ("BNYM" or the "Company") between February 28, 2008 and October 4, 2011, inclusive (the "Class Period"), including those who purchased BNYM stock pursuant or traceable to BNYM's secondary public offerings of May 11, 2009 (the "May 2009 Offering") and June 3, 2010 (the "June 2010 Offering"). The allegations herein are based upon Plaintiffs' personal knowledge with respect to themselves and, as to all other matters, upon Lead Counsel's investigation, which has included, *inter alia*, a review of: internal emails and documents produced by BNYM to various regulators and filed as exhibits in various state attorneys general ("AG") actions; BNYM's public filings with the Securities Exchange Commission ("SEC"); securities analyst reports; transcripts of BNYM conference calls; BNYM press releases; media reports concerning BNY; and information from ongoing *qui tam,* state AG, and federal Department of Justice ("DOJ") proceedings against BNYM regarding its foreign exchange practices. Plaintiffs believe that additional evidentiary support will exist for the allegations herein after reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.    BNYM is a financial services company whose primary source of revenue is the provision of custody and related services to many of the world's largest institutional investors, including states, cities, colleges, universities, foundations and pension funds. For fiscal 2010, BNYM reported total revenues of $13.8 billion and $25 trillion in assets under custody – making BNYM the "world's largest global custodian" and "the largest custodian for U.S. public pension

plans." On behalf of these clients, BNYM provides a variety of services to safeguard, maintain and manage their assets. Because BNYM's large custodial clients typically invest in securities of foreign issuers, and must convert U.S. Dollars ("USD") into foreign currencies to purchase such securities (and convert foreign currencies back into USD when selling such securities), foreign exchange ("FX") services are one of the most important services that BNYM provides to its custodial clients. In conducting FX transactions during the Class Period, BNYM served in a fiduciary capacity and was obligated to act in the best interests of its custodial clients.

2.     Throughout the Class Period, BNYM described itself as an "open and honest" custodian that operated and conducted business with "the highest standards of integrity." Unbeknownst to investors, however, BNYM and its senior executives were actually engaged in a fraudulent scheme to artificially boost the Company's reported earnings by effectively rigging the pricing of its FX transactions to reap illicit profits at the expense of its custodial clients. Pursuant to this scheme, BNYM and its top officers not only misled their own customers, but also defrauded investors in BNYM common stock by issuing numerous false and misleading statements that touted both the financial performance of the Company's FX operations and the Company's alleged "highest ethical standards."

3.     BNYM's underlying FX scheme was brazen. BNYM represented that its "Indirect" or "Standing Instructions" ("Indirect/SI") custodial clients received the "most competitive/attractive FX rates available" when BNYM traded currencies on their behalf. However, instead of giving its clients the "best rate of the day" or the "best execution" price, BNYM actually provided the opposite: namely, the day's *worst* (or virtually the worst) rates of that day. Indeed, as BNYM employees have since admitted, and as internal BNYM documents have confirmed, BNYM artificially inflated its profits by pocketing the difference between what

2

was effectively the worst price of the day, which it charged its clients, and the actual market price at the time the clients' trades were made. Moreover, before getting its FX prices for its Indirect/SI clients, BNYM actually made a marginal adjustment at the end of each day so that the clients' prices were not *quite* the very worst of the day – an arbitrary and *de minimis* adjustment that was calculated to camouflage the fraud, and to create the wholly false appearance that client trades were priced during (rather than after) currency markets had closed. In short, the FX rates that BNYM charged its Indirect/SI clients bore no relationship to prevailing Interbank market rates at the time the trades were actually executed – and BNYM selected the rates after-the-fact solely to maximize its own fees at the expense of its clients.

4.      BNYM profited enormously from its FX scheme. For example – and contrary to BNYM's representations that it provided FX trading services "free of charge" – the New York Attorney General ("NYAG") has determined that, through the FX fraud, BNYM improperly reported hundreds of millions of dollars in phony income. Specifically, the NYAG determined that FX trades made through BNYM's Indirect/SI program were *seven times more profitable* to BNYM than the FX trades that it negotiated "directly" with its non-Indirect/SI clients. Similarly, the NYAG has calculated that although such trades accounted for only 20% of BNYM's total FX trades, they generated 65% to 75% of its total FX revenue, *and roughly 69% of BNYM's profits from FX trading*. Over the Class Period alone, this would equate to more than $2.4 billion. Indeed, during the financial crisis as most financial institutions (and investors) were suffering, BNYM exploited the volatility in FX rates to reap particularly obscene profits from its Indirect/SI customers: for example, based on documents provided by the relator in the Florida *qui tam* action, from the fall of 2008 to the fall of 2009 BNYM's "spreads" were 10-20 times greater for its Indirect/SI clients than for its clients which did not trade through that program.

5.     BNYM's FX trading business was critical to the Company's "Asset Servicing" business segment, which in turn was a critical pillar of BNYM's overall financial performance. For example, during the Class Period, BNYM's FX revenue constituted as much as 27% of BNYM's Asset Servicing revenue, and Asset Servicing revenue constituted as much as 56% of the Company's overall revenue. Indeed, FX revenue alone constituted as much as approximately 11% of the Company's total annual revenue during the Class Period. Moreover, as BNYM repeatedly emphasized throughout the Class Period, FX trading was one of its highest margin businesses. As one analyst explained in 2009, "the relative margin of [BNYM's FX business] cause[s] outsized growth in bottom line profitability." Although, as noted above, BNYM did not publicly disclose the extent to which its "Indirect/SI" clients accounted for such a disproportionate share of the Company's total FX revenues and profits – none of BNYM's FX programs were remotely as lucrative and profitable as its fraudulent "Indirect/SI" operation.

6.     Internal BNYM documents establish that BNYM's top officers were well aware of the Company's FX fraud since the inception of the Class Period. For example, on February 1, 2008 (just before the start of the Class Period), Defendant Jorge Rodriguez (a BNYM Managing Director and the head of BNYM's Global FX Sales) sent an email to his immediate superior, Richard Mahoney (BNYM's EVP and Head of Global and Capital Markets), which explained precisely how BNYM was utilizing its "Standing Instruction" program to exploit the daily spread in FX prices at the expense of its clients:

> *As we all know, Standing Instruction [Service] is the most profitable form of business. <u>It offers the traders a free intra-day option to time its currency execution in the marketplace knowing it does not have to get back to the customer immediately with the deal price</u>. Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges*. All these pricing advantages disappear when a client trades via an e-commerce platform and *full transparency* is achieved. Based on our actual records, in 2007, non-negotiated business generated an average profit of 9 basis points.

As Defendant Rodriguez's email also warned, whenever a BNYM Indirect/SI client decides not to utilize BNYM's standing-instruction program, "margins greatly decline:"

> Our experience has demonstrated that when a non-negotiated (ultra-friendly) client converts to a multi-bank e-commerce platform (competitive price shopper) *margins greatly decline as the free intra-day option feature previously enjoyed disappears, the competitive pressure of going up against as many as 10 banks at a time, and the client's ability to carefully monitor each and every trade at the time of execution reduces margins dramatically*.

7.     Later that same day, Mahoney sent his own slightly revised version of the Rodriguez email to BNYM's CEO, Defendant Robert Kelly, and its CFO, Defendant Bruce Van Saun. In that email, Mahoney reviewed for Defendants Kelly and Van Saun the basics of the ongoing FX fraud, and how the "pricing advantages" (and resulting revenues and profits) that BNYM enjoyed would "disappear" if BNYM were ever to become "full[y] transparen[t]" about its FX practices:

> *Standing instruction [...] offers [BNYM] traders a free intra-day option to time the currency execution in the marketplace knowing we don't have to get back to the customer immediately with the deal price.  Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges. All these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved* (comparison pricing, execution, and confirmation in real time)....
>
> Some anecdotes will help illustrate the impact to our business when a client moves from Standing Instruction to [directly negotiated] e-commerce [FX trading]:
>
> • [Client X] generated revenue of approximately $11 million in 2007 on business with an average margin of 8 basis points.  Since converting to a negotiated basis via an e-commerce solution in late 2007, [BNYM's] margins have compressed to 1 basis point and are possibly headed lower...

8.     Throughout 2008-2010, BNYM reported substantial revenue from FX trading. Each time, BNYM falsely claimed that the impressive FX revenue results were the result of client wins, increased client volume and volatility in the market.  At no time did BNYM disclose that such revenue flows were due in large part to the fraud alleged herein (or explain that

"increased volatility" enhanced profitability precisely because it created wider intra-day price swings that it exploited to collect especially large "spreads" on its Indirect/SI trades). More particularly, BNYM failed to disclose that it had: (1) manipulated FX trades to extract illicit profits from its Indirect/SI clients; (2) engaged in unlawful practices to artificially increase its FX fee revenue; (3) presented a misleading picture of BNYM's business model and how it "earned" its FX fee revenue; (4) withheld full transparency from its clients, which was critical to maintaining the profitability of its FX business segment and BNYM's overall profits; and (5) lacked adequate internal controls to prevent its FX customers from being defrauded.

9.     Information about the extent and seriousness of BNYM's FX fraud and its impact on BNYM's revenue and profits emerged only gradually through a series of partial disclosures beginning in early 2011, as BNYM's practices became the subject of an increasing number of civil suits, DOJ and state attorneys general investigations, and investigatory articles by *The Wall Street Journal* ("*WSJ*") and others.  For example, in January 2011, the initial whistleblower (or *qui tam*) lawsuit against BNYM was unsealed and the market learned that the Virginia AG had opted to intervene in that action.  This news was followed by explosive investigative articles, including articles by the *WSJ* on February 3-4, April 19 and May 23-24, which gradually disclosed additional information relating to BNYM's conduct, including internal BNYM documents and independent analysis.  Thereafter, on August 11, 2011, the Virginia AG and the Florida AG filed complaints in intervention against BNYM that cited to additional internal emails (including those quoted above) among BNYM executives, and that discussed the negative impact of providing clients "transparency" on FX fees and the impact that this would have on the Company's profitability.

10.     Significantly, however, after each of these partial disclosures, Defendants emphatically denied any wrongdoing and, in fact, embarked on an aggressive campaign to discredit or at least neutralize the impact of these partial disclosures. For example, on May 26, 2011, the *WSJ* published an Op/Ed submitted by BNYM in which the Company claimed that *WSJ* articles regarding BNYM's FX fraud were "***highly distorted***" and filled with "***inaccurate claims from baseless lawsuits***" about its "standing-instruction" program.

11.     The truth about the nature and scope of Defendants' FX fraud was fully revealed on October 4, 2011 (the last day of the Class Period), when the NYAG sued BNYM seeking *$2 billion* in damages for its FX-related misconduct, and the DOJ filed a civil fraud action against the Company. Overall, in response to the partial disclosures of the fraud, by the end of the Class Period the price of BNYM's stock had fallen to $18.28 – representing a staggering 59% decline from its Class Period high of $44.56, and a roughly 43% decline since the first partial disclosures concerning the fraud began to emerge in January 2011.

12.     Since this action was first filed, BNYM's FX revenue has declined significantly. In addition, BNYM has entered into a partial settlement of the DOJ's claims for injunctive relief, which sought to enjoin Defendants from continuing to make materially false and misleading statements concerning its FX services. Under that settlement, BNYM may "no longer describe the standing instruction service as free," "represent that the service applies best execution standards," or "represent that it offers netting of [FX] transactions unless certain criteria are met." The DOJ's remaining claims seeking monetary fines and penalties continue to be litigated. In the meantime, by this action, Plaintiffs (on behalf of themselves and the Class they seek to represent) seek to recover damages for the substantial losses they have suffered as a result of Defendants' false and misleading statements.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and under §§ 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o). This Court has subject matter jurisdiction over this action pursuant to § 22 of the Securities Act (15 U.S.C. § 77v), § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, BNYM's principal offices are located within this District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## PARTIES

### A.     Plaintiffs

16.     Lead Plaintiff The State of Oregon, by and through the Oregon State Treasurer on behalf of the Common School Fund and, together with the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund (collectively referred to herein as "Oregon"), operates and oversees public funds for the benefit of public schools and retirees respectively.  The Oregon Public Employee Retirement Fund is a state pension fund for retired public employees with roughly $58.4 billion in assets.  The Oregon Common School Fund, with roughly $1.1 billion in assets, provides financial support for public schools.  As set forth in the certification attached hereto as Exhibit A, the Oregon Public Employee Retirement Fund and Common School Fund purchased BNYM common stock at artificially inflated prices during the Class Period and have been damaged thereby.

17. Additional Plaintiff Pompano Beach General Employees Retirement System ("Pompano GERS") is a defined benefit plan that provides retirement benefits for employees of Pompano Beach, FL, and currently manages over $100 million in assets. As set forth in the certification attached hereto as Exhibit B, Pompano GERS purchased BNYM common stock in the June 2010 Offering and has been damaged thereby.

18. Additional Plaintiff Laborers' Local 235 Benefit Fund ("Local 235") is a defined benefit plan based in Elmsford, New York that provides retirement benefits to its members, with assets of roughly $100 million. As set forth in the certification attached hereto as Exhibit C, Local 235 purchased BNYM common stock in the May 2009 Offering and has been damaged thereby.

**B.** **Defendant BNYM**

19. Defendant BNYM, formed in July 2007 through a merger of The Bank of New York Company, Inc. ("BNY") and Mellon Financial Corp. ("Mellon"), is a financial services company with roughly $25 trillion in custodial assets that provides financial products and services to institutions and individuals worldwide.

**C.** **The Officer Defendants**

20. Defendant Robert P. Kelly ("Kelly") was BNYM's CEO from 2007 until he resigned on August 31, 2011 and Chairman from 2008 until he resigned.

21. Defendant Bruce W. Van Saun ("Van Saun") was BNYM's Chief Financial Officer ("CFO") from 2007 until July 1, 2008. He previously served as BNY's CFO.

