# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | **CIVIL ACTION NO.** |
| | MASTER FILE |
| BANK OF NEW YORK MELLON CORP. | 12 MD 2335 (LAK) |
| FOREX TRANSACTIONS LITIGATION | |
| | |
| This Document Relates to: 11-CV-09175 | |

**MEMORANDUM OF LAW IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
Max W. Berger
John C. Browne
Jeremy P. Robinson
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Counsel for Lead Plaintiff and
Lead Counsel for the Settlement Class*

Dated: September 15, 2015

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 4

I.   THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ........................ 4

    A.   The Settlement Was Reached After Extensive, Arm's-Length
    Negotiations Conducted Under The Auspices Of An Experienced
    Mediator ........................................................................................................ 5

    B.   Application Of The *Grinnell* Factors Supports Approval Of The
    Settlement As Substantively Fair, Reasonable And Adequate ............................ 8

        1.   The Complexity, Expense And Likely Duration Of The Litigation
        Support Approval Of The Settlement ........................................................ 8

        2.   The Reaction Of The Settlement Class To The Settlement ...................... 10

        3.   The Advanced Stage Of The Proceedings And The Extensive
        Discovery Completed Support Approval Of The Settlement ................... 11

        4.   The Risks Of Establishing Liability And Damages Support
        Approval Of The Settlement .................................................................... 12

            (a)   Risks To Proving Liability ............................................................ 13

            (b)   Risks To Proving Loss Causation And Damages ......................... 15

        5.   The Risks Of Maintaining The Class Action Through Trial Support
        Approval Of The Settlement .................................................................... 16

        6.   The Ability Of Defendants To Withstand A Greater Judgment ............... 17

        7.   The Range Of Reasonableness Of The Settlement Fund In Light Of
        The Best Possible Recovery And All The Attendant Risks Of
        Litigation Support Approval Of The Settlement ...................................... 18

II.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE
    APPROVED ...................................................................................................... 19

III.   THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED ......................... 21

IV.   NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF
    RULE 23 AND DUE PROCESS .......................................................................... 22

CONCLUSION ........................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Advanced Battery Techs. Inc. Sec. Litig.*,
    298 F.R.D. 171 (S.D.N.Y. 2014) ...................................................................................23

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
    293 F.R.D. 459 (S.D.N.Y. 2013) .....................................................................................5

*In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012).............................................................. *passim*

*In re Canadian Superior Sec. Litig.*,
    No. 09 Civ. 10087 (SAS), 2011 WL 5830110 (S.D.N.Y. Nov. 16, 2011) ............................18

*Chatelain v. Prudential-Bache Sec., Inc.*,
    805 F. Supp. 209 (S.D.N.Y. 1992) ...............................................................................17

*In re China Sunergy Sec. Litig.*,
    No. 07 Civ. 78595 (DAN), 2011 WL 1899715 (S.D.N.Y. May 13, 2011) ...........................18

*In re Citigroup Inc. Bond Litig.*,
    296 F.R.D. 147 (S.D.N.Y. 2013) .................................................................................5, 7

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448, 463 (2d Cir. 1974)................................................................8, 12, 16, 18

*City of Providence v. Aeropostale, Inc.*,
    No. 11 CIV. 7132 (CM), 2014 WL 1883494 (S.D.N.Y. May 9, 2014),
    *aff'd* 607 F. App'x 73 (2d Cir. 2015)...........................................................................8

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001).........................................................................................5, 17

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).....................................................................................................15

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974).....................................................................................................22

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
    No. 05 CIV 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ..............................23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02-CV-3400 (CM) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ........................ 10

*Frank v. Eastman Kodak Co.*,
    228 F.R.D. 174 (W.D.N.Y. 2005) ........................................................................................ 17

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ...................................................................................... 7, 20

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................................... 8, 11

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    No. 12-Civ-8557 (CM), 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ........................... 19, 20

*Hicks v. Stanley*,
    No. 01 CIV. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ............................. 19

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ............................................................................. 5, 17, 19, 20

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) ................................................................................. 19

*Louisiana Municipal Police Emps.' Ret. Sys. v. JPMorgan Chase & Co. et al.*,
    No. 12-cv-06659, 2013 WL 3357173 (S.D.N.Y. July 3, 2013) ........................................ 3, 13

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
    233 F.R.D. 306 (E.D.N.Y. 2006) .......................................................................................... 9

*In re Marsh & McLennan Cos. Sec. Litig.*,
    No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............................... 23

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ........................................................................................ 20

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    No. 02 MDL 1484 (JFK), 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) .................................. 19

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) .............................................................................................. 18

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ........................... 18, 20

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................................................ 15

*Shapiro v. JPMorgan Chase & Co.*,
    No. 11 Civ. 8331 (CM), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014)...............................7, 8

*Thompson v. Metro. Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003) ........................................................................................8

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05 MDL 01695 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) .............................10

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)................................................................................5, 7, 22

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982)...............................................................................................11

*In re World Trade Center Lower Manhattan Disaster Site Litig.*,
    No. 21 MC 102 (AKH), 2015 WL 3606032 (S.D.N.Y. June 9, 2015)....................................7

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)...................................................................................5

*Yang v. Focus Media Holding Ltd.*,
    No. 11 Civ. 9051 (CM), 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) .........................5, 7, 20

