UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

BANK OF NEW YORK MELLON CORP.
FOREX TRANSACTIONS LITIGATION

This Document Relates to: 11-cv-9175 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MASTER FILE
12 MD 2335 (LAK)


## MEMORANDUM OPINION ON MOTION FOR ATTORNEYS' FEES


Appearances:

Max W. Berger
John C. Browne
Jeremy P. Robinson
BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
*Attorneys for Lead Plaintiffs*[1]


LEWIS A. KAPLAN, *District Judge.*

In early 2011, following the unsealing of certain *qui tam* lawsuits,[2] allegations

emerged that Bank of New York Mellon ("BNYM") had overcharged certain of its custodial clients

for foreign exchange services for over a decade.  Several lawsuits followed, including, *inter alia*,

customer class actions,[3] ERISA class actions,[4] cases brought by the Department of Justice[5] and the

---

[1]

  As typically occurs in common fund attorneys' fee applications, defendants have taken no
  position here and therefore are not listed.

[2]

  *Commonwealth of Va., ex rel. FX Analytics v. The Bank of N.Y. Mellon Corp.*, No.
  CL-2009-15377 (Va. Cir. unsealed Jan. 21, 2011); *State of Fla., ex rel. FX Analytics v. The
  Bank of N.Y. Mellon Corp.*, No. 2009-ca-4140 (Fla. Cir. unsealed Feb. 7, 2011).

[3]

  *Se. Pa. Transp. Auth. v. The Bank of N.Y. Mellon Corp.*, 12-cv-3066; *Int'l Union of
  Operating Eng'rs, Stationary Eng'rs Local 39 Pension Trust Fund v. The Bank of N.Y.
  Mellon Corp.*, 12-cv-3067; *Ohio Police & Fire Pension Fund v. The Bank of N.Y. Mellon*

2

New York Attorney General,[6] false claims cases brought by certain California governmental subdivisions,[7] and a securities class action brought on behalf of investors in BNYM common stock.[8] The matter is before the Court on the motion of lead counsel in the securities class action, which recently settled for $180 million,[9] for an award of $45 million for attorneys' fees as well as reimbursement of approximately $1.6 million of litigation expenses.[10]

*Background*

On March 29, 2012, the Court appointed as co-lead plaintiffs: (1) the State of Oregon, by and through the Oregon State Treasurer on behalf of the Common School Fund, and (2) the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement

---

*Corp.*, 12-cv-3470.

[4] *Carver v. The Bank of N.Y. Mellon*, 12-cv-9248; *Fletcher v. The Bank of N.Y. Mellon*, 14-cv-5496.

[5] *United States v. The Bank of N.Y. Mellon Corp.*, 11-cv-6969.

[6] *The People of the State of N.Y. ex rel. Schneiderman v. The Bank of N.Y. Mellon Corp.*, No. 114735/2009 (N.Y. Sup. Ct. N.Y. Cnty.).

[7] *L.A. Cnty. Emp. Ret. Ass'n ex rel. FX Analytics v. The Bank of N.Y. Mellon Corp.*, 12-cv-8990; *In re Bank of N.Y. Mellon Corp. False Claims Act Foreign Exch. Litig.*, 12-cv-3064.

[8] *La. Mun. Police Emps.' Ret. Sys. v. The Bank of N.Y. Mellon Corp.*, 11-cv-9175.

[9] DI 266-1; DI 281.  (References to "DI" are taken from the docket sheet in 11-cv-9175.)

[10] DI 275 at 1.

Fund (collectively, "Oregon").[11]   The Private Securities Litigation Reform Act ("PSLRA") certification that accompanied Oregon's motion for lead plaintiff was signed by the chief of staff of the Oregon State Treasurer.[12]   The Court approved also Oregon's selection of Bernstein Litowitz Berger & Grossman LLP ("BLBG") as lead counsel.[13]   Although BLBG was the only firm appointed lead counsel under the PSLRA, Oregon was represented also throughout this litigation by Stoll Stoll Berne Lokting & Shlachter, P.C. ("Stoll Berne").   Additional named plaintiffs who asserted claims under the 1933 Act were represented by Saxena White LLP ("Saxena White") (collectively, "securities counsel").[14]

As noted, lead counsel now move (on behalf of securities counsel) for an award of $45 million in attorneys' fees and reimbursement of $1,616,575.69 in litigation expenses.[15]   The application rests on reported expenditure of 118,867 hours on this litigation at a blended hourly rate of $394 – in other words, on a "lodestar" of $46.8 million.   Thus, they seek a multiplier of 0.96 and fees which, if granted, would amount to 25 percent of the aggregate class recovery.[16]

---

[11]   DI 39.