22. Defendant Thomas P. Gibbons ("Gibbons") has served as BNYM's CFO since July 1, 2008. Prior to the merger, Gibbons was the CFO of BNY.

23.     Defendant Jorge Rodriguez is a BNYM managing director and headed its Global Foreign Exchange Sales from March 2005 through January 2010, and has served as Executive Vice President and Head of Global FX sales at BNYM Global Markets since January 2010.

24.     Defendant Michael K. Hughey ("Hughey") was BNYM's Controller from 2007 until May 1, 2008. Prior to the merger, Hughey was the Controller of Mellon.

25.     Defendant John A. Park ("Park") became BNYM's EVP and Controller on May 1, 2008, and continues to serve in this position.

26.     Defendants Kelly, Van Saun, Gibbons, Rodriguez, Hughey and Park are collectively referred to as the "Officer Defendants." The Officer Defendants, because of their positions with BNYM, possessed the power and authority to control the contents of BNYM's filings with the SEC, its press releases, its presentations to securities analysts and institutional investors, and its other public statements. Each Officer Defendant was provided with copies of the Company's reports and other public statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each Officer Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and misleading when made.

**D.     The Director Defendants.**

27.     Defendant Ruth E. Bruch ("Bruch") has been a member of BNYM's Board of Directors since July 2007.

28.     Defendant Nicholas M. Donofrio ("Donofrio") has been a member of BNYM's Board of Directors since July 2007.

29. Defendant Steven G. Elliott ("Elliott") was a member of BNYM's Board of Directors from 2007 until July 31, 2008. Elliott was also a Senior Vice Chairman of BNYM from 1998 until December 30, 2010.

30. Defendant Gerald L. Hassell ("Hassell") has been a member of BNYM's Board of Directors since July 2007.

31. Defendant Edmund F. Kelly ("E. Kelly") has been a member of BNYM's Board of Directors since July 2007.

32. Defendant Richard J. Kogan ("Kogan") has been a member of BNYM's Board of Directors since July 2007.

33. Defendant Michael J. Kowalski ("Kowalski") has been a member of BNYM's Board of Directors since July 2007.

34. Defendant John A. Luke, Jr. ("Luke") has been a member of BNYM's Board of Directors since July 2007.

35. Defendant Robert Mehrabian ("Mehrabian") was a member of BNYM's Board of Directors from July 2007 until April 12, 2011.

36. Defendant Mark A. Nordenberg ("Nordenberg") has been a member of BNYM's Board of Directors since July 2007.

37. Defendant Catherine A. Rein ("Rein") has been a member of BNYM's Board of Directors since July 2007.

38. Defendant William C. Richardson ("Richardson") has been a member of BNYM's Board of Directors since July 2007.

39. Defendant Samuel C. Scott III ("Scott") has been a member of BNYM's Board of Directors since July 2007.

40. Defendant John P. Surma ("Surma") has been a member of BNYM's Board of Directors since July 2007.

41. Defendant Wesley W. von Schack ("von Schack") has been a member of BNYM's Board of Directors since July 2007.

42. Defendants Bruch, Donofrio, Elliott, Hassell, E. Kelly, Kogan, Kowalski, Luke, Mehrabian, Nordenberg, Rein, Richardson, Scott, Surma and von Schack are collectively referred to as the "Director Defendants."

**E.  The Underwriter Defendants**

43. Defendant Barclays Capital Inc. ("Barclays") was an underwriter of BNYM's May 2009 common stock offering.

44. Defendant BNY Mellon Capital Markets, LLC ("BNYM Capital"), a subsidiary of BNYM, was an underwriter of BNYM's May 2009 common stock offering.

45. Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of BNYM's May 2009 common stock offering, and co-lead underwriter of the June 2010 offering.

46. Defendant Goldman, Sachs & Co. ("Goldman Sachs") was co-lead underwriter of both BNYM's May 2009 and June 2010 common stock offerings.

47. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of both BNYM's May 2009 and June 2010 common stock offerings.

48. Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") was co-lead underwriter of BNYM's May 2009 offering and an underwriter of the June 2010 offering.

49. Defendant UBS Securities LLC ("UBS") was an underwriter of BNYM's May 2009 common stock offering.

50. Defendants Barclays, BNYM Capital, Citigroup, Goldman Sachs, Merrill Lynch, Morgan Stanley and UBS are collectively referred to herein as the "Underwriter Defendants,"

and are charged herein solely with violations of the Securities Act in their capacity as underwriters for May 2009 and/or June 2010 offerings based on the materially false and misleading offering materials issued in connection therewith.

## BNYM'S FRAUDULENT FX TRADING SCHEME

### A. Background: The Purported Benefits Of BNYM's "Indirect/SI" Program To BNYM's Custodial Clients

51. Institutional investors and asset managers utilize BNYM's custody services for multicurrency trading and settlements, accounting, portfolio servicing and reporting, and income collection. Custodial clients typically invest in multiple securities of foreign issuers, and as such, must convert USD into foreign currencies to purchase these overseas securities. Additionally, foreign dividends and currencies must be converted into USD before being repatriated to the U.S.. BNYM offers FX trading services to its custodial clients as a component of its custodial/trust services. FX transactions involve "buy" and "sell" rates, which are used to determine how much one currency (such as the USD) is worth in terms of another (*e.g.,* the euro). The difference between the rate at which a trader such as BNYM buys and sells a particular currency is called the "spread."

52. Throughout the Class Period, BNYM executed FX transactions for its clients in basically two separate ways. For its direct clients, after a request was made for a FX transaction, BNYM would quote an exchange rate based on then-current market rates that the client could either accept or reject. If BNYM's rate was sufficiently competitive, the client would accept it and the trade would be executed at the agreed upon exchange rate. BNYM made very modest profits on its "direct" (or "negotiated") FX trades during the Class Period.

53. A large number of BNYM clients, however, conducted their FX trades using BNYM's "indirect" or "standing instruction" program. These FX trades (hereafter referred to as

"Indirect/SI") were *not* negotiated between the client and BNYM, and did not involve the client receiving a quoted exchange rate based on then-current market prices. Instead, after a request was made for a FX transaction, an Indirect/SI client would rely on BNYM to independently conduct the trades. BNYM's Asset Servicing group (within BNYM's custody operation) would then enter the client's trade request into BNYM's Cash Management System ("CMS"). The trade request would include: (a) client name, (b) amount of foreign currency to be traded, (c) currency pair being traded (*e.g.*, buy Japanese Yen and sell USD, or sell euros and buy USD), (d) trade date, and (e) time stamp of entry into the system. BNYM's CMS system would then send the FX trade order to BNYM's FX Trading System, known as "Charlie," where BNYM's FX Transaction Desk would then conduct the trade.

54.    BNYM represented that the Indirect/SI FX trades were executed according to "best execution standards" and that it provided its Indirect/SI clients with FX trading services "free of charge." For example, BNYM represented on its website that its "Indirect/SI" FX services were "[o]perationally simple, free of charge and integrated with the client's activity on the various securities markets," and were "designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business," all while giving its Indirect/SI clients the benefit of FX trades "execut[ed] according to best execution standards."

55.    Moreover, BNYM also represented that its Indirect/SI clients would be given the benefit of "aggregation and netting" of their FX transactions. "Netting" trades (also known as "matching" trades) involves aggregating a client's "buys" and "sells" involving the same currencies on the same trade, so that the client ultimately incurs the costs of only one "netted" trade. For example, a client who might place five separate orders to convert a total of 5 million euros to USD on a given day, while also needing to convert USD $10 million to euros, would, if

the trades were netted, need to place only *one* trade based on the *difference* between euro €5 million and USD $10 million – thereby saving the client the transaction costs of doing separate trades representing the *combined value* of the trades.

**B.     The Reality: BNYM "Rapes" Its Custodial SI/Indirect Client Accounts Of Hundreds Of Millions Of Dollars Through Its FX Fraud**

56.     The purported "benefits" of BNYM's FX program to the Company's Indirect/SI clients, however, were a sham. As a result, both BNYM's clients and investors in BNYM stock were materially misled.

57.     First, trading through BNYM's Indirect/SI program was not conducted on a "best execution" basis. To the contrary, as detailed in the *qui tam* complaints (including subsequent complaints in intervention filed by the Virginia and Florida Attorneys General) and the complaints brought by the DOJ and the Attorneys General of New York, Ohio and Massachusetts, BNYM would effectively credit its Indirect/SI clients with the *worst* prices of the day. More specifically, after BNYM received instructions from a custodial client to execute a FX trade, BNYM would convert funds to complete the transaction. However, the *client's* price for the transaction would *not* be based on the price(s) that BNYM actually paid. Instead, *after the trade was executed* "[BNYM] would note the low and high exchange rate of the day for the two currencies involved in the FX trade." At the end of the trading day, BNYM would then simply "ignore[] the price [it] paid for the FX [transaction]" *and would charge its client for the FX transaction "as if the trade occurred at either the high or low of the day (depending on the nature of the transaction, buy or sell), in order to charge [its client] the least favorable rate that occurred that trading day."*

58.     In short, when an Indirect/SI client bought a foreign currency, BNYM would buy the currency at one rate, but charge its clients a higher rate. BNYM then pocketed the difference

between the price it paid for the currency and the price it charged its clients.  Conversely, when a

client sold a foreign currency, BNYM would sell the currency at one rate, but credit its clients

with a lower rate.  Again, BNYM pocketed the difference between the price it received for the

currency and the price it gave to its clients.

59.     Accordingly, BNYM's indirect FX trades were obviously not "executed

according to best execution standards"; "Best execution" requires that a broker-dealer seek to

obtain for its customers the most favorable terms reasonably available under the circumstances.

60.     Indeed, numerous internal BNYM documents show that BNYM's and the

industry's definition of best execution during the Class Period was execution "to achieve the goal

of maximizing the value of the client portfolio under [the] particular circumstances of the time."[1]

Similarly, BNYM's internal definition of best execution invoked the SEC's statement that "best

execution is trading in such a manner that the client's total cost or proceeds in each transaction is

*the most favorable under the circumstances*," as well as the Association for Investment

Management and Research's definition of best execution as "well informed trade execution

decisions made with the intent of maximizing [sic] the value of the client portfolio under the

particular circumstances at the time."  BNYM's internal FX marketing materials (dating back to

before its merger with Mellon) were also designed to stress that client inquiries about "best

execution" should be answered by stating that the Company "ensures best execution" by offering

the "best rates for our clients":

> The Bank of New York ensures best execution on foreign exchange transactions
> through the following mechanisms: As a major market participant, the Bank is

---

[1] Numerous internal BNYM documents have been made public through the Massachusetts Attorney General action or through public records requests by the *WSJ*.  For those documents cited in the Ohio and Florida Attorney General complaints not made publicly available, Lead Counsel has confirmed with the Attorneys General of Ohio and Florida that their complaints are, except where explicitly stated on information and belief, based on a review of the evidence.  The U.S. Attorney's Office for the Southern District of New York has also confirmed that its complaint is based on its review of the evidence.

actively engaged in making markets and taking position in numerous currencies so that we can provide the ***best rates for our clients***.

An internal BNY "Question and Answer" document from June 2006 similarly states:

> [Question:] "How do you ensure custody clients consistently receive fair prices for their trades?
>
> [Answer]: Clients benefit from our attractive rates because we aggregate all client income in any given currency to obtain the 'best rate of the day.' That 'best rate of the day' is applied to all of the income conversions that we execute for that day, regardless of the amount."

61.     Thus, at a minimum, BNYM knew that "best execution" standards required it to execute Indirect/SI FX transactions in a manner designed to secure the best available rates. Instead, BNYM did the opposite, charging or crediting clients the worst (or nearly the worst) rate of the day and pocketing the difference. Indeed, BNYM's system of executing FX trades and assigning the worst FX rates of the day to its Indirect/SI clients was purposely designed to allow BNYM to exploit daily trading volatility in favor of BNYM at the expense of its custodial clients.

62.     BNYM has since admitted that it did not execute indirect trades in accordance with best execution standards. For example, BNYM's head of Business Development for Global FX Sales testified that:

> Q.     If I understand what you're saying, it's that Bank of New York Mellon does not do best execution with respect to Standing Instruction trades because it is a counterparty?
>
> A:     My understanding is that Bank of New York Mellon does not have a role in providing best execution.

63.     Similarly, as David Green, another BNYM executive, admitted in a July 26, 2010 email to Defendant Rodriguez and other BNYM executives, ***BNYM's Indirect/SI execution is at "the high and low of the day, <u>depending on which one is against [the client]</u>."*** Indeed,

Defendants acknowledged in an April 21, 2010 email to, among others, Defendant Rodriguez, that "*[p]ricing is an art, not a science.*"

64.    Second, it is equally apparent that BNYM did not provide indirect trading "free of charge." For example, as early as August 1, 2006, an internal BNYM email states: "We charge a premium for our services (i.e. we have the audacity to think we are entitled to a spread on every trade. How 1990's is that?)."

65.    Third, BNYM also did not aggregate and net indirect trades. Had BNYM in fact netted Indirect/SI trades, when an Indirect/SI client gave BNYM both buy and sell orders for a particular currency on a given day, it would have executed only a single buy or sell order to cover the net difference. Instead, BNYM executed each buy and sell transactions separately, and applied its fraudulent spreads to all the trades. Indeed, BNYM conducted post-trade cash flow analyses every day to tabulate its profits from *each* completed Indirect/SI FX trade, based on the difference between (a) the price that BNYM actually received when its trading desk executed the transaction and (b) the artificially high (or low) price that BNYM later assigned to the indirect client at the end of the trading day.