**STATUTES**

15 U.S.C. § 78u-4(a)(7) ........................................................................................................22

**OTHER AUTHORITIES**

Cornerstone Research, *Securities Class Action Settlements: 2014 Review and
    Analysis* (2015) .............................................................................................................19

Fed. R. Civ. P. 23 (c)(2)(B) .............................................................................................22, 23

Fed. R. Civ. P. 23 (e)(1).........................................................................................................22

Fed. R. Civ. P. 23 (e)(2).........................................................................................................5

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff, on behalf of itself and the Settlement Class, respectfully submits this memorandum of law in support of its motion for final approval of the proposed settlement (the "Settlement") of this Action, and for approval of the proposed plan of allocation (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Lead Plaintiff has agreed, subject to Court approval, to settle all claims in this Securities Action in exchange for a cash payment of $180 million, which has been deposited in an interest bearing escrow account. Lead Plaintiff respectfully submits that the proposed Settlement represents an excellent result for the Settlement Class and easily satisfies the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure.

As detailed in the accompanying Browne Declaration,[2] at the time the agreement to settle was reached, Lead Plaintiff and Lead Counsel had a thorough understanding of the strengths and weaknesses of Lead Plaintiff's claims and Defendants' defenses. Indeed, the Settlement was reached after an enormous litigation effort spanning three and a half years. During that time, Lead Plaintiff's many efforts included filing an amended complaint, overcoming motions to dismiss, obtaining, reviewing and analyzing nearly 30 million pages of documents, taking, defending or otherwise participating in 90 depositions, including 54 depositions of BNYM witnesses and 27 depositions of non-parties, serving detailed interrogatory responses setting forth hundreds of pages

---

[1] Unless otherwise indicated, all capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated June 23, 2015 (ECF No. 611-1) (the "Stipulation") or in the Declaration of John C. Browne in Support of: (A) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Browne Declaration" or "Browne Decl."), filed concurrently herewith. Citations to "¶ __" in this memorandum refer to paragraphs in the Browne Declaration.

[2] The Browne Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*, the history of the Action; the nature of the claims asserted; the negotiations leading to the Settlement; the risks and uncertainties of continued litigation; and the terms of the Plan of Allocation.

of evidence in support of Lead Plaintiff's claims, and doing significant work on preparing merits expert reports.

The Settlement was achieved only after a months-long mediation process conducted under the auspices of a highly-respected mediator, former United States District Judge Layn Phillips. These intense settlement negotiations – which took place as the parties were engaged in fact discovery and preparation of expert reports – involved the exchange of multiple mediation statements and other submissions, several in-person mediation sessions, and numerous communications between counsel for all parties and the mediator.  The Settlement was ultimately reached when both sides agreed to a final mediators' recommendation proffered by Judge Phillips.

Lead Plaintiff respectfully submits that the very substantial benefit the Settlement provides to Settlement Class members is particularly noteworthy in light of the complexity and risks of the Action.  As set forth in the Browne Declaration, this was an extremely large, complex and challenging case that was based upon allegations that BNYM had wrongfully overcharged its custody clients for standing instruction FX services.  Lead Plaintiff asserted violations of the securities laws on behalf of a class of investors in BNYM common stock based on the theory that, in light of the alleged FX scheme to overcharge its customers, BNYM misrepresented its reported revenues and FX services in public filings and on its corporate website.  Lead Plaintiff further alleged that investors were damaged when the truth about the Bank's FX pricing scheme began to come to light in 2011, causing the price of BNYM's common stock to decline.

As discussed in more detail below and in the Browne Declaration, while Lead Plaintiff believes that the Securities Action had substantial merit, the Settlement Class faced significant risks in establishing liability and damages.  For example, establishing the underlying standing instruction FX scheme, which was a necessary first step towards proving Lead Plaintiff's securities

2

claims, presented serious challenges and risks.  BNYM advanced a host of substantial arguments in defense of its FX pricing practices, including that the spreads it charged were permitted by the vast majority of the custodial contracts with its custody clients, and that the Bank's custody clients and their sophisticated investment managers were well aware of the Bank's pricing practices. Some of these arguments had been accepted by other courts in similar circumstances.  *See, e.g., Louisiana Municipal Police Emps.' Ret. Sys. v. JPMorgan Chase & Co.*, No. 12-cv-06659, 2013 WL 3357173 (S.D.N.Y. July 3, 2013).  Lead Plaintiff thus faced a highly atypical risk that BNYM's many defenses to the underlying alleged FX scheme would prove successful at, for example, summary judgment or trial.

To prevail in this Securities Action, Lead Plaintiff also had to establish the elements of securities fraud, including materiality, scienter, price impact and loss causation.  As discussed below, Lead Plaintiff faced significant risks in proving each of these elements, with loss causation posing a particular risk.  The declines in the price of BNYM common stock that followed each of the corrective disclosures alleged in the complaint were very small, ranging from $0.32 cents to just $0.98 cents per share, and Defendants argued forcefully that most of these declines were not statistically significant.  Defendants further argued that even for those few stock price declines that *were* statistically significant, Lead Plaintiff could not carry its burden of establishing loss causation because none of those disclosures revealed any new information concerning the alleged FX scheme.  These and other substantial arguments discussed below posed significant and unique risk in the Securities Action.