[12]   DI 19-1.

[13]   DI 39.

BLBG was also one of three firms appointed to the Plaintiffs' Executive Committee in the *Bank of New York Mellon* multidistrict litigation.   DI 103.

[14]   DI 276 at ¶ 3 n.1.   The claims brought by Saxena White's clients, Pompano Beach General Employees Retirement System and Laborers' Local 235 Benefit Fund, were voluntarily dismissed with prejudice on March 23, 2015.   DI 256.

[15]   DI 275 at 1.

[16]   *See* DI 276 at ¶ 234; DI 275 at 5.

4

The application is supported also by a declaration of Frederick M. Boss, Deputy Attorney General for the State of Oregon, stating both that (1) Oregon had negotiated fee agreements with BLBG and Stoll Berne "prior to retaining those firms" that permitted a fee award up to 25 percent of any settlement fund, and (2) "Oregon fully supports Lead Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses."[17]

The Court heard argument on the motion for attorneys' fees on October 20, 2015 and received a post-argument submission.[18]

*Discussion*

Courts in this circuit have broad discretion in evaluating the reasonableness of proposed attorneys' fees drawn from a common fund. They may rely on either the "percentage of the fund" or the "lodestar" method.[19]

This Court long has favored the lodestar approach[20] in which a court "scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate" to determine the lodestar.[21] The Court then, in its discretion,

---

[17]     DI 276-1 at ¶¶ 10-11.

[18]     DI 282.

[19]     *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010).

[20]     *E.g.*, *Freedman v. Weatherford Int'l Ltd.*, No. 12-cv-2121 (LAK), 2015 WL 7454142, at *1 (S.D.N.Y. Nov. 23, 2015); *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517, 527-28 (S.D.N.Y. 2015); *In re Weatherford Int'l Sec. Litig.*, No. 11-cv-1646 (LAK), 2015 WL 127847, at *2 (S.D.N.Y. Jan. 5, 2015).

[21]     *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

may adjust the lodestar "by applying a multiplier" based on factors such as "the risk of the litigation and the performance of the attorneys"—that is, the six case-specific factors enumerated by the Second Circuit in *Goldberger*.[22]  In cases to which the PSLRA applies, however, there are additional considerations – considerations that explain the Oregon submissions.

In *In re Cendant Corp. Litigation*,[23] the Third Circuit stated that "courts [in cases subject to the PSLRA] should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel."[24]  Indeed, it held "that the presumption may be rebutted by a prima facie showing that the (properly submitted) retained agreement fee is clearly excessive" or by a substantial change in circumstances "that could not reasonably have been foreseen at the time of the original agreement."[25]  Accordingly, the submission of the Oregon materials in support of the fee agreement and application certainly is understandable notwithstanding that (1) the Third Circuit has backed away somewhat from the language in *Cendant*,[26] (2) *Cendant* has not been adopted, at

---

[22]     The six factors are:  "'(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'" *Id.* at 50 (alteration omitted) (quoting *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989)).

[23]     264 F.3d 201 (3d Cir. 2001).

[24]     *Id.* at 282.

[25]     *Id.* at 282-83.

[26]     *See In re AT&T Corp.*, 455 F.3d 160, 168-69 (3d Cir. 2006) (cautioning district courts "against affording the presumption [of reasonableness] too much weight at the expense of the court's duty to act as 'a fiduciary guarding the rights of absent class members'"); *see also In re Schering-Plough Corp. Enhance Sec. Litig.*, Nos. 08-cv-397 (DMC) (JAD), 08-

least explicitly, by the Second Circuit, which has "found nothing indicating a congressional intent

for courts to consider the fees agreed upon by PSLRA lead plaintiffs as presumptively reasonable"[27]

and ultimately has "le[ft] open the question of how much weight should be given to fees agreed

upon by PSLRA lead plaintiffs,"[28] and (3) lead counsel during oral argument abandoned its reliance

on the *Cendant* presumption.  They instead took the position that the existence of its *ex ante* fee

agreement with Oregon (and its endorsement of lead counsel's current fee application) are merely

relevant factors the Court should consider when determining the reasonableness of a fee request.[29]

But the question of the weight to be given the *ex ante* fee arrangement between Oregon and lead

counsel and Oregon's present support of the fee application remains – and it arises in circumstances

that warrant some attention.