66.    BNYM took a number of steps to conceal its fraudulent practices. As noted above, before fixing its FX prices for its Indirect/SI clients, as part of the fraud BNYM made a marginal adjustment at the end of each day to the prices it gave its clients so that the clients' prices were not *quite* the very worst of the day. These arbitrary and *de minimis* adjustments were calculated to camouflage BNYM's fraud and to create the wholly false appearance that client trades were priced at the time of the trade, and during (rather than after) currency markets had closed. Nor was this the only step that BNYM took to conceal its fraudulent practices. For example, BNYM also deliberately refused to provide its Indirect/SI clients with "time stamped"

trade order confirmations (as well as internal time-stamped confirmations from its CMS system, which reflected the time when BNYM traders had actually executed the underlying FX trade for the client). This practice helped conceal the fraud because without time-stamped trade confirmations, clients could not compare the trade prices with which they were credited to the market prices at the times that BNYM actually had executed the relevant trades. Similarly, BNYM conducted daily "reconciliation" calls between its two FX trading desks (located in New York and Pittsburgh, respectively) to ensure that there were no reported discrepancies between their pricing operations, thus further reducing the risk that BNYM's fraud would be discovered.

67. A fraud of this length and magnitude, and perpetrated against BNYM's largest custody clients – including hundreds of public employee, teacher, police and fire pension funds – obviously was not designed or carried out without the knowledge of BNYM's top executives. Indeed, as detailed in the Virginia Complaint in Intervention, BNYM's "deceptive practices reflected *a well thought-out scheme emanating from the highest reaches of BNYM's senior management*," who in turn *"were aware of and participated in the deception*." A March 29, 2011 whistleblower letter from a BNYM employee to the Florida AG similarly confirms that BNYM's "top management was aware of the fraud the entire time":

> I was [...] trained in committing fraud using various strategies [against] the bank's corporate foreign exchange clients.... I can tell you firsthand and without any hesitation that the fraud is prevalent throughout BNY Mellon's Foreign Exchange Group. I can also share with you that *top management was aware of the fraud the entire time*.... BNY Mellon's foreign exchange group was very small. I was only 1 of 3 people in the entire bank who focused exclusively on the corporate client segment. We used the same systems and fraudulent strategies on the corporate clients as was used on the pension fund clients.

68. Internal company documents also confirm that the Officer Defendants were well aware of the FX fraud. For example, as Defendant Rodriguez explained in a February 1, 2008 email to his immediate superior, Richard Mahoney (BNYM's EVP and Head of Global and

Capital Markets), BNYM used its Indirect/SI program to exploit the daily spread in FX rates at the expense of its clients, and BNYM's FX margins would "greatly" decline in the event that Indirect/SI clients were to migrate away from the program in substantial numbers:

> As we all know, Standing Instruction [service] is the most profitable form of business. *It offers the traders a free intra-day option to time its currency execution in the marketplace knowing it does not have to get back to the customer immediately with the deal price*. Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges. *All these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved*. Based on our actual records, in 2007, non-negotiated business generated an average profit of 9 basis points....

> Our experience has demonstrated that when a non-negotiated (ultra-friendly) client [*i.e.*, Indirect/SI client] converts to a multi-bank e-commerce platform (competitive price shopper) *margins greatly decline as the free intra-day option feature previously enjoyed disappears, the competitive pressure of going up against as many as 10 banks at a time, and the client's ability to carefully monitor each and every trade at the time of execution reduces margins dramatically*.

69.     Defendant Rodriguez then provided a number of recent examples where BNYM had experienced a significant loss in revenue as a result of a client switching from its Indirect/SI services to "direct" FX services:

> Recent examples of this are [Client X] where in 2007, BNY Mellon generated revenue of approximately $12MM, on business averaging a 7 basis point margin. Since converting over to a negotiated status, margins have been compressed to 1 basis point and are possibly headed lower . . . Another noteworthy example is [Client Y] where margins in 2007 went from two basis points on swaps business to one-tenth of that spread today . . . [Client Z] is yet a third example of what was once a very good FX high margin client who upon moving to [a negotiated channel] squeezed margins so much that it was more cost effective for us to earn third party FX fees (TPFX) than to compete for their FX business.

Defendant Rodriguez then concluded by stating:

> At the end of the day, FX is a pure commodity and it is up to the sales professional to pro-active[ly] manage a client relationship with a goal of identifying ways to add value and generate a fair return in the process. *The problem is that in these cases, a fair return is only a fraction of what it could be if the business were awarded to BNY Mellon in a non-negotiated capacity*.

70.    As Mahoney then advised the Company's CEO and CFO – Defendants Kelly and Van Saun – in an email later that same day that was entitled "FX Channel Mix" (and that was apparently sent in response to a specific inquiry by CEO Kelly):

> *Standing instruction...offers the traders a free intra-day option to time the currency execution in the marketplace knowing we don't have to get back to the customer immediately with the deal price. Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges.*

The email also expressly briefed Kelly and Van Saun on how "full transparency" with BNYM's Indirect/SI clients regarding its FX practices would destroy BNYM's "pricing advantages": *"All these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved (comparison pricing, execution, and confirmation in real time)."*

71.    Mahoney's email also cited several of the same client "anecdotes" included in Defendant Rodriguez's earlier email to drive home for Defendants Kelly and Van Saun "the [negative] impact to our business when a client moves from standing instruction to e-commerce." Finally, Mahoney concluded his email by offering to "walk over" to CEO Kelly's office "to answer [any remaining] questions directly."

### C.    BNYM's Concerted Efforts To Conceal Its FX Fraud

72.    As discussed in ¶66 above, BNYM took a number of steps to minimize the risk that its FX trading scam would be exposed. In the Fall of 2009, however, BNYM and the Officer Defendants faced a potentially new challenge to their cover-up efforts when, on October 20, 2009, an action filed by the California AG against State Street Bank & Trust Co. ("State Street") was unsealed which alleged that State Street had systematically overcharged state pension funds for their FX transactions. Tellingly, BNYM's Director of FX Trading e-mailed a *Reuters* news story about the lawsuit to all of BNYM's FX sales employees with the subject heading *"Oh No."* Similarly, a former BNYM FX employee who had left BNYM in 2008,

Robert Donelan, promptly emailed his former colleagues (including BNYM's head of Business Development for Global Sales), an article about the lawsuit against State Street. Donelan wrote: *"Well, is the 'Game' over? Time to retire after raping the custodial accounts, of all 'Public Trust' money?"* In early 2010, BNYM also received a number of subpoenas from state and federal regulatory authorities concerning its FX program. According to the relator in the Florida *qui tam* action, upon learning of these investigations Susan Pfister, a veteran of BNYM's Pittsburgh FX trading desk, similarly lamented: *"It's over, it's all over."*

73.      BNYM immediately recognized that its own FX fraud was at risk of discovery and hastily assembled a team to respond to the inquiries that it would now doubtless receive. For example, BNYM's Executive Vice President e-mailed all senior personnel involved with FX to advise them of the *State Street* suit and directed them to "[p]ut a team together to examine our practices . . . Assume disposition of this case will shine a light on Standing Instruction FX, and best execution practices."

74.      BNYM, however, had no intention of declaring "game over" with respect to its ongoing fraud, and consciously decided **_not_** to adopt a policy of transparency or to disclose how it actually priced Indirect/SI FX transactions. For example, as an October 28, 2009 e-mail from John Cipriani, Managing Director of Foreign Exchange Planning and Execution, stated: *"I do NOT like it [transparency]. Once pricing spreads are disclosed it will be a race to how quickly clients work it down to zero."*

75.      Accordingly, BNYM and the Officer Defendants made only *de minimis* changes in their disclosures that fell far short of correcting their past misstatements – let alone of bringing the fraud to an end. For example, prior to November 2009, BNYM's website and client communications stated that Indirect/SI FX services were provided "according to best execution

standards" and "free of charge." In November 2009, BNYM's head of Business Development for Global Sales proposed in at least two separate internal e-mails to senior management that BNYM add to its website description of Indirect/SI trades a statement that "[t]ransactions in [the Indirect/SI] program tend to be priced towards the limits of the respective currency's daily inter-bank trading range." However, this proposal was rejected. Instead, BNYM only removed from its website the statement that indirect FX trade execution was "free of charge," and added a definition of "best execution" (which had not previously been specifically defined) as follows:

> We consider best execution, as it relates to the Standing Instruction process, as providing a consistent, accurate and efficient means of facilitating pre-trade, trade and post-trade activities. These activities include identification of trade requirements, pre-trade administration associated with regulated markets, arranging settlement, reconciling discrepancies, posting cash to accounts and reporting all relevant transaction details to investment accounting systems.

However, this novel definition of "best execution" was not only plainly inconsistent with any normal usage of that term, it also continued to be patently (and deliberately) misleading because it failed to disclose (*inter alia*) that BNYM's practice was (and continued to be) to charge or credit Indirect/SI clients what was effectively the worst price of the day. Nor did this revised disclosure correct Defendants' earlier repeated misstatements that Indirect/SI FX trades would be executed at the "best price available" at the time of the trade and "free of charge."

76. Similarly, in response to inquiries from customers about its Indirect/SI FX practices that it received in the wake of the *State Street* action, BNYM deliberately chose **not** to disclose its fraudulent conduct. For example, according to the relator, BNYM EVP Mahoney stated internally that BNYM's FX Department "owns" how to respond to such inquiries, and that "we do not have to tell anyone how much money we make on our dealings."

77. Instead, according to the relator, when customers began to ask questions regarding BNYM's indirect FX trading practices, BNYM's customers were told to "go pound

sand," and BNYM continued to lie and mislead. For example, in a December 18, 2009 email purportedly explaining to a client why it received a particular FX price, BNYM's Managing Director of FX Planning and Execution (John Cipriani) simply lied to the client, stating: "The rate assigned to this type of transaction is a blended rate derived by a number of market trades executed throughout the day to offset the many client trades received during the session. This method is employed by our Brussels desk and the NY desk so that all clients in our SI program are executed at the same rate (We are required to do this to fulfill ERISA requirements)." Likewise, when a representative of T. Rowe Price Associates requested that BNYM explain how it provides best execution to its clients, BNYM told the representative that "we price foreign exchange at levels generally reflecting interbank market at the time the trade is executed by the foreign exchange desk."

78.     BNYM's efforts to assuage custodial clients' concerns following disclosure of the *State Street* action and the subpoenas were successful. For example, an e-mail from Defendant Rodriguez dated July 21, 2010 stated: "FX Sales volumes from the FX Sales force for the first half of 2010 vers[u]s the same period last year are up over $1 trillion, an amazing 24% growth over the same period last year." In a reply email sent later that same day, Robert Near, Managing Director of BNYM Global Markets, attributed this success to BNYM's success in remaining less transparent than its competitors:

> While difficult to quantify, and only having a 'couple' of data points, ***I think BNYM has been more successful in maintaining spreads in the [Indirect/]SI space compared to these peers [State Street and Northern Trust]. Another way to say this is BNYM is 'late' to the transparency space.***

Although Near's email went on to note that BNYM was hearing more from some of its clients about how "our competitors are offering time stamping and fixed spreads across all currencies," BNYM's continuing refusal to make adequate disclosures allowed its lucrative fraud to continue.

### D.    The Importance of the FX Fraud To BNYM's Financial Results

79.    During the Class Period, BNYM's FX operations were extremely important to BNYM. For the years 2000 through 2010, BNYM and its predecessors reported more than $7.7 billion in FX revenue, and during the Class Period (as the chart below shows) FX revenue clearly comprised a significant percentage of BNYM's *total* revenue:

| Year-End | FX Revenue | FX as % of Total Revenue |
|---|---|---|
| 2008 | $1.462 billion | 10.7% |
| 2009 | $1.0 billion | 9.9% |
| 2010 | $886 million | 6.4% |
| First three quarters of 2011 | $621 million | 7% |

80.    Moreover, BNYM's fraudulent Indirect/SI operations were far more profitable to the Company than its "direct" or "negotiated" FX transactions. For example, the NYAG has calculated based on internal BNYM documents that, from 2001 to 2009, BNYM "earned" *seven times more* on its Indirect/SI FX transactions than it did on its direct FX transactions, resulting in an average profit margin of 17.5 basis points ("bps") on Indirect/SI FX trades compared to an average of only 2.5 basis points on direct FX transactions. Similarly, an internal analysis prepared by BNYM in November 2009 showed that on a year-to-date basis BNYM's margin on Indirect/SI trades was 22.33 basis points, compared to only 2.80 basis points on direct FX trades placed by telephone – and compared to a mere 1.18 basis points on trades placed through BNMY's e-commerce FX platform. Defendants plainly understood that indirect FX transactions were a major profit center for BNYM. As Defendant Rodriguez wrote in a February 1, 2008 email to Mahoney, *"As we all know, Standing Instruction [Service] is the most profitable form*

*of business."* Similarly, a December 2008 internal e-mail to BNYM's Global Market Management Committee noted how, despite the financial crisis, BNYM's FX trading had made "bundles of cash."

81. Defendants also knew that providing "best execution" and "transparency" of its FX practices to its clients and the market would significantly lower BNYM's margins and profits. For example, as early as June 2004, BNY executives stressed in internal emails the need to "protect" its Indirect/SI program from being converted into a more transparent program, given the substantial adverse impact that such a change would have BNYM's revenue. As one such email noted, "[t]his is currently our revenue and it should remain so; *we all understand how the bonus pool funds*." Similarly, an internal Global Markets 2007 Strategic Plan prepared just before the BNY/Mellon merger noted the negative impact of clients moving from "indirect" to "direct" trading, and expressly warned that "[i]f a Standing Instruction client converts to benchmark pricing, then the pre-negotiated spread may be as low as 1-3 basis points."