While Lead Plaintiff believes it has meritorious responses to each of Defendants' arguments, the proposed Settlement, if approved, will enable the Settlement Class to recover a very significant sum without incurring the risk that Defendants would prevail at summary

judgment, trial, or in subsequent appeals on any of their many defenses.  Indeed, the $180 million cash settlement represents a recovery of approximately 18% of the Class's estimated likely maximum recoverable damages of approximately $1 billion.  That such a significant settlement was achieved in a complicated and challenging case with unique risks strongly suggests that the Settlement is fair and reasonable.

Lead Plaintiff Oregon is an institutional investor of the type favored by Congress when passing the Private Securities Litigation Reform Act of 1995 ("PSLRA") and has closely monitored and participated in this litigation from the outset.  Lead Plaintiff has been closely involved in settlement negotiations, evaluated the proposed Settlement, and recommends that it be approved.  *See* Declaration of Frederick M. Boss, Deputy Attorney General for the State of Oregon, attached to the Browne Decl. as Exhibit 1, at ¶¶7-9.  Further evidence of the fairness of the settlement is provided by the accompanying declaration of the mediator, Judge Phillips, in which he states that he "strongly support[s] the approval of the Settlement in all respects," and believes that the Settlement "represents a recovery and outcome that is reasonable and fair for the Class and all parties involved."  Declaration of Layn R. Phillips, attached to the Browne Decl. as Exhibit 2, at ¶15.  Further, Lead Counsel, who has extensive experience in prosecuting securities class actions, strongly believes that the Settlement is in the best interests of the Class.  Browne Decl. ¶¶19-20.

In light of all of these considerations, Lead Plaintiff respectfully submits that the Settlement warrants final approval by the Court.

## ARGUMENT

## I.  THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement should be approved if the Court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2);

*see In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 154 (S.D.N.Y. 2013); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 293 F.R.D. 459, 464 (S.D.N.Y. 2013).   Public policy favors the settlement of disputed claims among private litigants, particularly in class actions.[3]

In ruling on final approval of a class settlement, the Court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms.   The Court may presume that a settlement negotiated at arm's-length by experienced counsel is fair and reasonable.

### A.   The Settlement Was Reached After Extensive, Arm's-Length Negotiations Conducted Under The Auspices Of An Experienced Mediator

The parties here negotiated the Settlement at arm's-length and under the auspices of former U.S. District Judge Layn Phillips, a highly respected mediator, which strongly supports a finding that the Settlement is fair and reasonable.[4]   The settlement negotiations in this case were long and arduous.   They involved senior attorneys from Securities Counsel, representatives from Lead Plaintiff, and multiple formal mediations sessions before Judge Phillips – all of which took place simultaneously with the last weeks of fact discovery and in the midst of other substantial litigation efforts.

---

[3] *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 188 (S.D.N.Y. 2012) ("we emphasize that [] there is a 'strong judicial policy in favor of settlements, particularly in the class action context'") (citation omitted); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 337 (S.D.N.Y. 2005) ("public policy favors settlement, especially in the case of class actions").

[4]   *See Yang v. Focus Media Holding Ltd.*, No. 11 Civ. 9051 (CM) (GWG), 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) (the participation of a highly qualified mediator in settlement negotiations "strongly supports [the] finding that negotiations were conducted at arm's length and without collusion"); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure").

The first mediation of this Securities Action took place before Judge Phillips in New York City on January 19 and 20, 2015 and was attended by representatives from Lead Counsel and Stoll Berne on behalf of the Securities Action (as well as representatives of the Customer Class Cases and the Government Actions).  Prior to this meditation, the parties submitted and exchanged detailed meditation statements with supporting exhibits and reply statements that directly addressed liability and damages in the Securities Action.  ¶¶181-182.  The mediation session did not end with a settlement in the Securities Action and the parties continued to engage in informal settlement discussions with the assistance of Judge Phillips.  ¶¶185-189.

On February 5, 2015, the Customer Class Cases and the Government Actions reached an agreement in principle to settle those litigations.  ¶¶131-132.  At that time, the Securities Action was not close to settlement and Lead Plaintiff continued to vigorously prosecute the case for the next three-plus months, taking additional depositions, moving for class certification, completing class certification expert discovery, serving voluminous responses to interrogatories, doing significant work preparing merits expert reports, and successfully moving to de-designate documents BNYM had marked as confidential.  ¶¶141-159.  In the midst of these efforts, Lead Plaintiff and Securities Counsel continued to engage in settlement negotiations both directly with Defendants and under the supervision of the mediator.  These further settlement efforts included participating in an additional formal mediation session held in New York City on March 4, 2015 before Judge Phillips, and preparing additional submissions to the mediator concerning the merits of Lead Plaintiff's claims and its ability to establish class wide damages under the securities laws. ¶¶185-187.  In early May, 2012, Judge Phillips ultimately made a mediator's recommendation that the parties agree to settle at $180 million.  ¶188.