　　　　*Cendant*'s conclusion with respect to the significance of *ex ante* fee agreements was

not uncritical.  That case and its progeny warned of pay-to-play arrangements – arrangements

"where a law firm makes campaign contributions to elected officials who control governmental

pension funds and is selected as the fund's lead counsel."[30]  Such arrangements suggest a conflict

---

cv-2177 (DMC) (JAD), 2013 WL 5505744, at* 22 (D.N.J. Oct. 1, 2013) ("Third Circuit jurisprudence appears to have diluted the weight to be accorded the *Cendant* presumption.").

27　　*In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (per curiam).

28　　*Id.*

29　　*See* DI 282 at 1-2.

30　　*In re AT&T*, 455 F.3d at 168; *accord In re Cendant*, 264 F.3d at 270 n.49 ("The concern is that an informal quid pro quo could develop in which law firms specializing in securities class actions would contribute to the campaign coffers of the elected officials who oversee those funds, and that, in exchange (and in the hopes of getting more contributions), those officials would use their control over the funds to select those firms to serve as lead counsel

of interest on the part of a lead plaintiff between an official's interest in campaign contributions and its fiduciary duty to the class.  Such a conflict could undermine the perhaps otherwise appropriate assumption that a lead plaintiff acts solely in the interests of the class in retaining and supporting fee applications by its chosen lead counsel.[31]  Moreover, even the appearance of such arrangements

---

for cases in which the funds are the lead plaintiff.")

[31]  The problem of pay-to-play arrangements between lead counsel and persons controlling public pension funds in securities class action lawsuits has been addressed by several scholars, journalists, and jurists.  *See, e.g.*, Stephen J. Choi, et al., *The Price of Pay to Play in Securities Class Actions*, 8 J. EMPIRICAL LEGAL STUD. 650, 678 (December 2011) (concluding that "[t]he evidence presented here shows that the hard bargaining by state pension funds [for lower attorneys' fees] largely disappears when decisionmakers for those funds receive political contributions—particularly when those contributions are large"); John C. Coffee, Jr., *Accountability and Competition in Securities Class Actions:  Why "Exit" Works Better than Voice*, 30 CARDOZO L. REV. 407, 422 (2008) (explaining that "the common practice for the larger plaintiffs' firms to entertain the officials of public pension funds (often lavishly) and to make political contributions to the elected public officials who control the fund's decision" has entrenched large plaintiffs' firms and stifled market competition for class action counsel, to the detriment of class members); James D. Cox, et al., *Does the Plaintiff Matter? An Empirical Analysis of Lead Plaintiffs in Securities Class Actions*, 106 COLUM. L. REV. 1587, 1611-15 (2006) (describing the "odor of corruption" surrounding pay-to-play arrangements in securities class actions, and suggesting possible reforms, including (1) barring law firms that have made political contributions to governmental officials who can influence choice of counsel from representing government funds in securities cases, (2) placing counsel-selection decisions in the hands of nonpartisan boards rather than elected officials, and (3) requiring putative lead counsel to disclose to the Court any contributions made to officials associated with an institutional investor vying for lead plaintiff so the Court can consider the information in selecting lead counsel); John C. Coffee, Jr., *The Attorney as Gatekeeper:  An Agenda for the SEC*, 103 COLUM. L. REV. 1293, 1315 n.61 (2003) (considering whether the SEC should adopt a rule barring firms that make political contributions to elected officials with control over public pension funds from representing those pension funds for a certain number of years); Mark Maremont, et al., *Trial Lawyers Contribute, Shareholder Suits Follow*, WALL STREET JOURNAL, Feb. 3, 2010, *a       v       a       i       l       a       b       l       e       a       t* http://www.wsj.com/articles/SB10001424052748703837004575013633550087098 (explaining that "25 leading firms, their lawyers and family members contributed a total of more than $21 million in the past decade to state-level candidates and party funds, as well as to national-party groups that work to elect state officials" and that "[l]ess than 40% went to candidates within the law firms' home states").