82. As of the beginning of the Class Period, internally BNYM continued to be greatly concerned about the detrimental effect that increased transparency would have on its FX revenues. For example, an April 4, 2008 internal email titled "Transparency" sent to Defendant Rodriguez and other senior BNYM managers stated bluntly: "*In general transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us many times over in reduced revenue. Nothing like a rock and a hard place.*" Moreover, an attachment to that email, entitled "Transparency – Top 5 Impacts," described the various negative effects that would result from providing truthful pricing information to its clients, and further described (*inter alia*) how (a) BNYM's purported "proprietary [pricing] information can be used against us in negotiations and create conflicts with clients who may be charged more;" (b) Global Markets

clients would likely be able to "further reduce their fees from 20 BPS [basis points] to 1 BPS;" and (c) BNYM should "prepare for fee compression" and would "need to generate more business to attain [the] same fee level."

83.     By November 2008, an internal BNYM analysis of its FX business concluded that "[m]argins have declined across all channels of distribution," due at least in part to increasing "[e]fforts to achieve best execution" and "[g]eneral demands for price transparency" on the part of some of BNYM's customers.  Defendants, however, remained determined to keep milking their FX cash cow with respect to as many customers as possible for as long as they could continue to get away with concealing how BNYM's Indirect/SI FX program actually represented the *opposite* of "best execution" practices and "free of charge" services.  Accordingly, as more fully described below, throughout the Class Period Defendants continued to issue a stream of false and misleading statements, and the truth about the nature, scope and seriousness of BNYM's FX scam remained concealed not only from BNYM's customers, but also from its investors.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

**A.      Defendants' False And Misleading Statements Regarding BNYM's Revenue And Internal Controls**

84.     The Class Period begins on February 28, 2008.  On that date, the Company filed a Form 10-K with the SEC for the fiscal year ended December 31, 2007 (the "2007 Form 10-K").  The 2007 Form 10-K, signed by Defendants Kelly, Van Saun and Hughey, stated, *inter alia*:

> In 2007, we reported consolidated net income of $2.039 billion and diluted earnings per share of $2.18 compared with net income of $2.847 billion and diluted earnings per share of $3.94 in 2006.

*      *      *

Revenue from foreign exchange and other trading activities was $786 million in 2007, compared with $415 million in 2006. The increase reflects . . . the favorable impact that resulted from increased currency volatility in the second half of 2007 .
. .

*        *        *

Foreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, was $786 million in 2007, an increase of $371 million, or 89%, compared with 2006. The increase was due to . . . record customer volumes due to increased activity of the existing client base, new clients, and the favorable impact that resulted from increased currency volatility in the second half of 2007.

85.    With respect to BNYM's adherence to ethics and its commitment to clients, the

2007 Form 10-K stated:

To address [operational] risks, we maintain comprehensive policies and procedures and an internal control framework designed to provide a sound operational environment. These controls have been designed to manage operational risk at appropriate levels given our financial strength, the business environment and markets in which we operate, the nature of our businesses, and considering factors such as competition and regulation. Our internal auditors monitor and test the overall effectiveness of the internal control and financial reporting systems on an ongoing basis.

We have also established procedures that are designed to ensure that policies relating to conduct, ethics and business practices are followed on a uniform basis. Among the procedures designed to ensure effectiveness are our "Code of Conduct," "Know Your Customer," and compliance training programs.

86.    The statements contained in ¶¶84-85 regarding BNYM's FX revenue, net income, and internal controls and the reasons for the increases in FX trading revenue were materially false and misleading when made because BNYM failed to disclose that it: (1) manipulated FX trades to extract illicit profits from its custodial clients; (2) engaged in unlawful practices to artificially increase its FX fee revenue which made up a material amount of BNYM's revenue; (3) presented a misleading picture of the Company's business model and the means by which it earned FX fee revenue; (4) failed to inform investors that withholding full transparency from its clients was critical to maintaining the profitability of its FX program; (5) materially inflated its

reported financial results; and (6) lacked adequate internal and financial controls over its foreign exchange operations. These false and misleading statements concealed the Company's true profitability and the sustainability of BNYM's reported revenues, and concealed known risks that the Company's illegal trading scheme exposed the Company to regulatory action, government and private lawsuits, adverse publicity, the loss of current and future custodial clients, and that exposure of BNYM's FX trading practices would negatively impact the Company's pricing of FX and other services.

87.     Moreover, statements that attributed changes in FX trading revenue to volatility and volume were materially misleading because they failed to disclose that such revenue was due largely to BNYM's booking of Indirect/SI client FX transactions at spreads that far exceeded best execution standards, and that were effectively based on the worst prices of the day. These statements were also false and misleading because they failed to disclose that any increases in revenue would have been more modest (or non-existent), and any declines more severe, had BNYM not implemented its fraudulent FX scheme.

88.     As set forth in the chart below, throughout the Class Period Defendants continued to make additional false and/or misleading statements in their annual and quarterly filings with the SEC and quarterly earnings announcements regarding BNYM's reported foreign exchange revenue ("FX&OTR") and net income and the reasons for the changes in reported FX trading revenue in their annual and quarterly filings with the SEC and Company press releases[2]:

|  | False and Misleading Financial Metrics | False and Misleading Commentary |
| --- | --- | --- |
| Apr. 17, 2008  1Q 2008  press release/ | Foreign Exchange and Other Trading Revenue | Defendants attribute year-over-year ("y-on-y") increase in FX&OTR to "benefit of |

---

[2] In deference to the Court's statements at the March 29, 2012 hearing, Plaintiffs have presented Defendants' false and misleading revenue and income statements in chart form in order to conserve space.

| 1Q2008 Form 10-Q filed May 9, 2008<br><br>Signed by Defendants Kelly, Van Saun, and Park | ("FX&OTR") = $259mm<br><br>BNYM Net Income = $746 mm | increased client volumes and currency volatility."<br><br>Defendants state, "Market volumes and volatility, together with new business wins, continued to favor our asset servicing and clearing businesses . . . ." |
|---|---|---|
| July 17, 2008 2Q2008 press release/2Q2008 Form 10-Q filed on Aug. 8, 2008<br><br>Signed by Defendants Kelly, Gibbons and Park | FX&OTR = $308 mm<br><br>BNYM Net Income = $309 mm | Defendants attribute y-on-y and quarter-over-quarter ("q-on-q") increase in FX&OTR to "benefit of increased volatility as well as higher client volumes" and "benefit of currency volatility and increased client volumes." |
| Oct. 16, 2008 3Q2008 press release/<br>3Q2008 Form 10-Q filed Nov. 1, 2008<br><br>Signed by Defendants Kelly, Gibbons and Park | FX&OTR = $385 mm<br><br>BNYM Net Income = $303 mm | Defendants attribute y-on-y increase of 62% and q-on-q increase of 25% in FX&OTR to the "benefit of higher market volatility and volumes associated with our client activity and the current market environment" and "benefit of increased volatility and higher client volumes." |
| Jan. 20, 2009 4Q2008 press release | FX&OTR = $510 mm | Defendants attribute y-on-y increase of 67% and q-on-q increase of 32% in FX&OTR to the "the benefit from higher volatility in all major currencies." |
| 2008 Form 10-K filed on Feb. 27, 2009.<br><br>Signed by Defendants Kelly, Gibbons and Park | FX&OTR = $1.462 bn<br><br>BNYM Net Income = $1.386 bn | Defendants attribute y-on-y increase of 86% in FX&OTR to "the higher volatility in all major currencies and a rise in client volumes, as well as the higher value of the credit default swap book (used to economically hedge certain loan exposures)."<br><br>The 2008 Form 10-K further misleadingly stated, "The results of the Asset Servicing segment are driven by a number of factors which include the level of transactional activity, the extent of services provided including custody, accounting, fund administration, daily valuations, performance measurement and risk analytics, securities lending and investment manager backoffice outsourcing, and the market value of assets under administration and custody." |
| Apr. 21, 2009 1Q2009 press release/<br>1Q2009 Form 10-Q filed on May 8, 2009<br><br>Signed by Defendants Kelly, | FX&OTR = $307 mm<br><br>BNYM Net Income = $322 mm | Defendants attribute y-on-y increase of 19% and q-on-q decrease of 40% in FX&OTR to "the benefit from a higher volatility of key currencies, partially offset by lower client volumes." |

| Gibbons and Park | | |
|---|---|---|
| July 22, 2009 2Q2009 press release/ <br> 2Q2009 Form 10-Q filed on Aug. 7, 2009 <br><br> Signed by Defendants Kelly, Gibbons and Park | FX&OTR = $237 mm <br><br> BNYM Net Income = $176 mm | Defendants attribute y-on-y decrease of 23% and q-on-q decrease of 23% in FX&OTR to "lower foreign exchange revenue driven by lower volumes, partially offset by higher volatility, while sequentially, foreign exchange fees increased driven by higher volumes." |
| Oct. 20, 2009 3Q2009 press release/ <br> 3Q2009 Form 10-Q filed on Nov. 6, 2009 <br><br> Signed by Defendants Kelly, Gibbons and Park | FX&OTR = $246 mm <br><br> BNYM Net Income = ($2.458 bn) | Defendants attribute y-on-y decrease of 36% and q-on-q increase of 4% in FX&OTR to "lower foreign exchange revenue, driven by lower volumes and volatility." |
| Jan. 20, 2010 4Q2009 press release | FX&OTR = $246 mm | Defendants attribute y-on-y decrease of 52% and no change q-on-q in FX&OTR to "lower foreign exchange revenue, driven by lower volatility and spreads." |
| 2009 Form 10-K filed Feb. 26, 2010. <br><br> Signed by Defendants Kelly, Gibbons and Park | FX&OTR = $1.036 bn <br><br> BNYM Net Income = ($1.367 bn) | Defendants attribute y-on-y decrease of 29% in FX&OTR to "lower foreign exchange revenue driven by lower volumes." <br><br> The 2009 Form 10-K further misleadingly stated, "Fees for many of our products and services are based on the volume of transactions processed, the market value of assets managed and administered, securities lending volume and spreads, and fees for other services rendered. Corporate actions, cross-border investing, global mergers and acquisitions activity, new debt and equity issuances, and secondary trading volumes all affect the level of our revenues." |
| Apr. 20, 2010 1Q2010 press release/ <br> 1Q2010 Form 10-Q filed on May 7, 2010 <br><br> Signed by Defendants Kelly, Gibbons and Park | FX&OTR = $263 mm/$262 mm <br><br> BNYM Net Income = $559 mm | Defendants attribute y-on-y decrease of 14% and q-on-q increase of 7% in FX&OTR to "lower foreign exchange revenue, driven by lower volatility, partially offset by increased volumes." |
| July 20, 2010 2Q2010 press release / <br> 2Q2010 Form 10-Q filed on Aug. 6, 2010 <br><br> Signed by Defendants Kelly, | FX&OTR = $220 mm ($244 mm in FX revenue) <br><br> BNYM Net Income = $658 mm | Defendants attribute a q-on-q increase of 39% in FX&OTR to "increased volatility." |

| Gibbons and Park | | |
|---|---|---|
| **Oct. 19, 2010 3Q2010 press release/**<br>**3Q2010 Form 10-Q filed on Nov. 8, 2010**<br><br>**Signed by Defendants Kelly, Gibbons and Park** | FX&OTR = $146 mm ($160 mm in FX revenue)<br><br>BNYM Net Income = $622 mm | Defendants attribute q-on-q decrease of 35% in FX&OTR to "seasonality and lower volatility." |
| **Jan. 19, 2011 4Q2010 press release** | FX&OTR = $258 mm ($206 mm in FX revenue) | Defendants attribute y-on-y decrease of 2% and q-on-q increase of 29% in FX&OTR to "increased volumes, new business and higher volatility." |
| **2010 Form 10-K filed Feb. 28, 2011.**<br><br>**Signed by Defendants Kelly, Gibbons and Park** | FX&OTR = $886 mm<br><br>BNYM Net Income = $2.518 bn | Defendants attribute y-on-y decrease in FX&OTR to "both lower fixed income and derivatives trading revenue and lower foreign exchange revenue."<br><br>The 2010 Form 10-K further misleadingly stated, "Our Asset Servicing business also generates foreign exchange trading revenues, which are influenced by the volume of client transactions and the spread realized on these transactions, market volatility in major currencies, the level of cross-border assets held in custody for clients, the level and nature of underlying cross-border investments and other transactions undertaken by corporate and institutional clients. As part of our [FX] business, we offer a standing instruction program that provides a cost-effective and efficient option, to our clients, for handling a high volume of small transactions or difficult to execute transactions in restricted and emerging markets currencies. Our [FX] platform provides custody clients and their investment managers an end-to-end solution that transfers to BNYM much of the burden, risk and infrastructure cost associated with [FX] transactions." |
| **Apr. 19, 2011 1Q2011 press release/**<br>**1Q2011 Form 10-Q filed on May 9, 2011**<br><br>**Signed by Defendants Kelly, Gibbons and Park** | FX&OTR = $198 mm ($173 mm in FX revenue)<br><br>BNYM Net Income = $625 mm | Defendants attribute y-on-y decrease of 1% and q-on-q decrease of 16% in FX&OTR to "increased volumes [that] were more than offset by declines in volatility." |

89.     Defendants' foregoing statements regarding BNYM's FX revenue and net income, and the reasons for the increases or declines in FX trading revenue were all materially false and misleading for the same reasons as set forth in ¶¶86-87 above.

90.     The Company's Forms 10-K for the years fiscal years ending 2008, 2009 and 2010 and Forms 10-Q for each quarter during the Class Period contained Sarbanes-Oxley required certifications which certified that, among other things, the filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."  These statements were also materially false and misleading because they failed to disclose that BNYM lacked adequate internal controls over its financial reporting and operations and that BNYM's internal controls were insufficient to prevent its Indirect/SI clients from being defrauded.