On May 12, 2015, Lead Counsel and Defendants' counsel participated in a settlement conference before this Court.   ¶189.   Shortly thereafter, the parties accepted the mediator's recommendation and reached an agreement in principle to settle the Action.   The Parties memorialized their agreement to settle by executing a term sheet on May 21, 2015, and entered into the Stipulation on June 23, 2015.  ¶190.

The fact that the Settlement was reached after arm's-length negotiations between experienced counsel after substantial discovery and with the assistance of a well-respected mediator establishes the procedural fairness of the Settlement and gives rise to a presumption that the terms of the Settlement achieved are fair and reasonable.[5]

Finally, Lead Counsel fully supports the Settlement.   ¶¶19-20.   Where, as here, Lead Counsel is highly experienced in securities class action litigation and is well informed about the facts of this case, its recommendation is entitled to "great weight."  *Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 8331 (CM) (MHD), 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014); *see also Yang*, 2014 WL 4401280, at *5 ("great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation").

---

[5] *See Visa*, 396 F.3d at 116; *In re World Trade Center Lower Manhattan Disaster Site Litig.*, No. 21 MC 102 (AKH), 2015 WL 3606032, at *3 (S.D.N.Y. June 9, 2015) ("Once the proponent establishes that the settlement was reached as a result of a fair process, there is a presumption that the terms of the settlement are also fair and reasonable."); *Citigroup Bond*, 296 F.R.D. at 155 (finding that the "settlement negotiations were fair and free from collusion, and the presumption of fairness, adequacy, and reasonableness applies" where Judge Phillips, an "experienced, neutral third-party mediator," oversaw settlement negotiations "over a period of months, and the parties eventually agreed to the settlement terms recommended by this impartial mediator"); *In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in   "arm's length negotiations," including mediation before "retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases"); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011)  (the settlement was entitled to a presumption of fairness where it was the product of "arms-length negotiation" facilitated by Judge Phillips, "a respected mediator").

**B.      Application Of The *Grinnell* Factors Supports Approval Of
The Settlement As Substantively Fair, Reasonable And Adequate**

The Settlement is also substantively fair, reasonable, and adequate.  The standards

governing approval of class action settlements are well established in this Circuit.  In *City of

Detroit v. Grinnell Corp.*, the Second Circuit held that the following factors should be considered

in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of
> the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible recovery; [and]
> (9) the range of reasonableness of the settlement fund to a possible recovery in light
> of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger

v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  "In finding that a settlement is fair, not every

factor must weigh in favor of settlement, 'rather the court should consider the totality of these

factors in light of the particular circumstances.'"  *In re Global Crossing Sec. & ERISA Litig.*, 225

F.R.D. 436, 456 (S.D.N.Y. 2004) (quoting *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61

(S.D.N.Y. 2003)).

**1.      The Complexity, Expense And Likely Duration
Of The Litigation Support Approval Of The Settlement**

This factor examines "the probable costs, in both time and money, of continued litigation."

*City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 (CM) (GWG), 2014 WL 1883494, at

*5 (S.D.N.Y. May 9, 2014), *aff'd* 607 F. App'x 73 (2d Cir. 2015); *Shapiro*, 2014 WL 1224666, at

*8. Courts in this district have repeatedly recognized that securities class actions "readily lend

themselves to compromise because of the difficulties of proof, the uncertainties of the outcome,

and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

This litigation was extremely complex and presented numerous difficult issues.  It involved an enormous number of documents (¶¶3, 12, 261) and was centered on the allegation that BNYM had engaged in a scheme to overcharge its custody clients for standing instruction FX services (¶¶6, 23, 36).  The FX market is unregulated, non-transparent and consists of hundreds of thousands or even millions of daily exchanges between thousands of entities involving dozens of international currencies.  ¶¶11, 60.  BNYM provided standing instruction FX services to its clients through a wide variety of contractual arrangements, memorialized through custody agreements, master FX agreements, requests for proposals, FX procedure forms and in other ways that differed greatly across a wide range of custody clients located in different states (and other countries).  ¶60.

These complexities were compounded by the fact that BNYM defended itself in part by gathering evidence from hundreds of non-parties, many of whom used BNYM's standing instruction services in their capacity as investment managers for BNYM custody clients.  ¶¶12, 61.  BNYM raised purported evidence obtained from dozens of these non-parties in its opposition to class certification in the Securities Action, asserting that hundreds of non-parties had actual knowledge of BNYM's standing instruction FX pricing practices.  ¶¶139, 204.  This broad inquiry into the knowledge of non-parties introduced additional complexities and challenges into an already very complex litigation.

While the litigation had advanced to a late stage before the Settlement began, deposition discovery of merits experts had not yet begun and summary judgment motions had not been briefed.  If not for the Settlement, Lead Plaintiff's claims would have been vigorously contested by Defendants at later stages of the litigation and the parties would have expended significant

additional resources.  Just by way of example, on April 27, 2015, Defendants identified **ten** rebuttal merits experts who were going to testify on issues relating to the FX industry and BNYM's profits from standing instruction FX services, materiality, price impact, loss causation, accounting, market efficiency, the meaning of "best execution," and other topics.  ¶¶157, 209.