8

threatens to sap the legitimacy of the selection and compensation of lead counsel in PSLRA cases.[32]

   This case raises concerns.  Both BLBG and Stoll Berne made multiple contributions – as firms – to the campaigns of current or recent Oregon state treasurers and attorneys general. Most recently, BLBG, a New York based firm with no office closer to Oregon than San Diego, California, donated $2,000 to the reelection campaign of the current Oregon attorney general on August 16, 2015,[33] less than one month before Oregon's deputy attorney general submitted his declaration to this Court stating that Oregon "fully supports" BLBG's motion for attorneys' fees.

   The Court recognizes that Stoll Berne's main office is in Oregon.  Some of the contributions appear to have been relatively modest and, in some instances, were made some time ago.[34]  Both BLBG and Stoll Berne assert that there was no ulterior motive for their campaign

---

[32]  Courts long have recognized the importance of curbing even the appearance of impropriety in cases involving dealings between political donors and government officials with whom they do business.  *See, e.g.*, *Ognibene v. Parkes*, 671 F.3d 174, 187 (2d Cir. 2011) (upholding certain New York City laws limiting campaign contributions from donors that had business dealings with the city, and recognizing that "[s]ince neither candidate nor contributor is likely to announce a *quid pro quo*, the appearance of corruption has always been an accepted justification for a campaign contribution limitations"); *Yamada v. Weaver*, 872 F. Supp. 2d 1023, 1063 (D. Haw. 2012) (upholding Hawaii's ban on direct campaign contributions from government contractors because it functions "to alleviate even the appearance of a connection (a *quid pro quo*) between a government contractor and a candidate for public office"), *aff'd sub nom.*, *Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015) ("Hawaii's government contractor contribution ban serves sufficiently important governmental interests by combating both actual and the appearance of quid pro quo corruption.").

[33]  DI 282-2 Attachment 1.

[34]  Since 2008, BLBG, as a firm, made only the $2,000 contribution described above and a $10,000 contribution to the campaign of a former Oregon treasurer, who died nearly two years before BLBG was retained by then putative-lead plaintiff Oregon.  Stoll Berne, as a firm, also donated $5,000 to the same campaign and $7,000 to the campaign of a former attorney general, all in 2008.  DI 282 at 2-3.  Certain individuals from these firms donated to these campaigns as well.  *Id.*

contributions.[35]  Deputy Attorney General Boss, moreover, asserts that he – not an elected official – "was the individual who selected Stoll Berne and BLBG to represent Oregon in this case" and that "[n]either [his] selection of counsel in this case nor [his] execution of the fee agreement was impacted in any way by any campaign contributions that may have been made to any elected official by either BLBG or Stoll Berne."[36]

There is no evidence before the Court that draws these assertions into question.  Nor do defendants have any incentive to quarrel with the proposed fee, as they have no economic interest in how the $180 million settlement is divided among the class and the lawyers.[37]  In the last analysis, however, it is unnecessary to decide what might be warranted in comparable circumstances if the question whether to approve the fee request were a close call or depended in any material way on the existence of the fee agreement and/or the endorsement of the lead plaintiff.

In this case, the Court is entirely satisfied that the *Goldberger* factors support the proposed award without regard to the fee agreements or Oregon's position.  There is no reason to question the hours devoted by the lawyers to this very hard fought case.  The blended hourly rate is reasonable.  The multiplier is appropriate.[38]  All things (save the fee agreements and the position of the lead plaintiffs) considered, the Court concludes that the requested fee is reasonable and that

---

[35]  *See* DI 282.

[36]  DI 282-1 at ¶¶ 2, 8.

[37]  *See Goldberger*, 209 F.3d at 52 ("Defendants, once the settlement amount has been agreed to, have little interest in how it is distributed and thus no incentive to oppose the fee."); *In re IndyMac*, 94 F. Supp. 3d at 522 (quoting *In re Weatherford*, 2015 WL 127847, at *1)).

[38]  The requested fee is also the highest permitted by counsels' *ex ante* fee agreements.

the expenses should be reimbursed.  The Court notes only that it might have been preferable if

lawyers had acted differently in dealing with these public officials and candidates for these public

offices.

*Conclusion*

For the foregoing reasons, the motion to approve the requested attorneys' fees and

expenses [12 MD 2335 DI 631, 11-cv-9175 DI 274] is granted.   A separate order embodying this

ruling will enter.

SO ORDERED.

Dated:        December 4, 2015

_____

Lewis A. Kaplan
United States District Judge