91.     In addition to Defendants' false and misleading statements regarding BNYM's financial metrics above, throughout the Class Period Defendants made numerous false and misleading statements on its conference calls with analysts and investors.  These additional statements, which also commented on BNYM's FX business and revenues and the primary factors driving changes in these figures, were materially false and misleading for the reasons set forth in ¶¶86-87 above, and included the following:

92.     On April 17, 2008, BNYM held a first quarter 2008 earnings conference call. During this call, Defendant Van Saun stated "FX and other trading generated 42% growth year-

over-year. We benefited from high levels of currency volatility as well as higher client volumes and business wins...our pretax margins versus a year ago improved from 33% to 36%."

93.     On June 17, 2008, BNYM hosted its 2008 Investor Conference, during which Defendant Gibbons stated that "[i]ncreased volatility . . . is helping both volumes and spreads in a number of our businesses, specifically in foreign exchange and spec lending [sic]."

94.     On July 17, 2008, BNYM conducted a second quarter 2008 earnings conference call. During the conference call, Defendant Gibbons stated:

> FX and other trading revenue generated strong growth of 75% year-over-year and 19% sequentially. Here we benefited from higher levels of currency volatility, client volumes and merger synergies relative to both periods. Traditionally, the third quarter is impacted by seasonality associated with lower levels of capital markets related revenues, particularly securities lending and foreign currency exchange. However, given the ongoing volatility in the markets we may see better than historical trend in some our businesses including foreign exchange.

95.     On September 10, 2008, BNYM made a presentation at the Lehman Brothers Global Finance Services Conference. At the conference, Defendants Kelly and Gibbons stated:

> **Kelly**: [In response to an analyst's question about FX] Let me say our foreign exchange revenues continue to be strong. The FX helps us from a capital standpoint because we generally have more US - we are over-weighted in US dollar capital.

> *       *       *

> **Gibbons**: [In response an analyst's question about FX] [f]oreign exchange . . . continues to be very strong.

96.     On October 16, 2008, BNYM conducted a third quarter 2008 earnings conference call. During the call Defendant Kelly stated:

> Market volatility resulted in record levels of foreign exchange and trading revenue based upon client volumes and activity.

> *       *       *

> [FX] and other trading revenue generated extremely strong growth of 62% year-over-year and 25% sequentially. We benefitted from higher levels of currency volatility

and client volumes relative to both periods, as well as the higher value of our portfolio credit default swaps, which we used to hedge certain loan exposures.

97.     During that same October 16, 2008 conference call, Tim Keaney, on behalf of BNYM, responded to the following question posed by an analyst:

> **Brian Bedell - Merrill Lynch**: And you're still seeing pretty good foreign exchange, success in foreign exchange as well, in terms of cross-sell?
>
> **Keaney**: Yes, we saw the volatility index up, Brian, about 53% year-over-year, volume's up 37% and our sense is that kind of momentum's still ahead of us here. We see strong FX volatility and volumes.

98.     On January 20, 2009, BNYM held a fourth quarter 2009 earnings conference call. On the call, Defendants Kelly and Gibbons stated:

> **Kelly**:  We had outstanding results in foreign [currency] exchange and net interest income...we enjoyed volatility in the foreign [currency] exchange practice which really helped those revenues.
>
> *       *       *
>
> **Gibbons**:  Volatility was also a key driver for us . . . [D]uring the quarter exchange rates were volatile, and combined with increased market share we enjoyed a record quarter for our foreign currency exchange business.  FX and other trading revenue jumped 67% over the year and 32% sequentially, where we capitalized on strong client flows and market volatility.

99.     On January 28, 2009, BNYM made a presentation at the Citi 2009 Financial Services Conference.  At the conference, Defendant Kelly stated, "[In 2008,] we really benefited from . . . foreign exchange because the volatility was very strong."

100.    Defendants' foregoing statements from fiscal year 2008 set forth above at ¶¶92-99 were all materially false and misleading for the same reasons as set forth in ¶¶86-87 above. Specifically, these statements failed to disclose that BNYM's FX trading revenue "benefited" primarily from BNYM's booking of Indirect/SI client FX transactions at spreads that far exceeded best execution standards and that were effectively based on the worst prices of the day, not just strong volatilty.

101.   On April 21, 2009, BNYM held its first quarter 2009 earnings conference call. On the conference call, Defendant Gibbons stated:

> **Gibbons**: FX and other trading revenue increased 19% year-over-year and it actually declined 40% sequentially. The increase from the year-over-year quarter reflects the benefit from higher volatility of key currencies, partially offset by lower client volumes. The decrease from the record fourth quarter reflects the impact of both lower volatility and client volumes.   With approximately 85% of the [foreign exchange] revenue driven by our securities servicing clients, lower volume and values negatively impact the trading revenue.

102.   On July 22, 2009 BNYM held its second quarter 2009 earnings conference call. On that call, Defendant Gibbons answered the following question posed by an analyst:

> **Ken Usdin - Banc of America/Merrill Lynch**: First of all, Todd, with your comments about the foreign exchange business, this quarter it seemed like the core FX looked like it was up, but the decline was really more to the derivatives side.  So can you talk about - is that one-time or is that seasonal?  And so when you think about going forward does that - overall, does that business come down off of the second quarter number?

> **Gibbons**: There are really two components. ***The core FX like I said was up 10% sequentially.  And it's actually doing quite well***, just a reflection of the rest of our businesses as we continue to capture the opportunities within the institution.

103.   Defendants' foregoing statements from fiscal year 2009 set forth above at ¶¶100-102 were all materially false and misleading for the same reasons as set forth in ¶¶86-87 above.

104.   On July 20, 2010, BNYM conducted its second quarter 2010 earnings conference call.  On this call, Defendants Gibbons and Palermo stated:

> **Ken Usdin - Banc of America Merrill Lynch**: Can you just detail for us in some of the fee items how much of an issue was the market and as far as in the FX line, ***what caused the big delta in the fixed income trading***, and then in the other fee income line, how much was the benefit from FX translation gains?

> **Gibbons**: [L]et's start with FX.  ***FX was strong***, volumes were pretty good, obviously volatility was up and we saw the 39% increase.

*        *        *

> **Betsy Graseck - Morgan Stanley**: Yes, I was intrigued in the quarter because while volumes might have come in a little bit lighter than expected, at least versus our

expectations probably due to the market activity, market valuation, the revenue line hit our number. It looks to me like your gross margins went up both in Asset Management and asset servicing. Is that accurate and if so can you talk about why?

Palermo: Well, on the asset servicing side we didn't go up on a link basis. So *margins from 28% to 30% and that's principally due to the seasonality though* when you have the big lift in securities lending as well as the foreign exchange that Todd was talking about earlier. As you look out into, particularly in the third quarter those have a tendency to soften. What we have seen which is encouraging on both fronts is because of the new business activity that we've converted over the last year, specifically we've converted about 1.3 trillion over the last four quarters. That results in more global across border activity. So that accounts for some of the foreign exchange growth . . . .

105.    On January 19, 2011, BNYM conducted its fourth quarter 2010 earnings

conference call. On that call, Defendant Kelly stated:

Foreign exchange trading revenue rebounded, up 29% sequentially due to high volumes and volatility . . . FX and other trading was up 77% sequentially. FX revenue totaled $206 million, up 29% compared to the third quarter on higher volumes, new business, and a little higher volatility.

106.    Defendants' foregoing statements from fiscal year 2010 set forth above at ¶¶104-

105 were all materially false and misleading for the same reasons as set forth in ¶¶86-87 above.

**B.      Defendants' False And Misleading Statements Regarding BNYM's Client Services And The Transparency Of Its Business Model**

107.    Throughout the Class Period, Defendants repeatedly emphasized the importance

of client service to BNYM's business model, and touted its "industry-leading client service."

For example:

- At a June 17, 2008 Investor Conference, BNYM pledged in a presentation lead by Defendants Kelly, Hassell, Keaney, Gibbons and Van Saun, to: (i) "be proactive and treat our clients as partners"; (ii) "put ourselves in the client's shoes"; (iii) act "with the highest standards of integrity and openness to ensure the trust of those we serve"; (iv) "be open and honest"; (v) operate with integrity"; (vi) "conduct business with the highest ethical standards"; (vii) "be mindful of our actions"; and (viii) "be responsible members of our communities." The presentation also pledged the Company's "ongoing commitment" to "delivering transparency to clients and shareholders."

- At a May 12, 2009 Goldman Sachs Financial Services Conference, Defendant Kelly represented that: "*Transparency of products, transparency of financial results, transparency of not just on balance sheet stuff, but off balance sheet stuff and securitization markets as it comes back. Everything is going to be about transparency going forward*, because as you know, a lot of people got burned by owning things that they in the end didn't really understand the risks on."

- In a March 25, 2010 press release entitled "BNY Mellon Takes the Gold in 25 Categories in Global Investors Magazine's 2010 FX Survey," Defendant Rodriguez stated that BNYM's "standing as a leader in FX service delivery reflects our longstanding strategic focus on adding value to our FX client relationships by providing innovative products and unsurpassed levels of client service."

- At a May 18, 2010 Barclays Capital Financial Services Conference, Defendant Keaney stated: "This is the second year in a row we've led the league tables in asset servicing and quality. *I'll draw your attention to what a terrific job my colleagues in the foreign exchange business have done building a very, very credible product* . . . The reason why that's important and it's not lost on us that *the biggest source of new revenue comes from your current clients*.

108.     The statements contained in ¶107 were materially false and misleading when made because they: (1) misrepresented the quality of services being offered to its Indirect/SI FX trading clients by, *inter alia*, failing to disclose that BNYM was actually defrauding those clients; and (2) failed to disclose the known risks that the Company's illegal trading scheme jeopardized the Company's relationship with its custodial clients, and that exposure of BNYM's FX trading practices would expose it to substantial liability and effectively eliminate BNYM's ability to continue to collect illicit windfall profits going forward from its Indirect/SI clients.

### C.     Defendants' False And Misleading Website Statements

109.     Until at least November 2009, BNYM's website stated that Indirect/SI FX orders were executed "according to best execution standards" and "free of charge," and that Indirect/SI trades were "aggregat[ed]" and "nett[ed]." Specifically, the website stated:

- "Operationally simple, *free of charge* and integrated with the client's activity on the various securities markets, [FX] standing instruction is designed to help

clients minimize risks and costs related to the foreign exchange and concentrate on their core business."

- "Standing Instruction Foreign Exchange Clients benefit from: [FX] execution according to **best execution standards** . . .".

- "Standing Instruction Foreign Exchange clients benefit from aggregation and netting of trades based on guidelines tailored to clients' needs.

110. These statements were materially false and misleading when made. First, as set forth above in ¶¶57-63 and as BNYM's head of Business Development for Global FX Sales (among others) later admitted, BNYM did not execute its Indirect/SI FX trades in accordance with best execution standards. Second, as set forth above in ¶65, BNYM also did not net its Indirect/SI trades. Third, as set forth above in ¶64, Indirect/SI trades were not "free of charge." Instead, BNYM charged its clients the difference between the market price at the time of execution and the worst (or virtually the worst) interbank market price at which the currency had traded in the interbank market during the trading day. Indeed, as discussed in ¶¶12, 140, BNYM has entered into a partial settlement with the DOJ which prohibits it from making any of the false statements above.

111. After November 2009, BNYM modified its website to include a definition of "best execution" (previously there had been no definition). BNYM's novel definition now represented that:

> We consider best execution, as it relates to the Standing Instruction process, as providing a consistent, accurate and efficient means of facilitating pre-trade, trade and post-trade activities. These activities include identification of trade requirements, pre-trade administration associated with regulated markets, arranging settlement, reconciling discrepancies, posting cash to accounts and reporting all relevant transaction details to investment accounting systems.

112. However, this new "definition" was not only insufficient to correct BNYM's past deceitful statements, but was also materially false and misleading in its own right. First, as set forth above in ¶¶86-87, this statement was materially false and misleading because it sought to

use the term "best execution" – which has a well-defined industry and regulatory definition – to describe BNYM practices that were patently inconsistent with any customary notions of "best execution." Second, this statement was false and misleading because it failed to disclose that BNYM was continuing to execute Indirect/SI FX trades at the worst (or virtually the worst) price of the day. Third, this statement was false and misleading because it failed to correct Defendants' earlier representations that BNYM executed Indirect/SI FX transactions at the best price available at the time of the transaction and free of charge. Indeed, as discussed in ¶¶12, 140, BNYM has entered into a partial settlement with the DOJ that belatedly requires it to make far more transparent, complete and non-misleading disclosures regarding its *actual* practices for executing Indirect/SI FX trades.

### PARTIAL DISCLOSURES, FURTHER MISLEADING STATEMENTS, AND THE GRADUAL EMERGENCE OF THE FULL SCOPE OF THE FRAUD

113.    The first details about BNYM's deceptive FX practices did not begin to surface until January 2011, when it was disclosed that a *qui tam* lawsuit against BNYM filed on behalf of certain Virginia pension funds had been unsealed. That suit alleged that:

> *[BNYM] knowingly and intentionally charged [Virginia] false exchange rates for purchases and sales of foreign currency rather than the exchange rates at which Defendant actually executed the transactions for the Funds . . . .*
>
> In order to keep the truth from [Virginia], in the periodic accountings which Defendant was obligated to render to [Virginia], *[BNYM] reported false FX prices that failed to reflect the actual cost of the transaction and concealed the Defendant's markup or markdown* that caused [Virginia] to pay more than it should have or to receive less than it should have.

As *The Washington Post* reported on January 28, 2011, the Virginia AG had also intervened in the Virginia action, and also reported that:

> According to the attorney general's office, [BNYM] would watch currency markets and conduct trades on behalf of Virginia at the most advantageous price it could find during a trading day. *But when the bank reported the results of the trade to the state,*

*it would report that the state had received the day's least advantageous price. It would then pocket the difference.*

In response to this story, on January 28, 2011 BNYM's stock fell over 2.3%, to close at $30.88.