In the absence of Settlement, continued litigation of the Action would have required extensive expert testimony, a ruling on the competing class certification briefing, summary judgment motions, motions *in limine* and, eventually perhaps, a lengthy and complicated trial. Further, at any such trial, Lead Plaintiff would have had to prove, first, the existence of a widespread scheme targeted at BNYM's custody clients and, second, the existence of a securities fraud directed at BNYM's investors.  ¶¶8, 17-18, 200, 204-216.  It goes without saying that any recovery the Class may have been able to achieve at trial would be delayed for years – and there was no guarantee that the case would even get to trial or that, if it did, Lead Plaintiff would prevail. ¶¶200-217.

In contrast to costly, lengthy and uncertain litigation, the Settlement provides an immediate, significant and certain recovery of $180 million for members of the Settlement Class. Accordingly, this factor supports approval of the Settlement.

### 2.    The Reaction Of The Settlement Class To The Settlement

The reaction of the class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy.  *See, e.g., In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 266-67 (S.D.N.Y. 2012); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *16 (S.D.N.Y. Nov. 8, 2010); *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *7 (S.D.N.Y. Nov. 7, 2007).

The deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Allocation, or to request exclusion from the Settlement Class is September 29, 2015.  To date, 23 requests for exclusion and two objections to the Settlement, the Plan of Allocation or Lead Counsel's Fee and Expense Application have been received.  ¶223.  Lead Counsel believes the objections are each without merit.  However, as provided in the Notice Order, and rather than responding to the objections in a piecemeal fashion, Lead Counsel will file reply papers on October 13, 2015 that will address the requests for exclusion and any and all objections that are received.

### 3.     The Advanced Stage Of The Proceedings And The Extensive Discovery Completed Support Approval Of The Settlement

This factor examines whether Lead Plaintiff had a sufficient amount of information available regarding the claims and defenses in the litigation to ensure that it was able to properly evaluate the case and assess the adequacy of the settlement.  *See Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982); *Bear Stearns*, 909 F. Supp. 2d at 267 ("In considering this factor, the question is whether the parties had adequate information about their claims, such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement.") (internal quotation marks omitted); *Global Crossing*, 225 F.R.D. at 458 (this requirement "is intended to assure the Court 'that counsel for plaintiffs have weighed their position based on a full consideration of the possibilities facing them'") (citation omitted).

There is no question that this Securities Action had reached the point where Lead Plaintiff had a thorough understanding of the strengths and weaknesses of its claims and Defendants' defenses and could make intelligent, informed appraisals regarding the chances of success had this Action continued to be litigated.  *See, e.g.,* ¶¶16-19.

As noted above and in the Browne Declaration, this case was settled after three-and-a-half years of vigorous, hard-fought litigation, including extensive document and deposition discovery. With respect to the latter, Securities Counsel took lead in, prepared for or participated in 90 depositions.  ¶¶3, 13, 89-96, 173.  Deponents included current and former officers of BNYM, non-parties and Lead Plaintiff's representatives (including its market efficiency expert).  Notably, Lead Counsel took lead in the depositions of most of BNYM's most senior officers, including, among others, BNYM's former Chief Executive Officer, its current Chief Financial Officer, its former Chief Financial Officer, its current Controller, and a two day deposition of the former head of its FX division.  ¶¶13, 91, 182.  Lead Plaintiff then litigated through the conclusion of fact discovery and expert discovery relating to class certification, exchanged class certification briefs, and was on the verge of exchanging merits expert reports when the parties accepted the mediator's recommendation to settle.  ¶¶141-159.

Accordingly, based on the stage of the litigation and amount of information obtained, Lead Plaintiff and Securities Counsel respectfully submit that they had sufficient information to negotiate the terms of the Settlement, and that this factor therefore supports approval.  *See Bear Stearns,* 909 F. Supp. 2d at 267 (parties had requisite knowledge to "gauge the strengths and weaknesses of their claims and adequacy of settlement" where they "conducted extensive investigations, obtained and reviewed millions of pages of documents, and briefed and litigated a number of significant legal issues").

### 4.    The Risks Of Establishing Liability And <u>Damages Support Approval Of The Settlement</u>

In assessing the fairness, reasonableness and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages."  *Grinnell*, 495 F.2d at 463 (citations omitted).  While Lead Plaintiff prevailed at the motion to dismiss stage, it

faced significant obstacles to proving both liability and damages.  ¶¶191-217.  There existed a very real risk that had Lead Plaintiff engaged in additional litigation, including summary judgment, a trial and likely appeals, that the class could have received an amount less than the Settlement or no recovery at all.

(a)      <strong><u>Risks To Proving Liability</u></strong>

The Securities Action also faced a truly unique (and burdensome) risk to obtaining a meaningful recovery:  Lead Plaintiff had to first prove the underlying customer-oriented FX fraud, *i.e.,* that BNYM applied unauthorized markups to its customers' standing instruction FX trades. Only then would Lead Plaintiff be able to prove the elements of a securities fraud – *i.e.,* that BNYM made materially false and misleading statements about its FX revenues and services and did so with scienter.   Thus, Lead Plaintiff faced many challenges in developing the factual record necessary to support its claims.