114.    Three days later on January 31, 2011, the *WSJ* published an article entitled "Global Finance: Virginia Files Suit Over Forex; State Says Bank of New York Gave It Unfavorable Prices in Currency Transactions." The article reported that "[a]ccording to the Virginia complaint, [BNYM] kept the difference between the rate charged and the actual rate between 2000 and 2009. *Bank of New York 'kept these profits a secret from its custodial client, the Commonwealth.*'"

115.    On February 3, 2011, the *WSJ* published another article, entitled "States Widen Currency-Trade Probes." The article discussed an expanding number of state probes into BNYM and other custodial banks' FX practices:

> *State prosecutors are getting help from an organized group of whistle-blowers in a widening investigation into whether banks overcharged public pension funds by tens of millions of dollars for foreign-exchange transactions.* The whistle-blowers. . . are helping with investigations into the issue by attorneys general in California and Virginia, according to court documents and people familiar with the matter.
>
> Other states, including Florida and Tennessee, also are conducting probes, according to a spokeswoman for the Florida [AG] and people familiar with the other states . . .
>
> Last month, the Virginia attorney general intervened [in], or took over [the Virginia whistleblower case against BNYM], which was filed in 2009. The suit, which was unsealed last week, seeks $150 million in damages . . .
>
> *The suits claim the banks didn't charge the pension funds the currency rates that the banks paid, but consistently charged them the highest currency-conversion prices of the day, and pocketed the difference.* The suits say the banks similarly overcharged when the pension funds exited the trades.

Also on February 3, the Florida AG intervened in a separate *qui tam* suit against BNYM in Florida, which also sought $150 million in damages.

116.    In response, the price of BNYM shares fell 1.2% on February 3, 2011.  As a *Dow Jones* article reported that same day, BNYM stock "[took] a hit after the [*WSJ*] reported the widening of state investigations into whether banks overcharged public pension funds for foreign-exchange transactions."  The *Dow Jones* article noted, however, that at least one analyst had questioned the merit of the suits that had been filed to that point.

117.    On February 4, the *WSJ* published an article titled "Bank Accused of Fake Trades: Suit Alleges BNYM Overcharged Virginia Pension Funds by $20 Million," which stated:

> [BNYM] currency traders used a foreign-exchange system called "Charlie" to create fake trades and overcharge Virginia pension funds by at least $20 million, according to allegations in recently unsealed documents in a Virginia court . . .

> [BNYM] generated 2009 revenue of $4.26 billion for its asset-servicing unit, *including $757 million from foreign-exchange and other trading activities, the latest full-year figures available*. The $4.26 billion figure was more than half of the bank's total 2009 revenue, though the 2009 total included an unusual one-time item. Asset servicing typically accounts for about a third of the bank's revenue . . .

> The states are investigating claims that the banks didn't charge the pension funds the currency rates that the banks paid but consistently charged them the highest currency conversion prices of the day, and pocketed the difference . . .

That same day, the *WSJ* also reported that Harry Markopolos, "the Boston-based investor who for years warned regulators that Bernard Madoff was running a Ponzi scheme," was "[h]elping [to] orchestrate the whistleblower effort," and that Tennessee was also conducting a probe.  In response to these reports, BNYM shares fell an additional 1.5%.

118.    Significantly, however, the same day BNYM began an aggressive campaign designed to discredit the allegations of FX fraud at the Company.  On February 4, 2011, BNYM spokesman Kevin Heine sought to reassure the market by denying the allegations in the Florida and Virginia lawsuits, and by asserting that they were "without merit."  Heine added that BNYM "provide[s] a broad range of valuable services, including foreign exchange, to large, sophisticated money managers representing pension funds and other institutional clients . . . .

The money managers transact with us at competitive foreign exchange prices, and we provide reliable low-risk service and execution." These denials were materially false and misleading because, *inter alia,* BNYM defrauded its customers and routinely executed FX transactions at grossly *uncompetitive* rates.

119.    On February 15, 2011, *Reuters* published an article entitled "U.S. Custody banks face FX profit margin squeeze." The article reported that profit margins at custodial banks would likely "shrink[] as scrutiny [over FX practices] grows." The article specifically cited to FX related lawsuits against BNYM alleging that it "overcharged public retirement funds," and noted that "U.S. custody banks are grappling with more than just lawsuits targeting their foreign exchange practices. They also face a profit margin squeeze on lucrative currency trading as customers look for better deals." The article also drew a direct link between the allegations in the lawsuits and their impact on BNYM's profitability: "***Whatever the outcome, analysts and industry observers point to increased customer scrutiny on pricing that is driving down margins in an area previously considered a safe haven for the custodians – and one far more profitable than their bread-and-butter recordkeeping and account processing work.***" The article also cited reports that CalPERS and the Mississippi AG were investigating whether their states' pension funds had been overcharged for FX transactions. In response, the price of BNYM stock fell over 3% percent on February 15, 2011, to close at $31.05 per share.

120.    On February 27, 2011, BNYM once again sought to reassure the public about its FX practices by publishing a false and misleading Op/Ed in the *Richmond Times Dispatch.* The Op/Ed defended BNYM's FX trading practices and dismissed as "inaccurate" the allegations advanced in Virginia's "meritless lawsuit."

121. Similarly, in response to questions from analysts on BNYM's April 19, 2011 first quarter 2011 earnings conference call, Defendants vigorously disputed the accuracy of the reporting on BNYM's fraudulent FX practices. For example, Defendant Kelly stated: *"[F]rankly the reporting on [BNYM's FX practices] just isn't accurate, in many ways it's actually misleading.* We continue to enjoy very strong use of our standing instruction program which really everyone does in our industry." Similarly, Defendant Keaney downplayed the impact of standing instruction FX transactions on BNYM's revenue, stating "[w]e are not seeing that impact our new business win rates because we are talking very openly about these issues with our clients." Defendant Palermo added that BNYM's FX clients are "very supportive of the approach that we've taken." These statements were all materially false and misleading, as (a) they failed to disclose that BNYM had actually engaged in fraudulent Indirect/SI FX practices; and (b) the partial disclosures relating to BNYM's Indirect/FX practices were already beginning to hurt BNYM's FX business and client relations.

122. On April 19, 2011, the *WSJ* published an article entitled "Custody Banks Face Forex-Fee Fireworks." The article stated, in relevant part:

> [U]nwanted scrutiny of foreign-exchange processing at [BNYM] and State Street Corp. over the past year has raised the risk of some unwanted fireworks.
>
> **State and local pension funds have demanded reams of data to determine if they are getting the best pricing for their currency trades.** State attorneys general in California, Virginia and Florida are pursuing legal claims to uncover whether funds in those states were charged properly.
>
> **On Tuesday [April 19, 2011], when [BNYM] and State Street report first-quarter results, investors will find out whether the scrutiny is forcing the banks to lower currency-trading charges and whether that's hurting profit.** Amid the upheaval, any impact could worsen. Wall Street competitors like the U.K.'s Barclays PLC are already circling to lure away pension business.

123. Later that same morning, before the opening of the markets, BNYM announced its first quarter 2011 results, which included only $173 million in FX revenue – a 16% decrease

from the prior quarter. On a conference call addressing BNYM's reported earnings that day, analysts questioned Defendant CEO Kelly and Defendant CFO Gibbons concerning the "attention" BNYM's FX business had received, including news relating to existing lawsuits and customer inquiries, and the impact of that scrutiny on how the FX trading business was priced and executed. In response to an analyst who asked whether the profit margins on FX trading would "come down towards the level of the rest of the firm" because of the increased scrutiny, defendant Gibbons stated that while "it's probably early to tell … we would expect the competitiveness of FX to – it's been competitive, it will continue to be competitive, and there is some potential there for margin compression."

124. In response to these disclosures of April 19, 2011 BNYM shares declined roughly 3%, to close that day at $28.35. Indeed, contemporaneous analyst reports specifically cautiously linked BNYM's declining share price to its FX woes. For example, an April 21, 2011 JP Morgan report noted: "[BNYM's] F/X revenue fell 16% [quarter over quarter] on sharply lower volatility and could be under some pressure with the recent spotlight and lawsuits." Likewise, an April 20, 2011 Jeffries analyst stated that the firm had "tempered our FX trading outlook" for BNYM "to account for what appears to be a more competitive market given increased scrutiny by clients." RBC Capital Markets similarly struck a cautious and restrained tone in their April 20, 2011 report: "We believe that FX trading needs to be monitored for headline risk and its impact on the company's FX business."

125. Some analysts, however, continued to be strongly influenced by Defendants' false and misleading statements, and stated that the impact of any alleged FX scheme on BNYM's revenue would be minimal. For example, a July 25, 2011 article in *Weekday Trader* quoted M&R Capital Management's John Maloney, who parroted BNYM's assertions "that less than

1% of the company's revenue is derived from the practices currently under scrutiny," and added that he "[didn't] see this being anything material going forward, whether they end up settling or litigating."

126.    On May 23, 2011, the *WSJ* published the results of an independent analysis it had undertaken to confirm the veracity of the allegations made in the *qui tam* actions.  Specifically, in an article entitled "Inside a Battle Over Forex: Bank Gave Pension Fund Least-Favorable Rates, Analysis Shows," the *WSJ* reported that:

> *A Wall Street Journal analysis of more than 9,400 trades the bank processed over the past decade for a large Los Angeles pension fund could provide ammunition to its critics.*
>
> *[BNYM] priced 58% of the currency trades within the 10% of each day's trading range that was least favorable to the fund*, the analysis shows. As a result, the trades cost the pension fund, the Los Angeles County Employees Retirement Association, $4.5 million more than if the average trade occurred at the middle of the trading range for each day, the analysis showed.
>
> *A [BNYM] spokesman confirmed the accuracy of the data and said the bank's employees "tend" to price foreign-exchange trades at one end of each day's "interbank" trading range - the rates at which major banks like [BNYM] buy and sell foreign currencies.* But the bank said there was nothing improper about the practice. It said clients like the Los Angeles pension fund knew - or should have known – that the bank doesn't act in their interests when pricing the trades.
>
> The Los Angeles fund disagrees. It said in a letter to [BNYM] in January that the bank was its fiduciary, so it should have looked out for the fund's interests and offered it "best execution," or the best possible price. It alleged [BNYM] had used a "hidden mark-up" in currency trades and had a duty "not to make undisclosed profits" at the fund's expense. The bank says it complied with its written agreement with its client. The fund has since ceased using the bank for certain currency trades.

In response, BNYM shares fell roughly 1.3%, to close on May 23, 2011 at $27.81, and the *AP Financial Wire* cited BNYM as a stock that "moved substantially or traded heavily" that day.

127.    After the close on May 23, 2011, the *WSJ's* on-line website published an article (which it reproduced in print on May 24) entitled "SEC Deepens Probe of Forex Trading:

Regulators Are Examining How State Street and BNYM Characterized Transactions to Clients."

The article stated, in relevant part:

> **The [SEC] is examining whether two major banks [BNYM and State Street] made proper representations to pension-fund clients about how their currency trades would be handled and priced,** according to a person familiar with the matter.
>
> **The SEC probe, which is examining the currency-trading activities of [BNYM] and State Street Corp., marks a new level of scrutiny by authorities** . . .
>
> It hadn't been previously known that the SEC was examining BNYM's activities. And the nature of the SEC investigation hadn't been made public . . .
>
> [T]he SEC can determine whether the banks' transactions with the pension funds breached securities laws. **One issue the agency is examining is whether the banks misrepresented how they intended to carry out the foreign-exchange trades**.

In response, BNYM shares fell roughly 1.3%, to close at $27.49 per share, representing a two-day decline of roughly 2.5%.

128. However, also on May 24, 2011, BNYM made a presentation at the Barclays Capital Americas Select Conference which tempered the market's reaction to the disclosure of the SEC investigation. Specifically, at that conference, Defendant Keaney again downplayed the impact of FX transactions on the Company's revenue and falsely stated that "our clients are very, very supportive and understand our standing instructions foreign exchange business," and that "client behaviors have not changed . . . clients continue to trade with us." Keaney also disputed the accuracy of recent *WSJ* articles disclosing improprieties in BNYM's FX transactions.

129. Mirroring the market's confusion, the next day, May 25, 2011, a *Bloomberg News* article (entitled "BNYM: No lawsuit impact") quoted Tim Keaney's false and misleading statements that "Trading patterns with us haven't changed," and "I am not worried," but also quoted an RBC Capital Markets analyst's opinion that "[w]e *could* see lower margins in this business." The article also highlighted the May 24, 2011 decline in share price (as well as the

fact that in 2011 BNYM's share price had fallen three times as much State Street's, the latter having essentially tracked the S&P index of asset managers and custody banks).

130. BNYM also responded to the *WSJ*'s May 23/24 article through the use of a materially false and misleading Op/Ed, which the *WSJ* published on May 26, 2011. BNYM's Op/Ed falsely stated:

> Your article "Inside a Battle Over Forex" (page one, May 23) is a highly distorted portrayal of pricing in the foreign-exchange market *and repeats inaccurate claims from baseless lawsuits about the "standing-instruction" program* [BNYM] offers to its clients. *[BNYM's] standing-instruction program provides competitive rates in more than 100 currencies in a highly transparent and competitive market.* Every day, our U.S. desks publish a guaranteed range of rates. Our clients and their investment managers can review these rates and opt out if they want to use another FX provider or service. They also get daily reports showing the actual rates applied to the prior day's transactions, so they can easily compare [BNYM's] rates to industry benchmarks or other options in the market. These are basic facts about the FX market that are conspicuously absent from the Journal's story. The Journal fails to report that approximately 88% of the transactions you analyzed were for amounts less than $100,000. Experienced investment managers understand that achieving any price within the interbank range for these sorts of small and difficult-to-execute transactions reflects a significant benefit over other alternatives. Further, 97% were for amounts under $1 million. Therefore, highlighting just two uncharacteristically large, multimillion-dollar trades is especially misleading, as is the characterization of this pricing as the "least favorable" of the day.