To start, Defendants argued vehemently that they had done nothing improper in connection with their standing instruction FX services.  On the contrary, according to Defendants, BNYM was entitled to earn a spread in providing its standing instruction FX trading services to clients and none of its more than one-thousand custodial contracts prohibited it from doing so.  Defendants also asserted throughout the litigation (including after BNYM settled the Government and Customer Actions) that most members of the proposed Securities class knew or ought to have known how BNYM was pricing standing instruction FX trades – because the majority of them were also BNYM's custodial clients.  ¶¶61, 139, 204, 205.  In short, Defendants had substantial arguments in response to the alleged underlying FX customer fraud, and some of those arguments had been accepted by other courts in similar circumstances.  *See, e.g., Louisiana Municipal Police Emps.' Ret. Sys. v. JPMorgan Chase & Co.,,* 2013 WL 3357173 (S.D.N.Y. July 3, 2013).

Defendants also had a host of separate – but equally serious – defenses unique to securities fraud.  ¶¶206-216.  For example, Defendants argued that even if a few of BNYM's myriad custodial contracts did prohibit the Bank from charging a mark-up on standing instruction FX trades, the revenue generated from this unauthorized practice was immaterial.  In that regard, BNYM claimed that its yearly revenues of $13.9 billion and its multi-trillion dollar balance sheet literally dwarfed the purportedly unauthorized revenues, which amounted at most to a few hundred million dollars spread over multiple years.  Browne Decl. ¶206.  In this context, there was significant risk that Defendants could succeed in establishing that any improper inflation of revenue over the three-and-a-half year Class Period was *de minimis*, and immaterial as a matter of law.  *Id*.

Further, to establish Defendants' liability for securities fraud, Lead Plaintiff had to establish that Defendants acted with *scienter* – *i.e.*, that they intentionally or recklessly misled BNYM investors.  ¶207.  Notoriously difficult to establish in any case, the *scienter* requirement would have been especially difficult here, where Defendants could argue that there was absolutely no intent to mislead investors (as opposed to clients) and that any misstatements were made in good faith and were, at their worst, only negligently made.  *Id*.

Finally, in order to ultimately prevail in this securities class action, Lead Plaintiff had to establish the applicability of the "fraud on the market" theory of reliance, including by demonstrating "price impact" – *i.e.,* that the alleged misrepresentations on BNYM's website and elsewhere impacted the price of BNYM's common stock.  ¶208.  Defendants amassed significant evidence, and a near army of experts, in support of their argument that none of the alleged misstatements actually impacted the price of BNYM's common stock.  For example, BNYM argued vigorously that its statements concerning "best execution" had only been published on a

customer-facing webpage, which was not viewed by any investors or otherwise disseminated into the marketplace.  ¶¶136, 137, 208.

### (b)      Risks To Proving Loss Causation And Damages

Even if Lead Plaintiff could establish Defendants' liability for material misstatements made with *scienter*, it faced an even greater risk in establishing loss causation and damages on those claims.  ¶¶210-216.

In order to prove damages in the Securities Action, Lead Plaintiff had to carry its burden of establishing "loss causation," *i.e.*, that BNYM's statements caused their alleged loss.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'").  Defendants would have argued that Lead Plaintiff could not establish that its losses were attributable to the revelation of the Bank's fraud and not the various other factors that affect a company's stock price.  Indeed, "[a] decline in stock price following a public announcement of 'bad news' does not, by itself, demonstrate loss causation." *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 282 (S.D.N.Y. 2012).

To meet this burden, Lead Plaintiff alleged in the Complaint that Defendants' fraudulent foreign exchange scheme was gradually revealed to the investing public through a series of partial allegedly corrective disclosures beginning in January 2011 when it was revealed that certain Virginia pension funds had filed a FX-related *qui tam* lawsuit against BNYM.  ¶212.  Lead Plaintiff alleged that over the next few months there were subsequent additional disclosures, including news reports discussing the alleged FX scheme and additional private lawsuits filed, with the truth finally being revealed to the market on October 4, 2011 upon the filing of the Government Actions.

Defendants had several powerful arguments against Lead Plaintiff's loss causation allegations.  ¶¶213-216.  *First*, Defendants would have pointed to the fact that the declines in the

price of BNYM common stock that followed each alleged corrective disclosure were small – less than $1 with nearly half of the declines under $0.50 – and would have argued that each decline was actually caused by reasons unrelated to the alleged FX fraud.  ¶213.  *Second*, Defendants would have argued that many of the alleged "corrective" disclosure dates did not involve stock price declines that were statistically significant in light of broader market movements and the historical patterns of BNYM common stock.  *Id*.

 *Third,* Defendants would have contended that with respect to corrective disclosure dates that *did* involve statistically significant price declines, none of them involved the revelation of any new information concerning the alleged FX fraud.  ¶214.  Defendants argued that allegations that the Bank was defrauding its custodial clients emerged on January 28, 2011 (when the Virginia lawsuit was revealed) caused no statistically significant decline in BNYM's stock price, and the remaining "corrective" disclosures essentially repeated the same or similar information without adding any new details concerning the alleged FX fraud and therefore could not be used as a basis to establish loss causation.  ¶¶214-215.

If Defendants had succeeded on their loss causation arguments, Lead Plaintiffs would have been unable to establish any damages, and the Class would have recovered nothing, even if Lead Plaintiff had established liability.  For all these reasons, this factor weighs heavily in favor of approving the Settlement.