However, BNYM's vehement denials were materially false and misleading because, *inter alia,* (1) the claims asserted in the referenced lawsuits were not "baseless;" (2) [BNYM's] Indirect/SI program did *not* provide competitive rates in that BNYM booked Indirect/SI client FX transactions at spreads that far exceeded best execution standards, and that were effectively based on the worst prices of the day; and (3) BNYM misleadingly attempted to assure investors that the Indirect/SI program involved only relatively small amounts of trading, without disclosing the grossly disproportionate amount of revenue and profit that BNYM actually reaped from its Indirect/SI FX trading practices.

131. On August 11, 2011, the Commonwealth of Virginia filed a Complaint in Intervention in the Virginia Action alleging damages "estimated to be in excess of $40,000,000, based on the Virginia Funds' standing-instruction FX trades, the rates of which BNYM falsely reported to the Commonwealth." The damages could be trebled (to $120 million) and the Company could also face civil penalties of at least $811 million. The Virginia Complaint also cited and quoted numerous internal emails among BNYM executives which discussed the negative impact on BNYM's profits that would ensue if it were to provide it clients with better transparency about the Company's indirect FX pricing:

> *These deceptive practices reflected a well thought-out scheme emanating from the highest reaches of BNYM's senior management. Internal BNYM communications reveal that high-ranking officers at the Bank were aware of and participated in the deception.*
>
> One e-mail, dated February 8, 2008, from Jorge Rodriguez, BNYM's Executive Vice President of Global Sales and a Managing Director at the Bank's New York City offices, explained to a number of other high-ranking New York-based BNYM executives, including Richard Mahoney, Executive Vice President of Global Markets, that the "pricing advantages" of BNYM's FX pricing scheme would "disappear" if the Bank's custodial clients achieved "full transparency."
>
> Such "full transparency" would permit custodial banking clients to understand the difference between what BNYM reported and (i) what BNYMM paid or received for the foreign currency, (ii) the FX rate at the time an instruction was given, or (iii) the FX rate at the time of BNYM's internal transfer of currency to or from its inventory to or from the Virginia Funds' accounts.
>
> *Specifically, Mr. Rodriguez noted that if BNYM were required to provide "full transparency" in its reports to its custodial clients, their increased "ability to carefully monitor each and every trade at the time of execution" would "reduce[] margins dramatically."*

The Complaint also noted that "BNYM's scheme guaranteed that its custodial clients . . . were unable to monitor any aspects of the Bank's practice of assigning false FX rates."

132. Also on August 11, 2011, the State of Florida filed its own complaint in the Florida *qui tam* action, which alleged:

*BNYM added hidden spreads, including mark-ups and mark-downs, to these foreign exchange trades rather than pricing the trades at the exchange rates at which it actually executed the transactions, causing the FRSTF [Florida Retirement State Trust Fund] to pay far more than it should have for buys and receive much less than it should have for sells.* BNYM also caused greatly increased (and unnecessary) trading costs for the FRSTF by not netting foreign exchange transactions when the FRSTF bought and sold the same currency on a given day. Due to BNYM's misconduct, the State will ultimately have to provide millions of additional dollars to the FRSTF, monies that otherwise could have been made available for essential services to its citizens.

133.    After the market closed on August 11, 2011, *WSJ* published an article discussing the complaints filed by the Florida and Virginia Attorneys General, and the internal BNYM emails that had been produced in those cases. The *WSJ* article stated in part:

The legal stakes are rising for [BNYM] in a widening controversy over the way it prices currency trades for pension funds and other big clients . . .

The Virginia lawsuit, filed in a Fairfax, Va., state court, cites internal bank emails allegedly *showing that senior bank officials knew about, and endorsed, a currency-trading method that hurt state pensioners.*

The complaint cites what it describes as a 2008 email from a senior [BNYM] banker, Jorge Rodriguez, *warning his colleagues that if the bank was required to provide "full transparency" to its clients, the clients' "ability to carefully monitor each and every trade at the time of execution" would eat into profits by reducing the bank's "margins dramatically."*

134.    In response to these disclosures on the following day (August 12, 2011) the price of BNYM common stock declined over 2.5% to close at $19.99 per share.

135.    The decline in BNYM's stock price, however, would have been more severe but for the fact that BNYM again falsely denied any wrongdoing that day in an *Associated Press* article published that day entitled "Florida sues Bank of New York Mellon Over Pension." In that article, BNYM spokesperson Jeep Bryant stated that the claims asserted in the Florida and Virginia actions were "unwarranted" and "reflected a flawed understanding of foreign currency markets," and that BNYM would refuse to be "coerced into paying for and admitting wrongdoing where none exists."

136.    On August 31, 2011, Defendant Kelly suddenly and unexpectedly resigned as BNYM's Chairman and CEO. According to a BNYM statement, Kelly's resignation was due to "differences in approach to managing the company" and was by "mutual agreement" with BNYM's Board of Directors. However, the *WSJ* reported that Kelly was "asked to leave," and that he had alienated some directors and top executives by blaming unspecified company "problems" on other members of senior management. As an analyst at RBC Capital Markets reported: "This is an extreme surprise. The company is currently facing two major issues, the planned downsizing and the ongoing [FX] litigation. We don't know how or if his departure was related to them."

137.    On October 4, 2011, the U.S. Attorney in Manhattan filed a civil fraud action against BNYM in this Court on behalf of the DOJ. According to the DOJ complaint, BNYM "from at least 2000 to the present has engaged in a scheme to defraud custodial clients who use BNYMM's foreign exchange services." The same day, the New York AG filed a complaint against BNYM in New York state court seeking $2 billion in damages.

138.    In response to these disclosures, shares of BNYM's stock declined a further 2.87%, to close on October 5, 2011 at $18.28 per share. Indeed, an October 6 *WSJ* article specifically tied the October 5, 2011 losses to the further fraud-related disclosures contained in the DOJ and New York AG complaints, noting that "[i]nvestors punished [BNYM] stock as legal pressure mounted on the giant bank amid a growing currency-trading crisis." As the article further reported:

> [The DOJ and New York AG] suits seek a total of ***more than $2 billion in damages from the bank***. The legal actions could upend what has been a profitable business line for the bank, in which it processes currency transactions for state and public pension funds, private companies, universities and banks.

139.    In sum, from the time that the truth about the nature, scope and seriousness of BNYM's fraudulent Indirect/SI FX practices slowly started to emerge in late January 2011, the Company's shares declined from $31.95 per share to close at only $18.28 per share on October 5, 2011 – reflecting a shocking decline of $13.67 per share, or over 43% percent.

## POST CLASS PERIOD DEVELOPMENTS

140.    On January 17, 2012, BNYM admitted, in a Stipulation and Order of Partial Settlement and Dismissal in the DOJ Action, that: (1) its subsidiaries and affiliates assign prices to "standing instructions" FX trades that are "at or near the high end of the range of prices reported in the interbank market for currency sales for the relevant pricing cycle, and at or near the low end of the range of prices reported in the interbank market for currency sales for the relevant pricing cycle," and that (2) the "pricing of Standing Instruction Service transactions is generally less favorable to clients than directly negotiated trades." *See* Dkt. No. 17 (Jan. 17, 2012) in *United States v. The Bank of N.Y. Mellon Corp.*, No. 11 Civ. 6969 LAK (S.D.N.Y.). BNYM also agreed as part of that stipulation to stop representing that its Indirect/SI FX trades are executed on a "best execution" or "free of charge" basis, or that Defendants offer "netting" of transactions (unless certain criteria are satisfied). *Id.*  BNYM also agreed to fully disclose Defendants' pricing of Indirect/SI FX transactions, and to provide custodial clients with a mechanism to compare the average pricing of Indirect/SI transactions with trades for non-restricted currency pairs at a particular point in time. *Id.* at 3-4.  Additionally, under the partial settlement, BNYM cannot "represent or suggest that all [Indirect/SI] clients receive the same pricing." *Id.* at 5.  The DOJ has not yet settled its claims for civil monetary penalties against BNYM, and accordingly those claims (as well as the numerous other claims that have been filed against it in various state and federal courts) continue to be litigated.

141. The disclosure of BNYM's fraudulent FX scheme has also effectively ended its ability to reap significant illicit revenue from its Indirect/SI FX business, which in turn, has had a material (and entirely predictable) adverse impact on BNYM's profitability. For example, between the third quarter of 2011 and the first quarter of 2012, BNYM's total FX revenue plummeted from $221 million to just $136 million – a staggering *38%* decline. While BNYM has tried to attribute this decline to "trading conditions" and "reduced volatility" in the FX market, in fact, most of this decline is attributable to the disclosure of its FX fraud, which in turn has forced BNYM to stop fraudulently overcharging its Indirect/SI clients.

142. Indeed, according to a May 2, 2011 *Reuters* article, now that BNYM's Indirect/SI clients have become aware of the FX fraud, those clients are either leaving BNYM or "pay[ing] much lower fees for foreign exchange transactions than they have in the past." Citing state pension fund managers, *Reuters* also reports that "once clients get the [FX] data, they are either demanding much cheaper trading costs or shifting business away from [BNYM] to smaller firms." For example, according to *Reuters*, the Massachusetts Pension Reserves Investment Management Fund and Iowa Public Employees Retirement System have recently left BNYM as a result of the disclosure of the extent and seriousness of the FX fraud. In sum, as the *Reuters* article also states, as a result of disclose of the FX fraud "the forex money train appears to have slowed" for BNYM.

**ADDITIONAL SCIENTER ALLEGATIONS**

143. As set forth above, numerous facts support a strong inference that BNYM and the Officer Defendants knew or recklessly disregarded that the statements set forth in ¶¶84-112 were materially false and misleading. These facts include, *inter alia,* internal BNY documents demonstrating that (a) Defendants Kelly (BNYM's CEO) and Van Saun (BNYM's CFO) were *specifically briefed* as early as February 2008 that BNYM was not being "full[y] transparent"

with its indirect/SI clients, and that BNYM was secretly timing the execution of its FX trades to exploit intra-day trading spreads (which were particularly large when FX markets were volatile) at the expense of BNYM's customers and in blatant contravention of BNYM's representations concerning its purported "best execution" practices and "free of charge" FX services; and (b) numerous other senior BNYM executives, including Defendant Rodriguez, were fully aware of – and indeed intimately involved in implementing and/or continuing – BNYM's scheme.

144.    Further, given the critical importance and materiality of the FX scheme to BNYM's profitability and overall financial position, as well as length and extent of the FX fraud, such facts further support a strong inference that each of the Officer Defendants was either aware or recklessly disregarded that their and the Company's public statements concerning BNYM's FX business were materially false and misleading as alleged herein. For example, as set forth above, BNYM's FX trading business was one of the largest and most lucrative components of BNYM's Asset Servicing segment, and indeed of BNYM's overall business, and contributed significantly to the Company's bottom line profitability. As the NYAG has determined, even though Indirect/SI trades accounted for only 20% of BNYM's total FX trades, they generated 65% to 75% of its total FX revenue, and roughly 69% of BNYM's profits from FX trading – and added billions of dollars in illicit profits over the past 10 years to BNYM's reported financial results.

145.    The Officer Defendants' scienter is further evidenced by both the cover-up of their FX fraud in the aftermath of the *State Street* action, as well as their repeated denials of any wrongdoing on multiple investor conference calls and in published Op/Eds in national and regional newspapers throughout the country.

146. Finally, as noted at ¶¶12, 140, BNYM has entered into a partial settlement with the DOJ which requires it to change its disclosures concerning its FX services so that, for example, it may "no longer describe the standing instruction service as free," "represent that the service applies best execution standards," or "represent that it offers netting of [FX] transactions unless certain criteria are met." Under the settlement, BNYM must also now: (a) "disclose how transactions executed through its standing instruction services are priced;" (b) "make certain pricing data available to its custodial clients on a periodic basis;" (c) disclose that it "assigns prices to standing instruction clients that are at or near the high and low ends of the daily ranges of prices reported in the interbank market;" and (d) disclose that "BNYM's pricing of standing instruction transactions is generally less favorable to clients than directly negotiated trades."

## CLASS ACTION ALLEGATIONS

147. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. Proc. Rules 23(a) and (b)(3) on behalf of all persons who purchased BNYM common stock during the Class Period and were damaged thereby, and on behalf of those who purchased BNYM's common stock pursuant or traceable to the May 2009 and June 2010 Offerings (the "Class"). Excluded from the Class are Defendants, BNYM's directors and officers, and their families and affiliates.

148. The members of the Class are so numerous that joinder is impracticable. Per BNYM's Form 10-K filed February 28, 2011, BNYM had over 1.2 billion shares outstanding.

149. Common questions of law and fact exist as to all Class members, and predominate over any questions affecting solely individual Class members. Such common questions include:

a. whether the federal securities laws were violated by Defendants' conduct as alleged herein;

b. whether the SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

c. whether, with respect to Plaintiffs' claims under the Exchange Act, Defendants named in those claims acted with scienter;

d. whether and to what extent the market prices of BNYM's common stock was artificially inflated during the Class Period;

e. whether Class members suffered damages as a result of the conduct complained of herein, and the appropriate measure of damages.

150.    Plaintiffs' claims are typical of those of the other Class members, as Plaintiffs' and Class members' damages were both caused by Defendants' common course of conduct.

151.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

152.    A class action is superior to other available methods for the fair and efficient adjudication of this matter, as the burden of individual litigation makes it impracticable for Class members to seek individual redress for the wrongful conduct alleged herein.