### 5.    The Risks Of Maintaining The Class Action Through Trial Support Approval Of The Settlement

The risks of maintaining the Action as a class action through trial should also be considered in evaluating a proposed settlement.  *See Grinnell*, 495 F.2d at 463.  Here, the parties had filed competing class certification briefs but no decision had been issued at the time the Settlement was reached.  While Lead Plaintiff believes that the class would ultimately have been certified and that

the claims in this case would continue to be found appropriate for class treatment through trial, Defendants had vigorously opposed the certification of a litigated class on numerous grounds.

Defendants contended that the Action was inappropriate for class treatment because: (i) questions about individual class members' knowledge of BNYM's FX pricing practices would predominate over class-wide issues; (ii) Oregon's alleged knowledge concerning these pricing practices made it an atypical or inadequate class representative; (iii) Lead Plaintiff had failed to establish a class-wide damages methodology; and (iv) no presumption of reliance was applicable because Lead Plaintiff could not establish the "price impact" of the alleged misrepresentations on the price of BNYM stock.  ¶150.

Defendants might have prevailed on one or more of these arguments, resulting in non-certification of the class or certification of a smaller class.  Thus, this factor also supports approval of the Settlement.  *See Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (noting that "[w]hile plaintiffs might indeed prevail [on a motion for class certification], the risk that the case might be not certified is not illusory"); *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification.").

### 6.    The Ability Of Defendants To Withstand A Greater Judgment

Lead Plaintiff believes that BNYM has the ability to pay a judgment in excess of the $180 million Settlement Amount.  However, "defendants' ability to withstand a higher judgment . . . standing alone, does not suggest that the settlement is unfair." *D'Amato*, 236 F.3d at 86.  A "defendant is not required to 'empty its coffers' before a settlement can be found adequate." *IMAX*, 283 F.R.D. at 191 (citation omitted).

      **7.**     **The Range Of Reasonableness Of The Settlement Fund**
                   **In Light Of The Best Possible Recovery And All The Attendant**
                   <u>**Risks Of Litigation Support Approval Of The Settlement**</u>

The last two substantive factors that courts consider are the range of reasonableness of the settlement fund in light of: (i) the best possible recovery; and (ii) litigation risks.  In analyzing these factors, the issue for the Court is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case.  The court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462 (citations omitted).  Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997) (citation and internal quotations omitted), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  Instead, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972) (Friendly, J.).

Lead Plaintiff submits that the Settlement is well within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation.  Lead Plaintiff's damage expert estimated that the Class's reasonably recoverable maximum damages at trial would likely be approximately $1 billion.  ¶214.  The $180 million Settlement represents a recovery of 18% of this estimated likely maximum recovery (¶243), a percentage that compares very favorably with other securities fraud class actions. *See, e.g., In re Canadian Superior Sec. Litig.,* No. 09 Civ. 10087 (SAS), 2011 WL 5830110, at *2 (S.D.N.Y. Nov. 16, 2011) (approving a settlement representing 8.5% of maximum damages, which the court noted "exceeds the average recovery in shareholder litigation"); *In re China Sunergy Sec. Litig.*, No. 07 Civ. 78595 (DAN), 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) ("the average settlement amounts in securities fraud class

actions where investors sustained losses over the past decade . . . have ranged from 3% to 7% of the class members' estimated losses") (internal quotation marks omitted); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (a recovery of approximately 6.25% was "at the higher end of the range of reasonableness of recovery in class action[] securities litigations"); *Hicks v. Stanley*, No. 01 CIV. 10071 (RJH), 2005 WL 2757792, at *7 (S.D.N.Y. Oct. 24, 2005) (a settlement representing 3.8% of plaintiffs' maximum damages estimate was "within the range of reasonableness for post-PSLRA securities class action settlements"); *see also* Cornerstone Research, *Securities Class Action Settlements: 2014 Review and Analysis*, at 8-9 (2015) (median securities action settlements as a percentage of "estimated damages" were 2.2% in 2014 and 2.7% from 2005 to 2013).

Moreover, given the substantial risks in the Securities Action, there was a significant chance that the Class would recover substantially less than that maximum or recover nothing at all after continued litigation. ¶¶200-216. Indeed, Lead Plaintiff and Securities Counsel might have obtained no recovery at all as a result of Defendants' loss causation arguments or liability defenses. In light of these risks, the Settlement provides a favorable outcome for the Settlement Class.

In sum, the *Grinnell* factors plainly support a finding that the Settlement is fair, reasonable and adequate.

## II.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable and adequate. *See IMAX*, 283 F.R.D. at 192; *Bear Stearns*, 909 F. Supp. 2d at 270. A plan of allocation is fair and reasonable as long as it has a "rational basis." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-Civ-8557 (CM), 2014 WL 7323417, at *10 (S.D.N.Y. Dec. 19, 2014); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009).

Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See Hi-Crush Partners*, 2014 WL 7323417, at *10; *IMAX*, 283 F.R.D. at 192. Plans of allocation, however, need not be tailored to fit each and every class member with "mathematical precision." *PaineWebber*, 171 F.R.D. at 133. In determining whether a plan of allocation is fair and reasonable, courts give weight to the opinion of experienced counsel. *See Yang*, 2014 WL 4401280, at *9; *see also Giant Interactive*, 279 F.R.D. at 163 ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel") (citation omitted); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (same).