## LOSS CAUSATION

153.    BNYM and the Officer Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses. The price of BNYM's common stock significantly declined (causing investors to suffer losses) when BNYM and the Officer Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by BNYM and the Officer Defendants materialized. Specifically, BNYM and the Officer Defendants' false and misleading statements misrepresented BNYM's true profitability and business prospects, and investors suffered losses as the price of BNYM stock declined when those statements were corrected and the risks concealed by them materialized, including on the dates that news reports concerning regulatory action regarding

BNYM's FX trading business, government and private lawsuits, and their impact on BNYM's FX trading practices were disclosed to the market as set forth above. Accordingly, as a result of their purchases of BNYM's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss and damages.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

154. At all relevant times, the market for BNYM's securities was efficient for the following reasons, among others:

a. The Company's securities were actively traded on the New York Stock Exchange, a highly efficient market;

b. BNYM common stock traded at a significant daily trading volume;

c. As a regulated issuer, BNYM filed periodic public reports with the SEC;

d. BNYM was followed by numerous securities analysts, who issued a significant number of reports on BNYM during the Class Period;

e. BNYM was eligible to (and did) register securities using Form S-3; and

f. BNYM communicated with investors via established market communication mechanisms, including the regular issuance of press releases through the Business Wire news service, and conference calls with analysts and investors.

155. As a result, the market for BNYM's securities promptly digested current information with respect to BNYM from all publicly available sources and reflected such information in the price of those securities. Accordingly, purchasers of BNYM's publicly traded securities during the Class Period suffered similar injury through their purchases of such securities at artificially inflated prices, and a presumption of reliance applies.

## EXCHANGE ACT COUNTS

## COUNT ONE

### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Against BNYM and the Officer Defendants

156.    Plaintiffs reallege every allegation set forth above as if fully set forth herein.

157.    During the Class Period, BNYM and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase BNYM common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

158.    BNYM and the Officer Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for BNYM common stock in violation of § 10(b) and Rule 10b-5.

159.    BNYM and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in a continuous course of conduct to conceal adverse material information about BNYM's unlawful FX trading scheme, financial well-being and prospects, as specified herein. These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

160.     As a direct and proximate result of BNYM and the Officer Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases or acquisitions of BNYM common stock during the Class Period.

**COUNT TWO**

**Violation of § 20(a) of the Exchange Act**
**Against the Officer Defendants**

161.     Plaintiffs reallege every allegation set forth above as if fully set forth herein.

162.     The Officer Defendants acted as controlling persons of BNYM within the meaning of §20(a) of the Securities Act.  By virtue of their high level positions, participation in, awareness of, direct control of and/or supervisory involvement in BNYM's day-to-day operations during the Class Period, the Officer Defendants had the power to, and did, control and influence the decision-making of the Company and the conduct of BNYM's business, including the content and dissemination of the statements that Plaintiffs allege to be materially false and misleading.  Moreover, the Officer Defendants had a duty to disseminate accurate and truthful information regarding BNYM's operations and financial performance and to correct any previously issued statements that had become untrue so that the market price of BNYM's securities would be based upon truthful and accurate information.

163.     BNYM and the Officer Defendants participated in writing or reviewing BNYM's statements, reports, press releases and SEC filings alleged herein to be misleading prior to and/or shortly after they were issued and thus had the ability and opportunity to prevent their issuance or cause them to be corrected, and thereby culpably participated in the fraud alleged herein.

164.     As a direct and proximate cause of BNYM's and the Officer Defendants wrongful conduct as set forth in this Count, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of BNYM securities during the Class Period.

## SECURITIES ACT COUNTS

165.    In Counts Three through Five below (the "Securities Act Claims"), Plaintiffs assert strict liability and negligence claims based on §§ 11, 12(a)(2), and 15 of the Securities Act. Plaintiffs explicitly disclaim any allegations of fraud, scienter or recklessness with respect to these Counts as the claims asserted therein are not based on any allegations of knowing or reckless misconduct on behalf of any Defendants, and do not allege or sound in fraud.

166.    The Securities Act claims arise out of (a) BNYM's $1.347 billion secondary public offering of roughly 48.3 million shares of common stock at a price of $28.75 per share (the "May 2009 Offering"), and (b) its $679 million secondary public offering of roughly 26 million shares of common stock at a price of $27.00 per share (the "June 2010 Offering"). Both Offerings were conducted pursuant to a shelf registration statement that was filed with the SEC on Form S-3 on July 2, 2007 (the "Shelf Registration Statement").

167.    On or about May 11, 2009, BNYM conducted the May 2009 Offering pursuant to the Shelf Registration Statement which incorporated a Prospectus and Prospectus Supplement (the "May 2009 Offering Materials"). The May 2009 Offering Materials incorporated by reference: (i) BNYM's 2008 Form 10-K (filed with the SEC on February 27, 2009 and discussed at ¶¶88, 90); and (ii) BNYM's form 10-Q for the first quarter of 2009 (filed with the SEC May 8, 2009 and discussed at ¶¶88, 90). The documents incorporated by reference into the May 2009 Offering Materials were materially false and misleading as of the effective date of the May 2009 Offering because they failed to disclose that (1) BNYM manipulated Indirect/SI FX trades to extract illicit profits from its custodial clients; (2) BNYM engaged in unlawful practices to artificially increase its Indirect FX fee revenue; (3) the materials presented a misleading picture of BNYM's business model and its dependence on its undisclosed Indirect/SI FX fee revenue practices; (4) BNYM withheld full transparency and adequate disclosure from its clients, and that

the withholding of such transparency and adequate disclosure was critical to maintaining the profitability of its FX program; (5) BNYM's fraudulent FX operations materially and artificially inflated BNYM's reported financial results; and (6) BNYM lacked adequate internal and financial controls over its FX operations to prevent its Indirect/SI customers from being defrauded. As a result, BNYM's May 2009 Offering Materials contained materially untrue statements and omitted material facts necessary to be stated therein at the time they became effective.

168. On or about June 3, 2010, BNYM conducted the June 2010 Offering pursuant to the Shelf Registration Statement which incorporated a Prospectus and Prospectus Supplement (the "June 2010 Offering Materials"). The June 2010 Offering Materials incorporated by reference: (i) BNYM's 2009 Form 10-K (filed with the SEC on February 26, 2010 as amended on May 14, 2010, and discussed at ¶¶88, 90); and (ii) BNYM's Form 10-Q for the first quarter of 2010 (filed with the SEC on May 7, 2010 and discussed at ¶¶88, 90). Each of these documents that was incorporated by reference into the June 2010 Offering Materials was materially false and misleading as of the date of Offering because they failed to disclose that (1) BNYM manipulated Indirect/SI FX trades to extract illicit profits from its custodial clients; (2) BNYM engaged in unlawful practices to artificially increase its Indirect FX fee revenue; (3) the materials presented a misleading picture of BNYM's business model and its dependence on its undisclosed Indirect/SI FX fee revenue; (4) BNY withheld full transparency and adequate disclosure from its clients, and that the withholding of such transparency and adequate disclosure was critical to maintaining the profitability of its FX program; (5) BNYM's fraudulent FX practices materially and artificially inflated BNYM's reported financial results; and (6) BNYM lacked adequate internal and financial controls over its FX operations to prevent its Indirect/SI customers from

being defrauded. As a result, BNYM's June 2010 Offering Materials contained untrue statements and omitted material facts necessary to be stated therein at the time they became effective.

**COUNT THREE**

**Violations of § 11 of the Securities Act**
**Against BNY, Defendants Kelly, Gibbons, Park,**
**the Director Defendants and the Underwriter Defendants**

169. Plaintiffs reallege every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.

170. This count is based on Defendants' negligence or, in the case of BNYM, its strict liability for making false and materially misleading statements in the Offering Materials. This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the Offering Materials are specifically excluded from this Count.

171. This claim is asserted by Plaintiffs on behalf of all persons who acquired shares of BNYM's common stock pursuant to or traceable to the May 2009 Offering or June 2010 Offering Materials. As referenced in ¶¶167-168 above, the May 2009 and June 2010 Offering Materials contained untrue statements and omissions of material fact concerning, *inter alia*, the Company's FX trading scheme, financial results and business prospects.

172. With respect to the May 2009 Offering Materials, this Claim is asserted against BNYM, Officer Defendants Kelly, Gibbons and Park and the Director Defendants (each of whom signed the May 2009 Offering Materials or were directors at the time of the 2009 Offering) and Underwriter Defendants Goldman Sachs, Morgan Stanley, Barclays, BNYM Capital, Citigroup, Merrill Lynch and UBS. With respect to the June 2010 Offering Materials, this Claim is asserted against BNY, Officer Defendants Kelly, Gibbons and Park, the Director

Defendants (each of whom signed the June 2010 Offering Materials or were directors at the time of the 2010 Offering), and underwriters Goldman Sachs, Citigroup, Merrill Lynch and Morgan Stanley.

173.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

174.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Materials contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased or acquired the registered securities. As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of BNYM common stock sold through the Offerings.

175.    This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Materials and within 3 years of their respective effective dates.

176.    By reason of the foregoing, the Defendants named in this Count are liable under § 11 of the Securities Act to members of the Class who purchased or otherwise acquired the securities sold pursuant and/or traceable to the May 2009 and/or June 2010 Offering Materials.

## COUNT FOUR

**Violation of § 12(a)(2) of the Securities Act**
**Against BNYM and the Underwriter Defendants**

177. Plaintiffs reallege every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.

178. This count is based on Defendants' negligence or, in the case of BNYM, its strict liability for making false and materially misleading statements or omissions in the Offering Materials. This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the Offering Materials are excluded from this Count.

179. This claim is asserted by Plaintiffs on behalf of all persons who acquired shares of BNYM's common stock pursuant to the May 2009 Offering or June 2010 Offering Materials. As referenced in ¶¶167-168 above, the May 2009 and June 2010 Offering Materials contained untrue statements and omissions of material fact concerning, *inter alia*, the Company's FX trading scheme, financial results and business prospects.

180. BNYM and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the May 2009 and/or June 2010 Offering Materials. With respect to the May 2009 Offering, this Count is asserted against BNYM and Underwriter Defendants Goldman Sachs, Morgan Stanley, Barclays, BNYM Capital Markets, Citigroup, Merrill Lynch and UBS. With respect to the June 2010 Offering, this Count is asserted against BNYM and Underwriter Defendants Goldman Sachs, Citigroup, Merrill Lynch and Morgan Stanley.

181. By means of the Offering Materials (as well as instruments of transportation and communication in interstate commerce and the mails), Defendants named in this Count, through one or more public offerings, solicited and sold BNYM common stock to members of the Class.

182.     Class Members purchased BNYM stock pursuant to the materially untrue or misleading Offering Materials. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Materials contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased such securities.

183.     By reason of the foregoing, BNYM and the Underwriter Defendants are liable for violations of § 12(a)(2) to Plaintiffs and the other Class members who purchased securities sold in the respective Offerings pursuant to the respective Offering Materials.

184.     This action is brought within one year of the date when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based, and within three years of the date that the securities upon which this Count is brought were sold to the public.

185.     By reason of the foregoing, BNYM and the Underwriter Defendants are liable for violations of § 12(a)(2) to Class members who purchased securities sold pursuant to the May 2009 and/or June 2010 Offerings pursuant to the May 2009 and June 2010 Offering Materials. Such Class members also have the right to rescind and recover the consideration paid for such securities upon tender of their stock to BNYM and the Underwriter Defendants, and to recover rescissory damages to the extent they have already sold such securities.

## COUNT FIVE

### Violation of § 15 of the Securities Act
### Against Defendants Kelly, Gibbons, Park and the Director Defendants

186.     Plaintiffs reallege every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiffs or members of the Class. This Count does not sound in fraud,

and any allegations of knowing or reckless misrepresentations and/or omissions in the Offering Materials are specifically excluded from this Count.

187.    As set forth in Counts Three and Four above, BNYM is strictly liable under §§ 11 and 12(a)(2) for untrue statements and omissions of material fact in the Offering Materials

188.    Defendants Kelly, Gibbons, Park and the Director Defendants, by virtue of their positions and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of BNYM within the meaning of § 15 of the Securities Act. These Defendants also had the power and influence and exercised the same to cause BNYM to engage in the acts described herein, including the conduct of the Offerings pursuant to the Offering Materials. Each such Defendant served as an executive officer and/or director of BNYM prior to and/or at the time of the May 2009 and the June 2010 Offerings, respectively.

189.    By virtue of the conduct alleged herein, Defendants Kelly, Gibbons, Park and the Director Defendants are liable for the aforesaid wrongful conduct and are liable, to the same extent that BNYM is liable under Sections 11 and 12 (a)(2) of the Securities Act, to members of the Class who purchased BNYM common stock pursuant and/or traceable to the May 2009 and June 2010 Offering Materials.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages and equitable relief in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     As to the Claims alleged under the Securities Act, awarding rescission or recessionary measure of damages as appropriate; and

(e)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 11, 2012                           Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: _____

Steven B. Singer
William Fredericks
Laura H. Gundersheim
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
Email: Steven@blbglaw.com
        Wfredericks@blbglaw.com
        Laurag@blbglaw.com
        Abe.Alexander@blbglaw.com

*Lead Counsel for Lead Plaintiffs the State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund and the Oregon Public Employee Retirement Fund and the Class*

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
Keith Ketterling
Scott Shorr
Keil Mueller
209 Southwest Oak Street
Portland, OR 97204
Tel:    (503) 227-1600
Fax:    (503) 227-6840
Email: KKetterling@stollberne.com
        SShorr@stollberne.com
        KMueller@stollberne.com

*Special Assistant Attorneys General and*

*Additional Counsel for Lead Plaintiffs the State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund and the Oregon Public Employee Retirement Fund*

**SAXENA WHITE P.A.**
Joe White
2424 North Federal Highway
Boca Raton, FL 33431
Tel:    (561) 394-3399
Fax:    (561) 394-3382
Email: jwhite@saxenawhite.com

*Counsel to Additional Plaintiffs Pompano Beach General Employees Retirement System and Laborers' Local 235 Benefit Fund*