Here, the Plan of Allocation, which was developed by Lead Plaintiff's damages expert in consultation with Lead Counsel, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms. ¶¶224-230. Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of BNYM common stock during the Settlement Class Period that is listed in the Claim Form and for which adequate documentation is provided. ¶227.

The calculation of Recognized Loss Amounts will depend upon when the BNYM common stock was purchased and sold. In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price of the stock, whichever is less. ¶227. Claimants who did not hold their BNYM shares over one of the disclosure dates in the Plan of Allocation – that is, those who sold their shares before the first disclosure date or who purchased and then sold all their shares between two such disclosure dates – will have no Recognized Loss Amount as to those transactions under the Plan of Allocation

because the level of alleged artificial inflation would be the same on their date of purchase and date of sale.  *Id*.

The sum of a Claimant's Recognized Loss Amounts is the Claimant's "Recognized Claim." The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  ¶228.

Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.  ¶229.  Moreover, as noted above, as of September 11, 2015, more than 934,000 copies of the Notice, which contains the Plan of Allocation, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members and their nominees.  *See* Declaration of Stephanie A. Thurin ("Thurin Decl."), attached to the Browne Decl. as Exhibit 3, at ¶8.  To date, only one objection to the proposed Plan of Allocation has been received.  ¶230.  In order to avoid addressing objections in a piecemeal fashion, Lead Plaintiff will respond to this and any other objections in its October 13, 2015 reply papers.  ¶¶230.

## III.    THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

The Parties have stipulated to certification of the Settlement Class, for purposes of the Settlement.  The Settlement Class consists of:

> all persons and entities who or which purchased BNYM common stock during the period beginning on February 28, 2008 through and including October 4, 2011 (the "Settlement Class Period") and were damaged thereby.

Stipulation ¶ 1(vv).[6]

---

[6] Excluded from the Settlement Class are: (i) Defendants; (ii) BNYM's subsidiaries and affiliates in which BNYM has a majority ownership interest; (iii) any person who is, or was at any time during the Settlement Class Period, an Officer or director of BNYM; (iv) the members of the Immediate Family of each of the

In the July 23, 2015 Notice Order, the Court preliminarily certified the Settlement Class for settlement purposes only, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.  ECF No. 614 at 2-3.  Lead Plaintiff now requests that the Court finally certify the Settlement Class for purposes of the Settlement.  Nothing has changed to alter the propriety of certification for settlement purposes and certification of the Settlement Class is appropriate for all the reasons stated in Lead Plaintiff's earlier brief requesting certification of the Settlement Class and entry of the Notice Order (ECF No. 612 at 18-25), which are incorporated herein by reference.

## IV.     NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974).  The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable" – *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Visa*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.  ¶¶218-223.  The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15

---

Individual Defendants or of any other person who is, or was at any time during the Settlement Class Period, an Officer or director of BNYM; (v) the Former Underwriter Defendants and their respective Officers and directors at any time during the Settlement Class Period or currently; (vi) the members of the Immediate Families of each person who is, or was at any time during the Settlement Class Period, an Officer or director of any of the Former Underwriter Defendants; and (vii) any entity in which any of the foregoing, at any time during the Settlement Class Period, held or as of May 21, 2015 held a majority interest; provided, however, that any Investment Vehicle shall not be deemed an excluded person by definition.  *See* Stipulation ¶ 1(vv)

22

U.S.C. § 78u-4(a)(7), including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of Settlement Class Members' right to opt-out of the Settlement Class or to object to the Settlement, the Plan of Allocation or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

As noted above, in accordance with the Court's Notice Order, beginning on July 29, 2015 through September 11, 2015, the Claims Administrator has mailed 934,632 copies of the Notice Packet (consisting of the Notice and the Claim Form) to potential members of the Settlement Class and nominees by first-class mail. *See* Thurin Decl. ¶¶3-8; Browne Decl. ¶220.  In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire* on August 11, 2015.   Thurin Decl. ¶9.  Copies of the Notice, Claim Form, and Stipulation were also made available on the Settlement website maintained by Epiq beginning on July 29, 2015, and copies of the Notice and Claim Form were made available on Lead Counsel's website.  *See* Thurin Decl. ¶14; Browne Decl. ¶222.  This combination of individual first-class mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, transmitted over a newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g., In re Advanced Battery Techs. Inc. Sec. Litig.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014); *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *12-*13 (S.D.N.Y. Dec. 23, 2009); *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 CIV 10240 (CM), 2007 WL 2230177, at *6 n.1 (S.D.N.Y. July 27, 2007).

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement as fair, reasonable and adequate and approve the Plan of Allocation as fair, reasonable and adequate.

Dated:  September 15, 2015

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Max W. Berger
John C. Browne
Jeremy P. Robinson
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444

*Counsel for Lead Plaintiff Oregon and*
*Lead Counsel for the Settlement Class*

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
Keith Ketterling
Keith Dubanevich
Scott Shorr
Keil Mueller
209 Southwest Oak Street
Portland, Oregon 97204

*Special Assistant Attorneys General and*
*Additional Counsel for Lead Plaintiff Oregon*